2016-2056

In The
# United States Court Of Appeals
# For The Federal Circuit

## AAT BIOQUEST, INC.,

*Plaintiff-Appellee,*

v.

## TEXAS FLUORESCENCE LABORATORIES, INC.,

*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 4:14-CV-03909-DMR
DONNA M. RYU, MAGISTRATE JUDGE

————————

## CORRECTED BRIEF OF APPELLANT

————————

**Rick B. Yeager**
RICK B YEAGER, ATTORNEY
**10805 Mellow Lane**
**Austin, TX  78759**
**(512) 779-9525**

*Counsel for Appellant*

FORM 9. Certificate of Interest

Form 9

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

AAT Bioquest, Inc.     **v.**     Texas Fluorescence Laboratories Inc.

Case No.     16-2056

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Texas Fluorescence Lab., Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

Texas Fluorescence Laboratories, Inc.

2. The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3. below) represented by me is:

Texas Fluoresence Laboratories, Inc.

3. All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below. (Please list each party or amicus curiae represented with the parent or publicly held company that owns 10 percent or more so they are distinguished separately.)

None

4. ☒ The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Rick B. Yeager ; Rick B Yeager, Attorney
Peter Henry Liederman; Law Offic

| May 25, 2016 | /s/ Rick B. Yeager |
|---|---|
| Date | Signature of counsel |

Please Note: All questions must be answered

cc: _____

Rick B Yeager
Printed name of counsel

Reset Fields

# **TABLE OF CONTENTS**

**Page**:

CERTIFICATE OF INTEREST ......................................................................i

TABLE OF CONTENTS.............................................................................. ii

TABLE OF AUTHORITIES ........................................................................vi

STATEMENT OF RELATED CASES ...................................................... viii

STATEMENT OF JURISDICTION.............................................................1

STATEMENT OF THE ISSUES....................................................................2

STATEMENT OF THE CASE.......................................................................3

    STATEMENT OF THE FACTS ...........................................................4

        A.    The Compound of Claim 1 (C33) ..........................................4

        B.    Tsien 1980 BAPTA PAPER [Appx. 316-324] .......................9

        C.    US Patent 4,603,209 - Tsien '209 [Appx. 335-357].................10

        D.    US Patent 5,409,673 - Tsien '673 [Appx. 335-357]................13

        E.    TEFLABS' 2011 Letter [Appx. 383-389] ...............................14

SUMMARY OF THE ARGUMENT ......................................................16

    A.    Anticipation ...................................................................16

    B.    Inequitable Conduct ......................................................18

    C.    Objectively unreasonable and willful infringement............18

    D.    Lost profits and two-supplier market ................................19

ARGUMENT ............................................................................................20

    STANDARD OF REVIEW.................................................................20

        Issue 1- Anticipation - de novo review ...............................20

        Issue 2- Inequitable Conduct - abuse of discretion ...........20

        Issue 3- Willfulness - de novo review .................................21

        Issue 4- Lost Profits - de novo review ................................22

    DISCUSSION OF THE ISSUES ......................................................23

        I.     The District Court erred in its summary judgment ruling that the compound of claim 1 was not anticipated by Tsien '673 ......................................................................23

               A.    The Court erred in its application of *Atofina* to the facts of this case. This case satisfies the *Finisar* single reference requirement .........................................23

               B.    The Court erred in rejecting TEFLABS' evidence of anticipation ................................................................28

               C.    The Court erred in denying TEFLABS' Motion for Reconsideration to reconsider its no anticipation ruling that presented with evidence, incorporated in the '165 Patent and Tsien '673 Patent, that directly refuted critical declaration assertions by Plaintiff's expert ............................................................28

        II.   The District Court erred in granting Plaintiff's cross motion of no inequitable conduct. Plaintiff's repeated misleading arguments, and its failure to disclose material prior art, satisfy the *Therasense* thresholds of "but-for" materiality and an only reasonable inference is an intent to deceive; and support a finding of inequitable conduct ........31

A.  Plaintiff could not have overcome the anticipation rejection of C33 during prosecution if properly disclosed the close affinity relationship between C33 and C34, and Tsien's BAPTA teachings the use of position k to modify affinity ...............................31

B.  Plaintiff avoided an anticipation rejection of C33 in the trial court by submitting false statements in its expert declaration.......................................................33

C.  Plaintiff could not have overcome an obviousness rejection of C33 during prosecution if it had properly disclosed the close affinity relationship between C33 and C34, and the common prior art use of position k to modify affinity ...............................34

D.  Plaintiff could not have overcome the lack of written description rejection of C33 during prosecution if it had followed proper amendment practice and identified C33 as the actual elected species; or if it had not relied on a different misprinted compound (284G) to support the re-introduced claim ...........................................................37

E.  Plaintiff avoided a lack of written description rejection of C33 during trial with an expert declaration which identified very different compounds in support of C33........................................39

F.  A most reasonable inference of intent to deceive is supported by other evidence in this case .......................41

III.  The District Court erred in finding that Appellant's defense was objectively unreasonable, and in finding willful infringement ..................................................................43

A   The merits of the defenses are objectively reasonable ..........................................................................43

B.  TEFLABS presented relevant facts in its defenses ........45

      C.     TEFLABS accepted case law where appropriate for this case, but reasonable believed that a POSA analysis was not required...............................................47

IV.    The District Court erred in its findings of a two supplier market with no non-infringing alternatives to Fluo-8, and erred in awarding lost profits ....................................................49

      A.     The Trial Court erred in misapplying *Micro Chem., Inc. v. Lextron, Inc.* Plaintiff did not establish a two-supplier market.  It could not define a market for the product; and the record clearly establishes non-infringing products...................49

      B.     There was no evidence of market reconstruction...........52

      C.     TEFLABS presented reasonable royalty evidence.........52

CONCLUSIONS AND RELIEF SOUGHT ...........................................................53

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s):**

## Cases:

*Atofina v. Great Lakes Chem. Corp.*,
    441 F.3d 991 (Fed. Cir. 2006) ....................................................25

*Finisar Corp. v. DirecTV Grp., Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008) ..................................................23

*GuideTech, Inc. v. Brilliant Instruments, Inc.*,
    No. C 09-5517 CW, 2014 WL 4182340 (N.D. Cal. Aug. 22, 2014) ............49

*Micro Chem., Inc. v. Lextron, Inc.*,
    318 F.3d 1119 (Fed. Cir. 2003) ..................................................49

*Micro Chem., Inc. v. Lextron, Inc.*,
    318 F.3d 1119 (Fed. Cir. 2003) ............................................22, 49

*Pell v. E.I. DuPont de Nemours & Co.*,
    539 F.3d 292 (3d Cir. 2008) ......................................................20

*Siemens Med. Solutions USA, Inc. v.*
*Saint-Gobain Ceramics & Plastics, Inc.*,
    637 F.3d 1269 (Fed. Cir. 2011) ..................................................49

## Statutes:

28 U.S.C. § 1295(a)(1) ...............................................................1

28 U.S.C. § 1331 ......................................................................1

28 U.S.C. § 1338(a) ..................................................................1

28 U.S.C. § 2107 ......................................................................1

35 U.S.C. § 102 ...............................................................2, 20, 53

35 U.S.C. § 112 .....................................................................37

**<u>Rules</u>:**

Fed. R. Civ. P. 54(b) ................................................................1

Fed. R. App. P. 4(a) ................................................................1

**<u>Regulation</u>:**

37 C.F.R. § 1.121 ..................................................................38

## <u>STATEMENT OF RELATED CASES</u>

There are no related civil cases.

On June 29, 2016, An Order Granting Request for Ex Parte Reexamination was issued for SNQ 1 [anticipation] and SNQ 2 [obviousness] in Request 90/013,742 filed May 11, 2016 by Appellant.

## <u>STATEMENT OF JURISDICTION</u>

The United States District Court for the Northern District of California has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

The United States Court of Appeals for the Federal Circuit has exclusive jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

The Notices of Appeal from the Final Judgment under Fed. R. Civ. P. 54(b) entered January 6, 2016 was timely filed in accordance with 28 U.S.C. § 2107 and Fed. R. App. P. 4(a) on April 28, 2016.

## STATEMENT OF THE ISSUES

### Issue 1- anticipation

Whether the District Court erred in its summary judgment ruling that the compound of claim 1 was not anticipated by the Tsien '673 Patent under 35 U.S.C. § 102.

### Issue 2- inequitable conduct

Whether the District Court erred in granting Plaintiff's cross motion of no inequitable conduct.

### Issue 3- Willfulness (Objectively unreasonable)

Whether the District Court erred in its ruling that Defendant's defense was objectively unreasonable, and in awarding treble damages.

### Issue 4- Lost Profits

Whether the trial court erred in finding a two supplier market with no non-infringing alternatives to Fluo-8; and awarding lost profits.

2

## STATEMENT OF THE CASE

On August 18, 2014, Plaintiffs sued Defendant in cause No. A-14-CV-3909 (DMR) in the Northern District of California.  Defendant filed an Answer on October 14, 2014 and stipulated to making and selling the compound of Claim 1 of the '165 Patent.  The parties agreed to a magistrate judge.  No claims construction hearing was held.

Defendant filed a Motion for Summary Judgment on December 17, 2014 seeking invalidity or unenforceability of Claim 1 on the grounds of anticipation, obviousness, lack of written description, and inequitable conduct.  A MSJ hearing was held March 3, 2015.  An order was entered on April 13, 2015 denying Defendant's Motion for Summary Judgment, and granting Plaintiff's Cross Motion for Summary Judgment on all invalidity issues.   A permanent injunction was entered on May 1, 2015.

A bench trial, limited to damages issues, was held September 9, 2015. Findings of Fact and Conclusions of law were entered November 30, 2015. [Appx10-37] On January 5, 2016, the Court denied leave for Defendant to file a Motion for Reconsideration.

Judgment was signed January 6, 2016.   A Motion for New Trial was filed January 31, 2016, and denied March 30, 2016.  This appeal ensued.

## STATEMENT OF THE FACTS

A.    **The Compound of Claim 1 (C33)**

1.    Claim 1 of the '165 patent is for a single compound shown below.  Upon

allowance, Claim 33 was renumbered to Claim 1.  To minimize confusion in

this Brief, the compound of claim 1 is designated as **C33**, and the compound

of claim 34 is designated as **C34.**



FIG. 1

2.    The **C33** compound, formerly claimed as the single compound in claim 26

(cancelled) and claimed as the single compound of new claim 33, is for a

fluorescein/BAPTA fluorescent ion indicator comprising a BAPTA portion

which selectively chelates calcium ions; and a fluorescein portion:



FIG. 2

3.    Claim 1 of the '165 patent is for a single compound shown below. **C33** and **C34** are "AM ester" forms of the indicator compound with five acetoxymethyl esters (the ellipses shown below) - four on the BAPTA arms and one on the fluorescein portion:

FIG. 4

4.    Both **C33** and **C34** are claimed in US Patent No. 5,409,673 (the Tsien '673

Patent) [Appx335-357] which had a "**fluo-2**" example as one of five

example compounds.  All Tsien examples were salt forms (without AM

esters), but Tsien claimed AM versions as "pharmaceutically acceptable"

forms of the compounds [Appx356] and specifically claimed the AM ester in

claim 6. [Appx0357]

5.    The fluo-2 example [Appx340] is presented below in the same format as

claim 1, and the absence of the AM esters is shown by the empty ellipses)[1]:

---

[1] The AM esters provide convenient cell loading, and are then cleaved by cell
enzymes.

FIG. 5 - "fluo-2" salt form

6.    The AM form of the fluo-2 example was designated in the '165 Patent as "compound 365" [Appx0081] but not identified as Fluo-2 AM; claimed in claim 34 [Appx873-874] which was rejected [Appx770]; designated in Plaintiff declarations of unexpected results as "Fluo-2 AM" [Appx0892]; sold by Plaintiff as "Fluo-8H AM" [Appx385]; and sold by TEFLABS as "Fluo-2 HA  AM" where "HA" designates "high affinity" [Appx384-385]:

FIG. 6 - "Fluo-2 AM" [C34]
"FLUO-8H AM"

7.    There are only two differences between **C33** and the "fluo-2" example

compound in the Tsien '673 Patent.  One difference is the acetoxymethyl

ester (AM) form of **C33** versus the salt form of the fluo-2 example

compound.   In four office actions, the examiner rejected applicant's

arguments that AM ester forms were not obvious or anticipated.

[Appx959960, Appx932, Appx863, Appx826 ¶4]  AM esters are the most

common forms for prior art calcium indicators. [Appx2191 ¶17] The

examiner maintained the anticipation rejection of **C34** as the AM version of

the Tsien '673 fluo-2 example, and dismissed applicant's arguments that the

AM esters should not be read into the '673 patent claims. [Appx770]

8.    The second difference is the "position k" substituent on the unlinked

BAPTA ring as shown above.  **C33** has k=H, while the fluo-2 example, and

the rejected **C34** which is the AM form of the fluo-2 example, had k=CH$_3$

(methyl).  A "Tsien 1980 BAPTA Paper" and "Tsein '209 Patent" were

expressly incorporated into Tsien '673 [Appx345 Publ. 19, Pat. 1]. As

discussed below, those references teach or claim k=H as one of several

substituents to predictably modify calcium ion affinity.

9.    Claim 1 After two anticipation rejections [Appx834-831, Appx858-865],

the examiner eventually allowed **C33** based on applicants' appeal brief

argument [Appx782-819, at Appx798]  that Tsien '673 Patent claimed a vast

number of potential substituents and that one skilled in the art would not be

able to visualize "Fluo-8" compound of **C33** from such a large number of

possible compounds. [Appx773-774].

**B.    Tsien 1980 BAPTA PAPER** [Appx316-324]

1.    This paper was presented as an exhibit in TEFLABS' MSJ, and was

specifically incorporated by reference into both Tsien '673 [Appx345 col 2,

line 54] and the '165 Patent [Appx83 col 61, line 29].  The paper presents

BAPTA (k = H, where position "k" is labeled as position "X" in the paper)

and mono- or di-substitutions of CH$_3$ or Br.  The k=CH$_3$ substitutions

lowered the dissociation constant K$_d$ (raised the calcium ion affinity) by 40%

relative to k = H.  The k=Br substitutions raised the dissociation constant $K_d$ (lowered the calcium ion affinity) by 120% relative to k = H [Appx321 col. 2 ¶5]:



2a : X = H
2b : X = CH₃
2c : X = Br

FIG. 7 [Appx317]

2.    The paper notes that other substituents may be used, and that the resulting affinity should be "quantitatively predictable" according to the electron-withdrawing strength of the substituents.  The paper states that is desirable to provide a "variation of substituents" to give a "whole series of related buffers of graded $Ca^{2+}$ [calcium ion] affinities while maintaining good ionic selectivity."  [Appx323, ¶2]

**C.    US Patent 4,603,209 - Tsien '209** [Appx335-357]

1.    The '209 patent is expressly incorporated by reference into the Tsien '673 Patent  [Appx345]  and was incorporated by reference into the '165 Patent [Appx53 col 1, line 48 ; Appx81 col 58, line 47].

10

2.    TEFLABS filed a Motion for Reconsideration [Appx3171-3182] arguing that Tsien '209, another Tsien '432 (another Tsien group patent), and the Tsien 1980 BAPTA paper, all incorporated by reference to Tsien '673, established a progression of using or claiming H or methyl at position k [Appx3175]; that the use of position k substituents was well-known before the 1987 Tsien '673 filing date [Appx3175]; that Tsien '673 met the standard for anticipating **C33** [Appx3172], and Plaintiff used those well established properties to sell "Fluo-8H" (C34 k=methyl), "Fluo-8" (C33 k=H), and "Fluo-8L". [Appx3175]

3.    TEFLABS argues in this Brief that it is error for the Court to denying [Appx3] TEFLABS' Motion for Reconsideration and refuse to consider the '209 Patent because it refutes critical false statements by Plaintiff's expert.

4.    The '209 Patent is a 1986 Tsien Group patent teaches and claims both AM esters and k=H (Position "R2") and other substituents *-( --CH$_3$, --F, --Cl, -- Br, and C$_0$ -C$_4$ alkoxy)* [Appx3208] of varying electron-withdrawing strengths for Fira-2 and other calcium ion indicators. It also recommends producing a variety of fluorescent ion indicators with different affinities:

"It is known that cation **affinities of BAPTA derivatives can be increased or decreased** by appropriate electron-donating or electron-withdrawing substituents (see generally reference 6 [*Ref. 6 is "Tsien 1980 BAPTA"*]).  For example, substitution of two methyl groups for the two hydrogens para to the two nitrogens of BAPTA strengthened Ca$^{2+}$ binding by 0.4 log unit [40%]  and similar disubstitution with

bromine weakened $Ca^2$ binding by 1.2 log units (see reference 6). We have found that monosubstitution gives half as much effect on calcium affinity (data not shown). **Those skilled in the art will realize that the effect of other substituents on the cation affinities of the present compounds should be** *quantitatively predictable* by a Hammett-type linear free-energy relation. " [Appx3195 col 10, lines 43-56, emphasis added]

" It is also known that the greatest change in dye indicating characteristics occurs within 2 log $[Ca^{2+}]$ units of the $K_d$ of any particular dye (see reference 6). As a result **it would be** *helpful to have dyes available which have a range of $K_d$ 's [affinity]*. **To this end, $R_1$ and $R_2$ can be varied to adjust the $K_d$ up or down.** As expected, the dye component of the molecule weakens $Ca^{2+}$ binding by 0-0.3 log units (compare Kd's in Table l with BAPTA $K_d = 100$ nm, see reference 6)." [Appx3195 col 10, lines 57-65, emphasis added]

5.   The "within 2 log $[Ca^{2+}]$ units of the $K_d$" means that a rule of thumb for the useful range of an indicator is 0.1 to 10 times its dissociation constant $K_d$.

[Appx84 col 63, lines 11-13]   The dissociation constant is a quantitative measure of "affinity" for calcium ions.   As noted in the '165 Patent:

"***The binding affinity of a chelator for a particular metal ion can be determined by measuring the dissociation constant*** between that chelator and that ion." [Appx55 col 5 lines 55-58]

"***The specific indicator used in a particular assay or experiment may be selected based on the desired affinity for the target ion*** as determined by the expected concentration range in the sample, the desired spectral properties, and the desired selectivity... " [Appx83 col. 62, lines 1-5]

**D.    US Patent 5,409,673 - Tsien '673** [Appx335-357]

1.    Tsien '673 was the primary reference cited by the examiner in four rejections

of all claims. [Appx953-0962, Appx930-937, Appx858-865, Appx824-831]

2.    The '673 patent claim positions are shown in FIG. 8 below in salt form.

Claim 1 includes "pharmaceutically acceptable non-toxic salts and esters

thereof" [Appx356];  The examiner noted that Tsien specifically claimed

AM esters at claims 3 and 6. [Appx863]



Tsien '673 [ Appx348 annotated]

3.    Applicant argued in its Appeal Brief that Tsien '673 covered a vast number

of potential compounds at the lettered positions (E1, E2, W, X, Z1, Z2, Q1,

Z3, Y, Z4, and Q2) [Appx884]

4.    Claim 1 TEFLABS presented the Minta declaration [Appx2188-2204] that

the positions shown in the ellipses of FIG. 8 above (E1, E2, Q1, Z3, Y, Z4,

and Q2) were never changed for the three fluo examples in Tsien '673 or in any commercial fluorescein indicator [Appx2195-2196 ¶¶28, 32, 34]; and that only positions Z1/Z2, W, and X (position k) were changed [Appx2196 ¶38]. Minta stated that:

"There are only 36 possible combinations [of claimed compounds] that could be made from substituents that had actually been used in known compounds (not "over a million", and not 20 billion)." [Appx2196 ¶37]

"The universe of practiced substituents comprised a "family" of indicator established by selecting Z1/Z2 and W, and selecting one of X = CH3, H, F, and NO2 to set affinity. This guidance was provided by 17 years of practicing the invention and its legitimate design-arounds." [Appx2196 ¶38]

5.  The Tsein '673 Patent claims **C33**; and claims "X"= H as one of 8 substituents at position k ('673 position "X") [Appx356].

**E.    TEFLABS' 2011 Letter** [Appx383-389]

1.  On March 3, 2011, TEFLABS responded to a notice letter from Plaintiff advising that the base application included the "Fluo-8" compound [**C33**] that TEFLABS was selling as Fluo-2 MedAff A AM (where "MedAff" represented "medium affinity"). TEFLABS advised that it was selling three affinity versions of Fluo-2, and that all of those products were public domain following the expiration of the Tsien '673 patent. [Appx384] Plaintiff was also selling 3 affinity versions as Fluo-8H, Fluo-8, and Fluo-8L. [Appx385]

"Tsien and Minta designate the methyl version as "Fluo-2". Claim 1 of the '673 patent clearly describes *substituting a H*, COOH, F, Cl, Br, I, or NO$_2$ for the methyl group. These type [sic] of *substitutions are made primarily to change the affinity* for calcium, and a*re now well-known* in the literature.

"[Appx385 emphasis added]

2.  Plaintiff's co-founder and CEO, Dr. Diwu testified:

> **Q**   **[to Dr. Diwu].** TEFLabs sells -- I'm sorry -- AAT sells three versions or four versions of Fluo-8 of various affinities; correct? Fluo-8H, Fluo-8L and Fluo-8FF?
>
> **A.**   I think more than that. We have Fluo-8FF.
>
> **Q.**   The only difference that I saw on your website is a statement that they have different affinities. There is no differentiation on the products; is that correct?
>
> **A.**   They have. There's different affinities differentiation. [Appx2926]

3.  There is no disclosure or discussion of affinity, or the modification of

affinity with position k substituents, in the prosecution history of the '165

Patent.

# SUMMARY OF THE ARGUMENT

**A.    Anticipation**

1.    The Trial Court erred in finding that C33, which differed by a single substituent from the fluo-2 example, was not anticipated because Plaintiffs had not disclosed any "invention" related to k=H which was not present in the rejected compound C34 (k = methyl).  Excluding a single-substituted example compound effectively requires a patentee to provide a specific example for every compound in a genus claim.

2.    Plaintiff sued TELFABS for infringement of claim 1 for a single compound that is anticipated by the Tsien '673 Patent co-invented by 2008 Nobel Laureate Dr. Roger Tsien and TEFLABS' founder Dr. Akwasi Minta. TEFLABS advised Plaintiff in 2011 the the claimed compound (C33) was claimed by the expired '673 patent, and was a simple affinity variant of the "fluo-2" example compound in the Tsien Patent.

3.    Plaintiff never disclosed the affinity relationship between rejected compound C34 ("Fluo-2 AM") and C33; and Claim 1 was allowed after two anticipation rejections when Plaintiffs made misleading arguments in its Appeal Brief.  Plaintiff could not have overcome the multiple anticipation and obviousness rejections if it had properly disclosed affinity or the routinely-practiced method of choosing "position k" substituents to make

predictable modifications of calcium ion affinity. The Trial Court's MSJ ruling was based on false assertions in Plaintiff's expert declaration. Those assertions were directly contradicted by prior art incorporated in the '165 Patent specification, and by other evidence submitted by Defendant.

4.  TEFLABS submitted Minta's Declaration and documentary evidence that establish the prior art teaching and use of k=H. That evidence was disregarded by the Trial Court in favor of Plaintiff's expert Declaration. The Court denied TEFLABS' Motion for Reconsideration which showed additional prior art references that were incorporated by reference into both the '165 patent and the Tsien '673 Patent. The Court erred in denying Defendant's Motion for Reconsideration which pointed out specific passages from prior art references expressly incorporated into the '165 Patent specification which refuted the expert declaration.

5.  The Tsien '673 Patent has a presumption of validity, and no prior art cited by Plaintiff supports the non-anticipation of a claimed large compound that differs from a specific example by a single substituent.

6.  TEFLABS argues that the Court erred in excluding documentary evidence in favor of Plaintiff's expert, and that it erred in not reconsidering its MSJ findings and permanent injunction.

**B.**     <u>**Inequitable Conduct**</u>

1.    Plaintiffs avoided four separate grounds of invalidity by failing to disclose

material prior art, and by making material misrepresentations that could not

have been presented with proper disclosure.  Each of these failures to

disclose and misrepresentations independently satisfy the *Therasense*

thresholds of but-for materiality.  At least three of those acts independently

support a finding of most reasonable inference of intent to deceive.

Collectively, those acts coupled with related actions during prosecution and

at trial, support a finding of that intent to deceive is the only reasonable

inference.

**C.**     <u>**Objectively unreasonable and willful infringement**</u>

1.    The record does not support a finding the TEFLABS' defenses were

objectively unreasonable. Under the unique facts of this case (particularly

the long and detailed prosecution history), a POSA analysis was not required

to establish a *prima facia* case of obviousness.  In the case of written

description, Plaintiffs admissions and actions related to **C33** are much more

reliable than Plaintiff's misleading expert declaration.

2.    With trial costs approaching $1 million or more, small Defendants are

effectively barred from judicial relief if summary judgment is not practical.

<u>Under the unique facts of this case</u>, the Court's insistence on a POSA

analysis and expert testimony for the obviousness and written description

unnecessarily eliminated cost-effective summary judgment resolution.

**D.**     **Lost profits and two-supplier market**

1.     The Court erred as a matter of law in finding a two-supplier market, and in

finding no non-infringing substitutes.  Despite an *in limine* ruling that

prevented TEFLABS from presenting evidence of non-infringing substitutes

at the damages hearing, there is ample evidence in the record from Dr.

Diwu's testimony (including an inability to define a market other than to

displace Fluo-3 and Fluo-4), Dr. Minta's declaration and testimony (that

C33 represented less than a 10% market share), prior art submitted for the

MSJ, and the '165 specification itself, that C33 represented a small portion

of a calcium indicator market still dominated by older Fluo-4 and Fluo-4

indicators.

# ARGUMENT

## STANDARD OF REVIEW

### Issue 1- Anticipation - de novo review

The district court interpreted 35 U.S.C. § 102 to permit a large organic chemical compound to be excluded from the scope of a broad genus claim in a prior art patent. That large compound differed from a specific example compound in the prior art patent by a single Hydrogen for Methyl substituent at a single position.   The patent in dispute failed to discuss any advantages or unexpected results of the Hydrogen for Methyl substitution. The Trial Court's interpretation would effectively limit the scope of genus claims to specific examples, and would require a patentee to provide <u>a specific example for every claimed compound</u>. Statutory interpretation presents a question of law over which this Court exercises de novo review. *Pell v. E.I. DuPont de Nemours & Co.*, 539 F.3d 292, 305 (3d Cir. 2008). Under a de novo standard of review, this Court owes no deference to the district court's statutory interpretation analysis. *See Pell*, 539 F.3d at 305.

### Issue 2- Inequitable Conduct - abuse of discretion

TEFLABS argues that it was an abuse of discretion to deny its Motion for Reconsideration which presented a prior art patent reference (the Tsien '209 Patent) which was incorporated into the '165 patent specification, but not reviewed by Plaintiff's expert.  That incorporated reference refuted critical assertions by the

20

expert, who had not reviewed the incorporated reference.  Plaintiff's submission of the expert Declaration is strong evidence of <u>ongoing intent to deceive</u>.   This appears to be an "abuse of discretion" standard.  A short review of two paragraphs from that reference would support invalidating the patent as anticipated, and support an immediate lifting of the injunction.

TEFLABS agrees with the *Therasense* "but-for" materiality and "most reasonable inference of intent" framework, but argues that the facts of this case meet those standards.  The factual issues appear to support a "clearly erroneous" standard of review.

### Issue 3- Willfulness - de novo review

TEFLABS argues that the Trial Court did not properly consider or apply the facts of this case to the legal requirements of obviousness and lack of written description.  The Trial Court found that TEFLABS defenses were objectively unreasonable, in large part because TEFLABS did not present a person of ordinary skill (POSA) analysis for the issues of obviousness and lack of written description. TEFLABS argues that a strong *prima facia* case of obviousness was established, and that the only remaining element of obviousness under *Graham v Deere* was whether the Plaintiff Declaration established objective evidence of non-obviousness (an element that cannot be determined by a POSA analysis).  With respect to written description, TEFLABS argues that the unique prosecution

21

history facts of this case were admissions that **C33** was not adequately disclosed; and that partisan expert testimony was far less reliable than these admissions. Statutory interpretation (whether Sections 103 and 112 always require expert construction of a POSA analysis) presents a question of law over which this Court exercises de novo review.

## Issue 4- Lost Profits - de novo review

The district court interpreted *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir. 2003) to find a "two-supplier" market and lost profit damages findings based on testimony that Plaintiff and Appellant were the only two suppliers for a specific compound ["Fluo-8"]. Plaintiff testified that (a) there were no non-infringing substitutes which had the specific properties of Fluo-8, but (b) the Fluo-8 market was to replace existing (still market leading) "Fluo-3" and "Fluo-4" and to develop new markets. Both parties sold other sister compounds ["Fluo-8H" or "Fluo-2"] with similar properties and overlapping "affinity" (useful range). Seven years after introduction, the compound in dispute ["Fluo 8"] had a 10% market share relative to "Fluo-3" and "Fluo-4". The Trial court's findings would effectively permit lost profit damages in every patent case. Statutory interpretation issue presents a question of law over which this Court exercises de novo review.

# DISCUSSION OF THE ISSUES

**I.    The District Court erred in its summary judgment ruling that the compound of claim 1 was not anticipated by Tsien '673**

**A.    The Court erred in its application of _Atofina_ to the facts of this case. This case satisfies the _Finisar_ single reference requirement.**

1.    TEFLABS agrees with the Court that "a single prior art reference must expressly or inherently disclose each claim limitation:

"…. this court has long held that anticipation requires the presence in a single prior art disclosure of all elements of a claimed invention **_arranged as in the claim_**." [citing _Finisar Corp. v. DirecTV Grp., Inc._, 523 F.3d 1323, 1334 (Fed. Cir. 2008). [Appx2555 emphasis added]

2.    The difficulty in _Finisar_ was mapping claim steps to a 1983 textbook. [_Finisar_ at 1335]

3.    In this case, the prior art Tsien '673 Patent arranged all of the elements <u>in its claims</u>.  That is the reason that the examiner twice rejected both claims 33 and 34 as anticipated by Tsien '673. [Appx858-865, Appx824-831]

4.    Claim 1 Anticipation is based on the Tsien '673 claims, with strong support from the  fluo-2 example. Tsien '673 presented the "fluo-2" compound as one of five specific examples. As the Court noted, there were only two differences between **C33** and the fluo-2 compound:

"By TEFLabs's own admission, there are at least two differences between the structure of the Fluo-8 AM claimed in the '165 Patent and the Fluo-2 compound disclosed in the Tsien Patent: (1) the Fluo-8 AM molecule has hydrogen at the K position; and (2) Fluo-8 AM has AM esters." [Appx2557]

23

5.    The Court wrongly assumed that the fluo-2 <u>example</u> was the basis of anticipation:

> *"**TEFLabs's admission alone is fatal to its motion** for summary judgment, because an anticipation defense requires TEFLabs to show that the Tisane Patent "expressly or inherently disclose[s] . . . all elements of a claimed invention arranged as in the claim," Finish Corp.*, 523F.3d at 1334, but TEFLabs has not identified where in the Tsien Patent the two admitted differences identified above were disclosed." [Appx2558, emphasis added]

6.    The significance of fluo-2 is how close it is to the structure of **C33**.  In maintaining the anticipation rejection of **C34**, the examiner noted that Tsien specifically claimed AM esters in claim 6 [Appx863].  In view of the PTO rejection of the AM ester argument, the only relevant difference between fluo-2 and C33 was k=methyl versus H.

7.    TEFLABS Answer states that Claim 1 of the Tsien '673 patent claims **C33** and **C34**.  Plaintiff has never disputed, in its responses to the anticipation rejections [Appx915-920, Appx939-945], or in this case, that Tsien '673 claimed **C33**.

> " ... ***Claim 1 of the Tsien Patent clearly claims both Fluo-2 compounds.*** [**C33**, **C34**] The difference between Fluo and Fluo AM versions is the 5 AM ester groups as shown below in the larger circles. The difference in Fluo families is established by Z: Fluo 2 when Z=Hydrogen; Fluo 3 when Z= Chlorine; and Fluo 4 when Z = Fluorine. Differences in "affinity" are established by X:
> Fluo-2 MA (medium affinity) when X = Hydrogen
> Fluo-2 HA (high affinity) when X = Me
> Fluo-2 LA (low affinity) when X = Fluorine

(AAT designates the medium affinity version as "Fluo-8" and designates high affinity and low affinity versions as "Fluo-8H" and "Fluo-8L" respectively.)" [Appx0183 ¶11 emphasis added]



Fluo AM          AM ester groups          Fluo

8.    TEFLABS agrees with the Court's analysis that a genus may not anticipate every species:

"TEFLabs also contends that the Tsien Patent anticipated Fluo-8 because it claims a genus of indicators, a species of which is Fluo-8. However, "[i]t is well established that the disclosure of a genus in the prior art is not necessarily a disclosure of every species that is a member of that genus." *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006). [Appx2558]

9.    *Atofina* related to a broad temperature range in the cited prior art:

"Given the considerable difference between the claimed range and the range in the prior art, no reasonable fact finder could conclude that the prior art describes the claimed range with sufficient specificity to anticipate this limitation of the claim."

10.    The Court summarizes the argument of Plaintiff's expert:

"... the permutations of these [Tsien '673 claimed] substituents means the Tsien Patent encompasses over 20 billion compounds with "dramatically different physical and functional properties, with no

25

guidance as to those with superior cell loading ability and brightness."
*Id.* at ¶¶ 40-41. Of these possible permutations, the Tsien Patent
discloses only five specific embodiments. *Id.* at ¶ 42. Thus, AAT
argues, one of ordinary skill would not be able to envision the billions
of other species encompassed within this vast genus, much less the
particular Fluo-8 AM species that is the compound of claim 1 of the
'165 Patent. *Id.* at ¶ 45." [Appx2558]

11.  The starting point for guidance to try **C33** is not a random trial of possible

     substituents from Tsien's broad genus claim 1- it is from modifying the

     example compound fluo-2 (and in, particular, to obtain a lower affinity that

     more closely matches Fluo-4).  Tsien claims only 8 substituents, including

     H, at position k ('673 position "X"); and the Tsien BAPTA paper teaches a

     predictable decrease in affinity by substituting H for methyl. [Appx321]

     The Minta declaration states that few variations of the Tsien claimed

     positions are practical [Appx2194-2198].  The Simpson 2006 [Appx379-

     382] listing of 18 commercial BAPTA/fluorescein compounds shows that

     for most commercial compounds developed in or after the Tsien '673 patent

     7 of the 11 positions were never changed. [Appx2192 Table 3] The number

     of practical permutations is thus <u>vastly</u> overstated.

12.  The Court erred in assuming that the <u>single substitution in an example

     compound</u> of H for methyl could be sufficient to disqualify a claimed

     compound from a pioneer patent.   This harsh of a standard is beyond reason

     and would effectively force patentees to provide a specific example <u>for</u>

26

every claimed compound.  TEFLABS suggests that there should be a very strong presumption that a single substitution of an example compound supports anticipation.  In the case of the H for methyl substitution, the examiner noted that H and methyl "are normally *prima facie* obvious". [Appx774, line 3]

13.  In order to avoid anticipation by Tsien '673, Plaintiffs must demonstrate unexpected performance differences between **C33** and fluo-2.  None of Plaintiff's cited cases support a finding of non-anticipation when a compound differs by a single substitution as obvious as H for methyl.  A prior art patent has a presumption of validity.  A single claimed substituent difference in an example compound should be anticipated - unless that substitution creates significant unexpected results.  It is reasonable to question the anticipation of more complex permutations with multiple substitutions; or even where a single substitution produces significant unexpected property changes.  In this case, the appeal brief argument was simply that Tsien '673 provided "little guidance" in selecting substituents- there was no allegation in the expert declaration or '165 specification that k=H yielded an unexpected result from the fluo-2 k=methyl example, and Diwu's declaration data reports similar results for **C33** and **C34** ("Fluo-2 AM").

27

**B.**   **The Court erred in rejecting TEFLABS' evidence of anticipation.**

14.   The Court erred in relying upon appellee's expert declaration that the k=H

substitution was not known, while disregarding the Minta declaration

[Appx2194 ¶¶29-30], the Tsien 1980 BAPTA paper [Appx317-324], and the

Simpson 2006 [Appx379-382] list of commercial compounds that

demonstrated that k=H, methyl, F, and $NO_2$ were recommended and

routinely used to adjust affinity of BAPTA/fluorescein indicators.  These

other sources created a material issue of fact that could not support a

summary judgment of no anticipation.  While the court could have

disregarded Patton's statements as being contradicted by the <u>documentary</u>

<u>evidence</u>, it should not have disregarded Minta's declaration simply because

Plaintiff's expert disagreed.

**C.**   **The Court erred in denying TEFLABS' Motion for Reconsideration to reconsider its no anticipation ruling that presented with evidence, incorporated in the '165 Patent and Tsien '673 Patent, that directly refuted critical declaration assertions by Plaintiff's expert.**

1.   Applicants' Appeal Brief argued that one skilled in the art could not

envision **C33** because Tsien '673 provided little guidance in selecting that

compound from the vast number of claimed compounds. [Appx798]  In its

MSJ defense and cross-motion, Plaintiff reasserted this argument and

expanded it with Dr. Patton's expert declaration that

- BAPTA affinity does not translate to teachings for Fluo indicator affinity [Appx2132 ¶21];

- position k is not an obvious method of modifying affinity [Appx2102 ¶46, 2132 ¶21 ];

- there is no specific guidance in the Tsien '673 regarding which substituents to select [Appx2102 ¶42];

- no commercial fluo indicators used k=H [Appx2102 ¶46] ; Oregon Green and Calcium Green are not relevant because of a different linkage [Appx2231 ¶18]; and

- Fluo-3 and Fluo-8 affinities disproved TEFLABS' allegations [Appx2231-2132 ¶21]

2.    The Court erred in not reconsidering its no anticipation ruling when presented with evidence, incorporated in the '165 Patent specification, that directly refuted Patton's critical declaration assertions.  The incorporated references (Tsien 1980 BAPTA, Tsien '209, and Tsien '432)[2] all specifically teach or claim k=H as one of several substituents to predictably modify affinity.  Patton admits in his declaration that he did not review the Tsien '209 or Tsien '432 patent.   [Appx2091 ¶13]  Patton read the BAPTA paper, but his statement that "BAPTA affinity does not translate to teachings for

---

[2] All 3 references were incorporated into Tsien '673; The BAPTA paper and Tsein '209 Patents were also incorporated into the '165 specification.

Fluo indicator affinity" was apparently based on his lack of specific expertise, and his failure to read the Tsien '209 reference which was expressly incorporated into the '165 specification.  (TEFLABS does not allege that Dr. Patton made intentionally false statements in his declaration; but does allege that Plaintiffs clearly knew the '209 teachings because they had expressly incorporated that reference.)

3.    After its MNT was denied, TEFLABS filed an *ex parte* reexamination request.  The USPTO has found substantial new questions of patentability on the issues of anticipation and obviousness based on the incorporated references and prior art references submitted by TEFLABS in this case. With regard to anticipation, the PTO notes:

> "In particular, **neither the Examiner nor applicant pointed to out [sic] to the teachings of Tsien 1980 BAPTA, Tsien '209,** and Tsien '432 providing that the changing of the K group has an effect on calcium affinity while maintaining good ionic selectivity." [USPTO PUBLIC PAIR 90/013,742 Decision on Reexamination Request mailed 6/29/2016 emphasis added]

**II.    The District Court erred in granting Plaintiff's cross motion of no inequitable conduct.  Plaintiff's repeated misleading arguments, and its failure to disclose material prior art, satisfy the *Therasense* thresholds of "but-for" materiality and an only reasonable inference is an intent to deceive; and support a finding of inequitable conduct.**

**A.    Plaintiff could not have overcome the anticipation rejection of C33 during prosecution if properly disclosed the close affinity relationship between C33 and C34, and Tsien's BAPTA teachings the use of position k to modify affinity.**

1.    The examiner issued a non-final anticipation rejection of all claims [Appx858-865] and then a final rejection of all claims as anticipated by Tsien '673 [Appx824-831].

2.    The Reasons for Allowance [Appx773-774] and Examiner Interview of May 23, 2014 [Appx770] show that Plaintiffs overcame the rejection of **C33** based on the appeal brief argument that the compounds were different from the Tsien '673 fluo-2 example.

3.    Plaintiff could not have overcome the anticipation rejection of C33 without its appeal brief distinction of **C33** (k=H) from "fluo-2" and **C34** (k=methyl); and could not have made that argument if it had disclosed the common practice, as taught by Tsien BAPTA 1980 and subsequent references, of providing affinity versions of BAPTA/fluorescein indicators through position k substitution, including k=H.

31

4.    Although $K_d$ was one of the most critical factors for indicator selection, the

'165 patent specification has very limited discussion of affinity or $K_d$

[Appx302-303]:

"***The binding affinity of a chelator for a particular metal ion can be determined by measuring the dissociation constant*** between that chelator and that ion." [Appx55 col 5 lines 55-58]

"The specific indicator used in a particular assay or experiment may be ***selected based on the desired affinity for the target ion*** as determined by the expected concentration range in the sample, the desired spectral properties, and the desired selectivity... " [Appx83 col. 62, lines 1-5]

"The spectral properties of the existing xanthene-based ion indicators may be modulated by selecting substituents $R^1$-$R^6$, while ***the chelating properties of the indicator may be adjusted by selecting and/or modifying substituents j, k, m and n*** on the phenyl ring that is not conjugated to the xanthene ring." [Appx57 col. 9 lines 43-45]

"...The most ***useful range of analyte concentration includes about one log unit above and below [0.1-10x] the dissociation constant*** of the ion-indicator complex. ..." [Appx84 col. 63, lines 11-13)

Beyond these statements, there is no discussion or guidance in the specification

about altering affinity or selecting k=H.  The specification does not provide any

other guidance on how to select or modify the substituents j, k, m and n; or provide

any guidance to select position k to modify affinity.

5.    Minta described why k=H was desirable to more closely match the affinity

of Fluo-3 and Fluo-4 [Appx301-302]

"As shown in Table 2, the $K_d$ of ***Fluo-2 high affinity AM*** is 232 nm (nanoMolar) which is substantially less than the $K_d$ of Fluo-4 AM

(350 nm) or Fluo-3 AM (390 nm). Halogens such as "F" and "Cl" were known from the Fluo-4 paper [Gee(2000)] to increase $K_d$ by about an order of magnitude. Since a halogen would cause the $K_d$ to exceed the desired level, k = H was the only choice of the Tsien patent claimed substituents that would provide a less dramatic increase in $K_d$

### Table 2- $K_d$ ($Ca^{2+}$) nM

| Indicator | Position X Substituent  (Position "k" in '165 Patent) | | | |
|---|---|---|---|---|
| | $CH_3$ | H | F | $NO_2$ |
| Fluo-2 | 232 (1) | 389 (2) | 1860 (3) | |
| Fluo-4 | 350 | | 2300 | 90,000 |
| Fluo-3 | 390 | | | |

(1) *Fluo-2 high affinity AM* [TEFLABS: Fluo-2 HA ; AAT Bioquest: FLUO-8H]
(2) *Fluo-2 medium affinity AM* [TEFLABS: Fluo-2 MA ; AAT Bioquest: FLUO-8]
(3) Fluo-2 low affinity AM [TEFLABS: Fluo-2 LA ; AAT Bioquest: FLUO-8L]

### B.    Plaintiff avoided an anticipation rejection of C33 in the trial court by submitting false statements in its expert declaration.

1. The examiner issued a non-final anticipation rejection of all claims [Appx858-865] and then a final rejection of all claims as anticipated by Tsien '673 [Appx824-831].

2. The Court erred in not reconsidering its no anticipation ruling when presented with evidence, incorporated in the '165 Patent specification, that directly refuted Patton's critical declaration assertions discussed above. [I ¶17] The incorporated references (Tsien 1980 BAPTA, Tsien '209, and

33

Tsien '432)[3] all specifically teach or claim k=H as one of several

substituents to predictably modify affinity.  Patton admits in his declaration

that he did not review the Tsien '209 or Tsien '432 patent.   [Appx2091 ¶13]

Patton read the BAPTA paper, but his statement that "BAPTA affinity does

not translate to teachings for Fluo indicator affinity" was apparently based

on his lack of specific expertise, and failure to read the other incorporated

references.

**C.    Plaintiff could not have overcome an obviousness rejection of C33 during prosecution if it had properly disclosed the close affinity relationship between C33 and C34, and the common prior art use of position k to modify affinity.**

1.   There was no discussion of unexpected results of **C33** or k=H in the

specification.  Applicants submitted two declarations of "unexpected results"

[Appx921-928; 890-896].  The declaration results are clear in reporting

substantially similar brightness results for **C33** and **C34**.  In this case,

similar results [Appx894] of the sister compounds cannot be unexpected,

and would not have overcome an obviousness rejection if the affinity

relationship between **C34** and **C33** had been disclosed. These declaration

results confirm, rather than overcome, the *prima facia* case of obviousness.

---

[3] All 3 references were incorporated into Tsien '673; The BAPTA paper and Tsein '209 Patents were also incorporated into the '165 specification.



2.  Plaintiffs hid the affinity relationship by naming **C34** "Fluo-2 AM" when it

    was selling the compound as "Fluo-8H". [Appx384-385]

3.  The only difference between rejected compound **C34** and **C33** was at

    position k.  The only discussion of position k in the '165 Patent is the single

    statement that k (and its neighbors j, m, and n) may adjust chelating

    properties:

    "The spectral properties of the existing xanthene-based ion indicators
    may be modulated by selecting substituents $R^1$-$R^6$, while ***the
    chelating properties of the indicator may be adjusted by selecting
    and/or modifying substituents j, k, m and n*** on the phenyl ring that is
    not conjugated to the xanthene ring." [Appx57 col. 9 lines 43-45]

4.  There is no discussion in the specification to differentiate k=H from a long

    list of independently adjustable substituents at each of the positions j, k, l,

    and m such as shown in the example formula below:

Formula 3

[Appx0057]

"In the embodiment of formula 3 ……. R3, R4, *j, k, m, n* and V are *independently H*, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl." [Appx57]

5.   Minta summarizes the prior art use of position k to modify the affinity of

prior art indicators, and shows k=H more closely matching the affinity of

Fluo-3 and Fluo-4 [Appx2199]:

40. Table 5 below shows the Kd of commercially available Fluo compound families. The substituents are presented in increasing electron-withdrawing strength ($CH_3<H<F<NO_2$).

Table 5- Fluo indicator affinities

| Z1, Z2 | Compound | Substituent ("k" or "X") | | | |
|---|---|---|---|---|---|
| | | CH₃ | H | F | NO₂ |
| Cl | Fluo-3 | 390 | | | |
| | Calcium Green-1 | | 190 | | |
| | Calcium Green-5N | | | | 14,000 |
| F | Fluo-4 | 345 | | | |
| | Fluo-5F | | | 2,300 | |
| | Fluo-5N | | | | 90,000 |
| | Oregon Green-BAPTA 1 | | 170 | | |
| | Oregon Green-BAPTA 5N | | | | 20,000 |
| H | Fluo-2 ("8") | 232 | 389 | 1,860 | |

**D.    Plaintiff could not have overcome the lack of written description rejection of C33 during prosecution if it had followed proper amendment practice and identified C33 as the actual elected species; or if it had not relied on a different misprinted compound (284G) to support the re-introduced claim.**

1.    The introduction of claim 33 violated proper amendment practice, which would have called attention to the attempted reinstatement of the withdrawn elected species, and alerted the examiner to reasserting the § 112 rejection:

[Appx2129]

37

**"A8. How can an applicant reinstate a canceled claim?**

Applicant can reinstate a canceled claim ***by presenting the text of the canceled claim*** with any desired changes in a new claim with a new claim number and use the status identifier, (new)." (Revised Amendment Practice under 37 CFR 1.121 and Other Topics - MPEP; Yeager Decl. ¶2- Exhibit 15)   [Appx2129]

2.    Fourteen months after withdrawing **C33** as the elected species, Plaintiff reintroduced the compound with new *independent* claim 33, which was presented in a different structural format from the canceled claim (Ex.12, pp 114-115; 252-254): [Appx2128]

3.    There is strong evidence that applicants deliberately hid the structure of **C33**. Applicants had three opportunities to disclose the **C33** structure. Neither **C33**  nor its sister compound **C34** were among the example compounds in the 2007 provisional application.  **C34** ("compound 365") was added to the 2008 non-provisional base application.  **C33** was not added to the base application or to the 2011 continuation application.   The omission of applicants' best selling product was made at risk of potentially invalidating patent claim(s) for failure to describe best mode under pre-AIA law.

4.    When Plaintiffs re-introduced **C33** as claim 33, the alleged support was compound 284G [Appx877] which had a -COOH group at position U, which lacked AM esters, and which itself had been falsified from the fluorinated

38

provisional application example. The figure below shows C33, the

published compound 284G, and the filed 284G.



**E.    Plaintiff avoided a lack of written description rejection of C33 during trial with an expert declaration which identified very different compounds in support of C33.**

1.    In granting the cross-motion of no invalidity for lack of written description,

the Court accepted Plaintiff's expert testimony that the '165 specification

disclosed **C33**:

"Dr. Patton points to specific support in the relevant patent applications and concludes that "[b]ased on [his] review, a person of ordinary skill in the art at the time of the invention would have understood the claimed compound to be adequately supported in both the provisional and utility applications." Patton Surreply Decl. [Docket No. 39-1] at ¶ 9." [Appx2551-2552]

2.    Patton identified compounds that were <u>very different</u> from **C33**:

" 9. .... Based on my review, a person of ordinary skill in the art at the time of the invention would have understood the claimed compound to be adequately supported in both the provisional and utility applications. In the utility application, the structures of **compounds 284 and 306** that are depicted are further supported by additional schemes and details of how to make these compounds. "   [Appx2228 ¶ 9 emphasis added]

3.    As shown in the '165 specification Compound 284 differs from **C33** by five AM esters, k=methyl, and T=COOH (and position T changes both spectral and chelating properties [Appx57 col 9 lines 46-49]).  Compound 306 differs by k=methyl and T=lactone.  Position k is the only difference between rejected **C34** and **C33**, and neither Compound 284 nor Compound 306 has k=H:



Compound 284 [Appx72]                    Compound 306 [Appx76]

4.    Neither compound satisfies the Court's *Union Oil* criteria [Appx2552] for

showing "..that the inventor '***invented what is claimed***.'"

**F.    A most reasonable inference of intent to deceive is supported by other evidence in this case.**

1.    In its declarations of unexpected results, Plaintiffs did not disclose that a

large portion of the brightness increase was due to test conditions- that the

measurement was with a 488 nm laser. The increased brightness of Fluo-2

was not "unexpected". As in Fluo-4 vs. Fluo-3, a large part of the increased

Fluo-2 brightness at 488 nm excitation (roughly half) is due to the excitation

maxima of Fluo-2 being closer to the 488 light source. [Appx295]

"We have found that fluo-4 performs similarly to fluo-3 in vitro and
under physiological conditions. Fluo-4 has a ***distinct advantage over
fluo-3 in its ability to be excited by the 488 nm argon ion laser*** line
and thereby offering brighter fluorescence emission intensities in
standard applications." [Gee(2000)]

2.    In its declarations of unexpected results, Plaintiffs did not disclose that improved loading of Fluo-2 relative to Fluo-3 was <u>expected</u> because Fluo-2's lack of chlorine substituents made it less hydrophobic and lower molecular weight than Fluo-3. [Kao(2012)] [Appx296]

3.    One of the cited reasons for allowance of claim 1 was the Plaintiff's representation that fluo-2 was "described by Tsien as the poorest performer in the patent specification" [Appx774].  As noted in the MSJ, that is not correct:

"Tsien did not characterize fluo-2 as the "poorest performer". Tsien did not provide dozens of useless or hypothetical examples in his patent specification, he responsibly reported five embodiments that were actually made and tested, and all of which worked. Tsien selected fluo-3 as the preferred embodiment of five good example compounds. That judgment was correct- detailed comparison of Fluo-3 AM, Fluo-4 AM, and ***Fluo-2 medium affinity AM*** concludes that Fluo-3 is substantially better. [Kao(2012)] A previous study of Fluo-3, Fluo-4, and 4 other indicators concluded that Fluo-3 was the best overall indicator of those tested. [Thomas(2000)] "[Appx296]

4.    Numerous other deceptive acts, including infringing the Tsien '763 claims, are discussed in TEFLABS Motion for Summary Judgment [Appx264-315] and Reply [Appx2126-2153].

**III.  The District Court erred in finding that Appellant's defense was objectively unreasonable, and in finding willful infringement.**

**A    The merits of the defenses are objectively reasonable**

1.   After its MNT was denied, TEFLABS filed an *ex parte* reexamination request.  The USPTO has found substantial new questions of patentability on the issues of anticipation and obviousness based on substantially the same evidence presented in this case. (The issues of written description and elected species are outside authorized reexamination authority.)  With regard to anticipation, the Decision notes:

> "In particular, ***neither the Examiner nor applicant pointed to out [sic] to the teachings of Tsien 1980 BAPTA, Tsien '209***, and Tsien '432 providing that the changing of the K group has an effect on calcium affinity while maintaining good ionic selectivity." [USPTO PUBLIC PAIR 90/013,742 Decision on Reexamination Request mailed 6/29/2016 emphasis added]

2.   The Decision also suggests a very strong *prima facia* case of obviousness by noting the "fluo-2 example", AM ester version of fluo-3; and that

> "... Molecular Probes Handbook and Simpson 2006 both teach that calcium ion affinity with position k substituents, ***including k=H***, provide indicators with similar spectral properties, but different useful ranges of calcium ion affinity."

3.   TEFLABS advised Plaintiff in 2011 that **C33** was a simple affinity version of Tsien's fluo-2 example. [Appx383-389 at Appx385¶2]  After that notice, Plaintiffs continued over 3 years of patent prosecution without ever disclosing the affinity relationship of C33 to fluo-2,  or disclosing the

43

practice of modifying affinity at position k.  Plaintiff could not have

overcome anticipation and obviousness rejections in the PTO if affinity had

been properly disclosed; and could not have obtained favorable summary

judgment rulings on these issues without the false assertions in Dr. Patton's

"expert" declaration.

4.    TEFLABS had a reasonable expectation of prevailing on its anticipation

defense (**C33** was claimed in Tsien '673 and very close to the "fluo-2"

example) and its obviousness defense (**C33** results were not unexpected).

5.    Dr. Minta's analysis suggests that the '165 specification was filled with

unworkable hypothetical example compounds [Appx2200-2202]:

> "45. I have been designing and synthesizing fluorescent ion indicators
> since 1982. In my experience, there are well-established methods of
> modifying known indicators, particularly calcium ion affinity (the
> dissociation constant $K_d$), and spectral properties. It is much harder to
> develop viable new types of indicators. I recall that ***my impressions of***
> ***the specification at the time, after reviewing the example***
> ***compounds, was that the inventors did not understand the design of***
> ***fluorescent indicators, and that they had copied Fluo-2***.

> 46. There were several flaws in the compounds that were shown as
> examples. In recently reviewing the example compounds, I have
> formed several opinions.

> 47. ***Nine of the 34 compounds*** [284, 286, 300, 302, 304, 306, 357,
> 365, and 366] ***are claimed in the Tsien patent.***

> 48. Of the 25 example compounds which were not claimed by Tsien,
> Eleven compounds have"Me" (methyl) substituents at position "T".
> [Example compounds 256, 258, 280, 292, 294, 296, 298, 308, 310,
> 350, and 352 (column 49)] Compounds 308 and 310 are not

fluorescein; and 308 would not fluoresce, and 310 would be very weak. Methyl substituents are electron donating, and at that position were known to dim the fluorescent response of Fluo indicators, and *it was unlikely that all 11 such compounds would have been actually synthesized before the inventors realized that it was not a desirable substituent*.

49. *Of the remaining fourteen compounds, I could not identify any compound that I would expect to produce a viable indicator*: ….

50. For the reasons discussed above, it is my opinion that many of the 34 compounds in Table 2 are *"hypothetical compounds" which* were not actually synthesized, and are *not realistic*. "

6.      TEFLABS' defenses cannot be considered unreasonable under any objective

analysis.

### B.      TEFLABS presented relevant facts in its defenses

1.      The Court's rationale for finding that TEFLABS acted willfully is

summarized in the Findings at [Appx2829]:

"In determining whether TEFLABS acted willfully, the court does not re-adjudicate the sufficiency of TEFLABS's defenses but instead considers whether those defenses were objectively reasonable. TEFLABS's *failure to offer evidence* or *persuasive case law* in support of its defenses [at summary judgment] rendered them meritless as presented." [emphasis added]

2.      TEFLABS respectfully responds that many patent issues, such as

obviousness, written description, and inequitable conduct are notoriously

case-specific, and must be decided on the unique facts of a particular case;

and that <u>facts</u> were presented on summary judgment:

**Anticipation:** TEFLABS 2011 letter [Appx383-389]; the Tsien 1980 BAPTA paper, the Minta declaration [Appx316-324], and the Simpson (2006) [Appx379-382] list of commercial BAPTA/fluorescein indicators all provided evidence of the use of k to modify affinity.

**Written Description:** The '165 patent specification and protection history establish Plaintiff's admission that **C33** was not disclosed as an example compound, that Plaintiff withdrew the compound as the elected species, and cancelled claim 26 for the compound in its response of March 2, 2011. [Appx939-945]

**Obviousness:** The Minta declaration [Appx2188-2031], and Kao declaration [Appx2154-2187] provide evidence that much of the brightness benefits of Fluo-2 were due to test conditions or lower hydrophobicity, and were not unexpected. The Kao 2012 paper [Appx390-401 at 400] provided evidence that Fluo-3 was a better overall indicator than Fluo-2.  Minta testified about low Fluo-8 market share and weak market acceptance as discussed below. [IV]

**Inequitable Conduct:** Plaintiff failed to disclose affinity or the use of position k, including k=H to modify affinity (while making the "vast possibilities"/"no guidance" argument).

46

**C.    TEFLABS accepted case law where appropriate for this case, but reasonable believed that a POSA analysis was not required**

1.    Actual facts provide a more reliable framework than can be obtained by conflicting and partisan "expert" testimony on what a POSA might think.  In this case:

- Case law guidance requiring threshold levels of materiality and intent are necessary, and those threshold levels are met, for the issue of inequitable conduct where Plaintiffs could not have avoided four types of claims rejections (anticipation, obviousness, written description, and non-elected species) but-for ongoing failure to disclose and material misrepresentations.

- Case law guidance requiring a single reference "to expressly or inherently disclose ...." is useful, and that standard is met, for the issue of anticipation where TEFLABS' evidence (Minta declaration, BAPTA paper, Simpson 2006 commercial compound listing) establish that **C33**, and k=H are disclosed and claimed in Tsien '673.  Case law guidance on genus versus species is not necessary or helpful in view of the facts of this case, and the facts of Plaintiff's cited cases are far removed from the single substitution of this case.  Plaintiff had the burden of proof in attempting to except **C33** from the scope of Tsien '673 claims, and did not cite any authority that supported removal under the facts of this case.

47

- In this case, guidance on a POSA framework is neither necessary nor helpful to establish a *prima facia* case of obviousness. Here, a very strong case of obviousness is established by the prior art and by the examiner's observation that <u>H and methyl substitutions are normally obvious</u>.[Appx774]  This case proceeds directly to the fourth *Deere* factor of objective evidence of non-obviousness - which cannot use a POSA analysis.  TEFLAB's presented evidence of underwhelming commercial success from 2007-2014  [Appx2190-2191] (weak commercial acceptance over that long of a period effectively counters allegations of technical superiority- particularly when Fluo-8 was sold at a much lower price [Appx2909] than market-leading Fuo-4). TEFLABS also presented evidence that much of the alleged brightness benefit was due to test conditions. Diwu's declaration showing similarity of the **C33** and **C34** sister compound data refutes unexpected results.

- Case law guidance on a POSA framework is not necessary or helpful on the issue of written description, where Plaintiff's admissions and actions provide sufficient, and much more reliable, evidence than Plaintiff's expert declaration.

**IV.    The District Court erred in its findings of a two supplier market with no non-infringing alternatives to Fluo-8, and erred in awarding lost profits.**

      **A.    <u>The Trial Court erred in misapplying *Micro Chem., Inc. v. Lextron, Inc.* Plaintiff did not establish a two-supplier market. It could not define a market for the product; and the record clearly establishes non-infringing products.</u>**

1.    The Trial Court outlined its reasoning in the Findings of Fact:

    "An alternative to the *Panduit* test for determining entitlement to lost profits damages is the two-supplier market test. *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir. 2003). The two-supplier market test requires the patentee to show: (1) ***the relevant market contains only two suppliers***; (2) the patentee has the marketing and manufacturing capacity to make the sales that were lost to the infringer; and (3) the amount of profit that the patentee would have made. *Id.* "In essence, the two-supplier market test collapses the first two *Panduit* factors into one 'two suppliers in the relevant market' factor." *Id. See also GuideTech, Inc. v. Brilliant Instruments, Inc.*, No. C 09-5517 CW, 2014 WL 4182340, at *5 (N.D. Cal. Aug. 22, 2014). That is, "[a]ccurately identifying a two-supplier market requires an analysis which excludes alternatives to the patented product with disparately different prices or significantly different characteristics." *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1288 (Fed. Cir. 2011) (citation and formatting omitted).[4]

    If lost profits cannot be ascertained, then the patentholder is entitled to damages in the form of a reasonable royalty on the infringer's sales. *Hanson,* 718 F.2d at 1078." [Appx21-22]

2.    There is ample evidence in the '165 Patent and the record that Fluo-3, Fluo-4, and Fluo-2 (C34) are all non-infringing alternatives to Fluo-8 (C33).

3.    Dr. Minta's declaration, based on royalty checks for the Tsien '673 patent,

stated that the combined sales of AAT and TEFLABS represented less than

10% of the visible calcium indicator market. [Appx2190-2191]:

> "15. Based on my UC Berkeley royalty reports, I estimate that the combined sales AATBioquest and TEFLABS of the compound of claim 1 represents less than 10% of the fluo indicator market. In addition to Fluo-3 and Fluo-4, the Fluo indicator market includes Calcium Green$^{TM}$, and Oregon Green$^{TM}$." [Appx2191]

4.    Plaintiff sales were relatively flat [Appx15], and much smaller than Dr.

Minta's calculation of Fluo-3 and Fluo-4 sales.  Minta testified that despite

Dr. Diwu's "glowing review" of Fluo-8, Fluo-4 was still the biggest seller in

the world. [Appx2973]

5.    Dr. Diwu "did not know if that guess [Minta's less than 10% estimate] is

close to the real market".  [Appx2920]

6.    Diwu could not define a Fluo-8 market, but stated that the market included

"replacing Fluo-3 and Fluo-4":

> Q.    How do you define the Fluo-8 market?
> A.    I don't know how to answer your question. The market is not defined by a company. The market is developed by itself. For example, they may not have a market until you have a new product. For example, I think about 20 years ago, there is no Internet, there is no Google. So the market is developed as some new technology come up. So *I cannot define a market*. I don't think that AAT Bioquest would do that.
> Q.    The -- everything that I've seen, Dr. Diwu, suggests that you're targeting Fluo-8 to be an overall replacement for almost all applications for Fluo-3 and Fluo-4.

Is that a fair characterization?

A.   ***Part of them is to replace Fluo-3 and Fluo-4 market. There is also open new market***. Like I said earlier, ample evidence that Fluo-8 have some features that enables some new custom assays.

Q.   Okay. ***So in addition to replacing Fluo-3 and Fluo-4, you could expand the market even further with new assay applications? That was your answer?***

A.   ***Yes***.   [Appx2197]

7.   The '165 Patent specification compares **C34** to Fluo-3 AM and Fluo-4 AM [Appx96 col 87 lines 35-38] and lists Fluo-3 AM and Fluo-4 AM as alternative assays to **C34** and other example compounds [Appx96 col 87 lines 52-53]

8.   Kao (2012) compared Fluo-2, Fluo-3, and Fluo-4; and concluded Fluo-3 AM is the best overall indicator [Appx400, Table 1].

9.   Simpson (2006) lists 18 commercial fluorescein/BAPTA indicators, and lists Molecular Probes as a major supplier [Appx1792-1795].

10.  Diwu's testimony admitted several other suppliers of Fluo-3 following the 2008 expiration of the Tsien '673 patent [Appx2920].

11.  AAT and TEFLABS both sold high affinity versions of **C33** [Appx384-385] and Diwu's declaration establishes similar performance of the high affinity version **C34** and **C33**.

## B.    There was no evidence of market reconstruction

1.    Plaintiff offered no expert testimony or market reconstruction. [Appx2913]

The trial testimony was that TEFLABS addressed a low cost market and

offered products for as low as 20% of Plaintiff's pricing [Appx2909]; and

that only two small overlapping customers could be identified [Appx2888-

2890]. Dr. Diwu did not know the market:

**Q. ….** How big is the overall Fluo-3 fluo market today?
**A.** I don't have the information to estimate the market size. That's -- I
just don't know. Sorry. I don't have that answer because I don't have
data.
**Q.** What's your best guess as far as the percentage of the overall --
between Fluo-3, Fluo-4 and Fluo-8 --
**A.** Sorry. I cannot guess that without data. [Appx2920]

## C.    TEFLABS presented reasonable royalty evidence

1.    TEFLABS' presented reasonable royalty testimony that it paid UC Berkeley

a 10% royalty for a non-exclusive license on the Tsien '673 patent

[Appx2965]; paid Vanderbilt University a 15% royalty on an exclusive

license for a thallium indicator [Appx2965], and paid Molecular Probes a

30% royalty on Fluo-4 [Appx2960], to settle a Fluo-4 dispute, before selling

its Fluo-3 and Fluo-4 product line to Molecular Probes for $2 million.

[Appx2961]; and that Fluo-4 pricing was likely to drop substantially in the

"next couple of years" when its patent expired [Appx2966].

## CONCLUSIONS AND RELIEF SOUGHT

1.    For the reasons set forth above, this Court should reverse the judgment of the District Court.

2.    Appellant requests that the '165 patent claim 1 be held invalid under 35 U.S.C. § 102 as anticipated by US Patent 5,049,673.

3.    Appellant further requests that the '165 patent be held unenforceable for inequitable conduct by appellee, and that the matter be remanded to the trial court for determination of potential damages due to Appellant.

4.    In the alternative, Appellant requests that this Court reverse the District Court's finding of willfulness and its award of lost profits, and remand the case for determination of a reasonable royalty.


Respectfully Submitted,

/s/ Rick B. Yeager
Rick B. Yeager, Attorney
10805 Mellow Lane
Austin, Texas 78759
512-779-9525 phone
email: ryeager@austin.rr.com


*Counsel for Defendant-Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on July 13, 2016, I electronically filed the foregoing Corrected Brief with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Melissa Karnes Dockery
Melissa Karnes Dockery
GIBSON MOORE APPELLATE SERVICES
P.O. Box 1460
Richmond, VA  23218
(804) 249-7770
melissa@gibsonmoore.net

# <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains <u>9,924</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

Dated July 11, 2016                    <u>/s/ Rick B. Yeager</u>
                                        Rick B. Yeager

# **ADDENDUM**

# TABLE OF CONTENTS
## Physical Compilation

**Page:**

Civil Judgment
        filed January 5, 2016..............................................................................Appx1

Order of
The Honorable Donna M. Ryu
Striking Defendant's Motion for Reconsideration; Granting
Plaintiff's Motion to Strike Defendant's Motion for Reconsideration;
Denying Defendant's Motion for Reconsideration
        filed January 5, 2016..............................................................................Appx2

Order of
The Honorable Donna M. Ryu
Re:   Amount of Costs and Interest
        filed December 16, 2015 .......................................................................Appx8

Findings of Facts and Conclusions of Law
        filed November 30, 2015 ....................................................................Appx10

U.S. Patent No. 8,779,165
        dated July 15, 2014 .............................................................................Appx38

1
2
3
4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    AAT BIOQUEST, INC.,                           Case No.  14-cv-03909-DMR

             Plaintiff,
8
                                                   **CIVIL JUDGMENT**
9         v.

10   TEXAS FLUORESCENCE
     LABORATORIES, INC.,
11
             Defendant.

12          The court hereby enters judgment in favor of AAT Bioquest, Inc. and against Texas

13   Fluorescence Laboratories, Inc.  AAT Bioquest, Inc. is awarded enhanced damages in the form of

14   three times the amount of AAT Bioquest, Inc.'s lost profits, in the amount of $423,078.69, plus

15   $5,000 in interest and costs, for a total of **$428,078.69**.

16          The Clerk of Court shall close the file in this matter.

17

18          **IT IS SO ORDERED.**

19   Dated: January 5, 2016

20                                                 _____

21                                                           Donna M. Ryu
                                                       United States Magistrate Judge
22

23

24

25

26

27

28

*United States District Court*
*Northern District of California*

**Appx1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AAT BIOQUEST, INC., | Case No. 14-cv-03909-DMR |
| Plaintiff, | **ORDER RE DEFENDANT'S MOTION FOR RECONSIDERATION; PLAINTIFF'S MOTION TO STRIKE; AND DEFENDANT'S MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION** |
| v. | |
| TEXAS FLUORESCENCE LABORATORIES, INC., | |
| Defendant. | Re: Dkt. Nos. 90, 92, 93 |

On November 30, 2015, the court issued Findings of Fact and Conclusions of Law following a bench trial in this patent case. [Docket No. 88.] On December 10, 2015, Defendant TEFLABS filed a motion for reconsideration with several attachments. [Docket No. 90.] Shortly thereafter, Plaintiff AAT moved to strike TEFLABS's motion because TEFLABS had failed to first seek leave of court as required by Civil Local Rule 7-9(a). [Docket No. 92.] TEFLABS quickly conceded its error, and filed a motion for leave to file a motion for reconsideration. [Docket No. 93.]

As TEFLABS admits, its initial filing was improper. The court therefore grants AAT's motion to strike Docket No. 90 in its entirety.

TEFLABS argues that the court should grant reconsideration to correct a "manifest error of fact." [Docket No. 93 at 1.] It urges the court to "re-examine the prior art Tsien Patent and its cited references with regard to affinity modification." *Id.* at 2. It recites at length from a declaration it submitted in January 2015 in support of its arguments in the parties' cross-motions for summary judgment. *Id.* at 5-6. In essence, TEFLABS now seeks yet another opportunity to rehash its invalidity argument based on the doctrine of anticipation.

Civil Local Rule 7-9(b) requires that a party demonstrate reasonable diligence in applying for reconsideration, plus at least one of three things, including "a manifest failure by the Court to consider material facts or dispositive legal arguments." Civil L.R. 7-9(b)(3).   The court already considered the facts and legal arguments now reargued by TEFLABS.  It ruled upon them nearly nine months ago in April 2015.  *See* Order on Motions for Summary Judgment, Docket No. 46 at 13-18 (analyzing parties' arguments re anticipation).   TEFLABS has not demonstrated diligence, nor has it provided a proper basis for reconsideration of its unsuccessful anticipation argument.

TEFLABS also argues that reconsideration would demonstrate that it had a reasonably objective belief that Claim 1 of AAT's patent-in-suit was anticipated and therefore invalid.  This in turn would lead to reconsideration of the court's finding that TEFLABS willfully infringed AAT's patent.  Not so.  In finding that TEFLABS willfully infringed AAT's patent, the court held:

> In its defense against a finding of willfulness, TEFLABS takes a second bite at the proverbial apple by recapitulating the same attorney arguments about invalidity and unenforceability that it raised during summary judgment.  This misses the point.  In determining whether TEFLABS acted willfully, the court does not re-adjudicate the sufficiency of TEFLABS's defenses but instead considers whether those defenses were objectively reasonable.  TEFLABS's failure to offer evidence or persuasive case law in support of its defenses [at summary judgment] rendered them meritless as presented.

Findings of Fact and Conclusions of Law, Docket No. 89 at 19-20.  TEFLABS's current motion amounts to an equally pointless attempt at a "third bite" at the same arguments, based on the same evidence.

For the foregoing reasons, the court denies TEFLABS's motion for leave to file a motion for reconsideration.  As a final matter, TEFLABS's motion includes two documents that have not previously been presented in this case.  *See* Docket No. 93, Exs. 2 and 3 (U.S. Patent No. 4,603,209 (1986) and U.S. Patent No. 4,689,432 (1987)).  These are not newly discovered documents, and there is no basis for admitting them into the record at this time.

**IT IS SO ORDERED.**

Dated: January 5, 2016

_____
Donna M. Ryu
United States Magistrate Judge

United States District Court
Northern District of California

2

Appx3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| AAT BIOQUEST, INC., a Delaware corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| TEXAS FLUORESENCE LABORATORIES, INC., a Texas corporation, | ) ) ) ) |
| Defendant. | ) ) ) |

Case No. 4:14-cv-3909-(DMR)

**[PROPOSED] ORDER REGARDING AMOUNT OF COSTS AND INTEREST**

Judge:        Hon. Donna M. Ryu

Appx8

1    PURSUANT TO THE PARTIES' JOINT STIPULATION REGARDING COSTS AND

2  INTEREST, filed on December 10, 2015, it is hereby ORDERED that:

3        1.    Texas Fluorescence Laboratories, Inc. shall pay AAT Bioquest, Inc. the agreed-upon

4  amount of **$5,000** in costs and interest, in addition to the damages award of **$423,078.69**.

5

6

7    **IT IS SO ORDERED.**

8

9

10  Dated:  ___December 16, 2015___    By: _____

11                                    
                                      Hon. Donna M. Ryu
12                                    Judge Donna M. Ryu
                                      UNITED STATES DISTRICT COURT
13                                    MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Appx9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AAT BIOQUEST, INC., | Case No.  14-cv-03909-DMR |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| TEXAS FLUORESCENCE LABORATORIES, INC., | |
| Defendant. | |

This is a patent infringement action.  The court determined on summary judgment that Defendant Texas Fluorescence Laboratories ("TEFLABS") had infringed United States Patent No. 8,779,165, to which Plaintiff AAT Bioquest ("AAT") holds all rights, title, and interest.  *See* Docket No. 46 ("MSJ Order").  In reaching this determination, the court rejected TEFLABS's arguments that the patent was invalid and/or unenforceable due to inequitable conduct.

The remaining issues relate to AAT's claims for damages, interest, costs, and attorneys' fees.[1]  The court held a bench trial on damages and entitlement to attorneys' fees.  Pursuant to Federal Rule of Civil Procedure 52(a), the court makes the following findings of fact and conclusions of law.

## I.       FINDINGS OF FACT

### A.       Background

1.  AAT and TEFLABS are direct competitors in the business of making, marketing, and

---

[1]   In addition to compensatory damages, the prevailing party in a patent infringement suit is entitled to recover "interest and costs as fixed by the court."  35 U.S.C. § 284.  The parties agreed to brief the issues of what interest rate to apply and how often it should be compounded, and the amount of awardable costs in post-trial submissions.

selling fluorescent ion indicators.[2]  They have competed in this market since at least January 2011.

2.  Dr. Zhenjun Diwu is the President of AAT.  Dr. Diwu has worked in the research and development of calcium ion indicators for over 20 years.  He is a named inventor on 47 issued patents and a number of pending patent applications.  AAT has 19 employees.  In 2014, AAT's revenue was between $4 and $5 million.

3.  Dr. Akwasi Minta is the founder, chairman, and chief scientist of TEFLABS.  Dr. Minta has 40 years of experience in the field of fluorescent ion indicators.  TEFLABS has two directors—Dr. Minta and Mr. Rick Yeager, whose role is discussed further below—and three other employees.  Dr. Minta and Mr. Yeager are responsible for managing and making decisions on behalf of TEFLABS.  TEFLABS's revenue in 2014 was about $400,000.  Roger Tsien and Dr. Minta were the named inventors in United States Patent No. 5,049,673 (the "Tsien Patent"), which issued in 1991 and is also in the field of fluorescent calcium ion indicators.

4.  At trial, both parties called the same witnesses: Dr. Diwu, Dr. Minta, and Mr. Yeager.

**B.    The '165 Patent and AAT's Fluo-8 Product**

5.  On July 15, 2014, the United States Patent and Trademark Office ("USPTO") issued Patent No. 8,779,165 ("the '165 Patent"), entitled "Fluorescent Ion Indicators and Their Applications."  AAT holds all rights, title, and interest in the '165 Patent.  AAT manufactures a product called Fluo-8 AM MA ("Fluo-8"), which is an embodiment of the invention claimed in Claim 1 of the '165 Patent.

6.  Fluo-8 is a desirable product among fluo indicators.  It has improved loading and brightness as compared to Fluo-4, another popular product.  Fluo-8 also has less temperature sensitivity, which means that tests can be performed easily at room temperature.  Ample evidence supports that TEFLABS recognized and advertised Fluo-8's advantageous qualities to its customers.  TEFLABS asked Dr. Joseph Kao to analyze Fluo-8 and compare it with Fluo-3 and Fluo-4.  Dr. Kao acknowledged that Fluo-8 is a better, higher intensity indicator than those two

---

[2]   The specifics of the technology are discussed in the court's order on summary judgment.  For simplicity, the court refers to the relevant class of products as "fluo indicators" or "calcium indicators."

2

**Appx11**

products.  TEFLABS's own marketing materials and customer communications tout Fluo-8's superiority.  *See, e.g.,* Joint Statement of Undisputed Facts ("JSUF") 20 ("TEFLABS advertised Fluo-8 "'the brightest and easiest loading Fluo indicator, and its long wavelength, high sensitivity, affinity, and fluorescent enhancement (.100x) make Fluo-8 an ideal indicator for the measurement of cellular calcium.'"); TEFLABS products list (Ex. 3) (Fluo-8 is "the brightest Fluo Dye available!"); marketing letter from Dr. Minta (Ex. 7) ("Fluo-8 is enjoying popularity over Fluo-4 owing to its better brightness and easier loading"); article on TEFLABS's website (Ex. 18) ("Fluo-2 MA (the same molecule as Fluo-8) has become a very cost effective replacement for screeners and researchers currently using Fluo-3, Fluo-4 or Fluo-8.").

7.  AAT is not aware of any Fluo-8 customer that has switched back to another fluo indicator after using Fluo-8.  There are no acceptable non-infringing substitutes to Fluo-8, (that is, no unpatented product with the same properties as Fluo-8), because only Fluo-8 has its improved qualities of loading, brightness, and less temperature sensitivity.

8.  Fluo-8 has been commercially successful for AAT, becoming its best-selling product within six months of its first commercial release in 2007.  Similarly, TEFLABS's Fluo-8 product became its best-selling calcium indicator until it ceased selling the product in May 2015 as a result of this lawsuit.

9.  Beginning on July 15, 2014, the issuance date for the '165 Patent, AAT put the patent number on its online product information sheet for Fluo-8 and also on the printed product materials.  Even before the patent issued, TEFLABS understood that AAT marked its Fluo-8 product as patent pending.

### C.    TEFLABS's Manufacture and Sale of Fluo-8

10. TEFLABS concedes that it made and sold a product with the same structure as Fluo-8, which TEFLABS initially called Fluo-2 MA AM.  TEFLABS eventually re-named its product Fluo-8 MA, because customers were asking for Fluo-8.[3]  It is undisputed that AAT and TEFLABS

---

[3]  To simplify the terminology, the court refers to the compound of Claim 1 of the '165 Patent (which AAT calls "Fluo-8 AM MA" and TEFLABS calls "Fluo-2 MA AM" and "Fluo-8 MA") as "Fluo-8."

United States District Court
Northern District of California

are the only manufacturers of Fluo-8.

11. There is also no dispute that TEFLABS intentionally copied Fluo-8 and began to manufacture and sell it.  During the relevant time period, AAT maintained the confidentiality of Fluo-8's molecular structure.  In order to manufacture the product, TEFLABS instructed Dr. Kao (an individual not associated with AAT) to obtain a sample of Fluo-8, because TEFLABS did not think AAT would sell to TEFLABS directly.  Once TEFLABS obtained the structure, it began making the product.

12. In 2011, AAT asked TEFLABS how it had determined the structure of Fluo-8, including how TEFLABS obtained a source for Fluo-8. TEFLABS refused to provide that information.

13. TEFLABS informed its customers that what it called "Fluo-2 MA AM" was the same product as AAT's Fluo-8.  For example, TEFLABS knew that Scripps Florida was an AAT customer. TEFLABS told Scripps Florida that its Fluo-2 MA AM was the same as Fluo-8, and sent Scripps Florida a sample to confirm that fact.  TEFLABS then lowered its price of Fluo-8 below AAT's price so that TEFLABS could get Scripps Florida as a customer.

### D.    TEFLABS's Awareness of '165 Patent

14. TEFLABS first became aware of the patent application that later resulted in the '165 Patent in 2009 or 2010.

15. On January 18, 2011, AAT sent TEFLABS a notice letter that included a copy of the patent application.  The letter indicated that the then-pending application was relevant to TEFLABS's Fluo-2 MA AM product.  TEFLABS did not consider ceasing its manufacture or sale of Fluo-8 after receiving the letter.

16. TEFLABS also chose not to obtain an independent opinion of counsel. Instead, it relied on the opinion of Mr. Yeager, who is the President of TEFLABS and is also a patent attorney.  He has been licensed by the USPTO for twenty years, and his practice involves the preparation and analysis of patents, particularly patents that relate to TEFLABS's core business.

17. Mr. Yeager is TEFLABS's counsel of record in this case, and he has not received compensation for his work.  TEFLABS did not hire counsel to defend this action because it believed the legal issues in this lawsuit, and in the pre-litigation review of the patent and patent

United States District Court
Northern District of California

4

**Appx13**

1    application, were straightforward enough that TEFLABS did not need outside counsel.  In any

2    event, TEFLABS did not have the ability to pay outside counsel.

3       18. On March 3, 2011, Mr. Yeager responded to the January 18, 2011 letter on behalf of

4    TEFLABS.  TEFLABS knew when it copied Fluo-8 that the product would be covered by AAT's

5    patent if it issued.  However, TEFLABS was convinced that the USPTO would not issue a patent.

6    As it asserted in its March 3, 2011 response to AAT, TEFLABS believed that Fluo-8 was in the

7    public domain because it was covered by the claims in the Tsien patent, which had expired.  Dr.

8    Minta believed that the structure of the Fluo-8 compound was the same as the Fluo-2 compound

9    that he had co-invented in the Tsien Patent.  However, Dr. Minta conceded that he had never made

10   a compound with the specific structure of Fluo-8 until TEFLABS copied Fluo-8.

11      19. The March 3, 2011 letter is the only written document reflecting Mr. Yeager's (and thus

12   TEFLABS's) assessment of the validity of Claim 1 of the '165 Patent.  Thus, before this lawsuit,

13   TEFLABS's only basis for believing that AAT's patent application should not issue was based on

14   the defenses of obviousness and anticipation in light of the Tsien Patent.  As discussed below, in

15   issuing the '165 patent, the patent examiner considered but rejected arguments about the Tsien

16   patent during the course of patent prosecution.

17      20. TEFLABS did not monitor the prosecution of AAT's patent application.  After the '165

18   Patent issued on July 15, 2014, AAT sent TEFLABS an August 28, 2014 cease and desist letter,

19   enclosing the '165 Patent and demanding that TEFLABS stop its infringement.  AAT also

20   informed TEFLABS that if it ceased its infringing activities immediately, AAT would not pursue

21   litigation or seek damages.

22      21. At this point, TEFLABS understood that its accused Fluo-8 product was covered by a

23   claim of the issued '165 Patent.  Nonetheless, TEFLABS did not cease its manufacture and sale of

24   its Fluo-8 product, nor did it attempt to design around the invention claimed in the patent.  Once

25   again, TEFLABS opted not to obtain an independent opinion of counsel as to the validity of Claim

26   1 of '165 Patent claim after the patent issued.

27      22. Among the reasons TEFLABS did not stop making and selling its Fluo-8 product was

28   because it represented $60,000 in annual sales.  TEFLABS also hoped to win over AAT's

United States District Court
Northern District of California

**Appx14**

customer, Molecular Devices, and grow those sales to $500,000 per year.  In addition, TEFLABS was exploring the possibility of being acquired by Molecular Devices.  TEFLABS approached Molecular Devices in 2013 about acquiring TEFLABS and becoming the exclusive marketer for TEFLABS's calcium products.

**E.    AAT and TEFLABS's Sales of Fluo-8**

23. The parties agree that the chart below accurately summarizes AAT and TEFLABS's annual revenues from Fluo-8 (*see* JSUF Ex. A):

| Year | AAT Sales ($) | TEFLABS Sales ($) |
|------|---------------|-------------------|
| 2007 | 72,002 | 0 |
| 2008 | 178,101 | 0 |
| 2009 | 428,366 | 0 |
| 2010 | 507,041 | 2,600.50 |
| 2011 | 510,722 | 36,513.00 |
| 2012 | 377,414 | 81,587.14 |
| 2013 | 396,726 | 58,354.57 |
| 2014 | 519,801 | 68,191.75 |

24. The parties also agree that the chart below accurately summarizes the per-customer revenue TEFLABS made from its infringing sales of Fluo-8 between July 15, 2014 (the date the '165 Patent issued) and May 27, 2015 (the date of TEFLABS's last infringing sale)(*see* JSUF Ex. B):

| Customer | Amount Sold | Total Revenue to TEFLABS |
|----------|-------------|--------------------------|
| Med Chem 101 | 865.0 mg | $36,825 |
| VRW International GmBH | 100.0 mg | $6,930 |
| Takeda Cambridge Ltd. | 50.0 mg | $12,000 |

6

United States District Court
Northern District of California

| Abcam PLC | 73.0 mg | $4,389 |
|---|---|---|
| Cambridge Bioscience Ltd. | 29.8 mg | $2,026.50 |
| All other customers | 112.5 mg | $14,277.00 |
| **TOTAL** | **1230.3** | **$76,447.50** |

25. It is undisputed that AAT's costs, including materials, labor, and general and administrative costs are $2.90 per milligram of Fluo-8. AAT's 2014/2015 list price for Fluo-8 was $245 per milligram. However, AAT offers discounts for strategically advantageous customers: a 40% discount for distributors, or $147 per milligram; and a 60% discount for potential strategic partners, or $98 per milligram. Dr. Diwu testified that Med Chem 101 and VRW were potential strategic partners that would have been charged the $98 rate; Takeda, Abcam, and Cambridge Bioscience would have been charged the $147 rate for distributors; and the remaining small-volume customers would have been charged the $245 list price, for a total of $144,594.10 in revenue. Applying these rates and subtracting AAT's cost of $2.90 per milligram yields lost profits of $141,026.23 for the sales of Fluo-8 made by TEFLABS.

26. Dr. Diwu testified that AAT has also suffered harm to reputation, price erosion, and lost opportunities to do business with other potential customers as a result of TEFLABS's sales. For example, Dr. Diwu testified that two customers asked AAT to match the lower price being offered by TEFLABS for Fluo-8, in one case resulting in AAT reducing its price from $147 to $73 per milligram. According to Dr. Diwu, AAT decided not to seek damages for these other harms because it did not have funds to hire an expensive damages expert.

27. The parties agree that AAT has the manufacturing and marketing capability to have made the Fluo-8 sold by TEFLABS, and has the capacity to meet the Fluo-8 demand going forward.

**F.    Procedural History and TEFLABs's Failures to Comply with the Injunction**

28. TEFLABS acknowledged that if the '165 Patent is valid, then its Fluo-8 product infringed AAT's patent. TEFLABS therefore proposed, and the parties agreed, that this case should proceed on an expedited schedule with early motions for summary judgment on the issue of patent validity.

29. On April 13, 2015, this court denied summary judgment on all of TEFLABS's invalidity

7

United States District Court
Northern District of California

United States District Court
Northern District of California

and inequitable conduct defenses, and granted AAT's cross-motion for summary judgment of no

invalidity and no inequitable conduct.  *See generally* MSJ Order.  TEFLABS's invalidity defense

relied primarily on prior art (the Tsien Patent) that TEFLABS knew had been considered by the

examiner in prosecution, and had been overcome.  In the order on summary judgment, the court

noted at numerous points TEFLABS's basic failures to present evidence or case law relevant to

the legal issues.  *See, e.g.*, MSJ Order at 8, 12, 20.  For example, Mr. Yeager acknowledged at trial

that he did not cite any case law in TEFLABS's motion for summary judgment relevant to

whether a species is patentable over a genus claim.  The court discusses below in greater detail

additional evidence from the summary judgment record.

   30. On May 1, 2015, the court entered a permanent injunction.  Docket No. 50.  The court

ordered TEFLABS "permanently restrained…from manufacturing, using, selling, importing,

and/or offering for sale fluo indicators which have the same structure as the indicator claimed in

Claim 1 of the '165 Patent in the United States for the life of the '165 Patent."  *Id.* at 2.  However,

TEFLABS took no action to comply with the permanent injunction until approximately two weeks

later.  Specifically, Mr. Yeager claims that he told Dr. Minta about the injunction on or before

May 1, 2015.  However, Dr. Minta testified that Mr. Yeager did not notify him about the

injunction until two weeks later, at which point Dr. Minta instructed TEFLABS employees to stop

selling Fluo-8.  Mr. Yeager took no action to implement the injunction other than to notify Dr.

Minta of its existence.

   31. Between May 1 and May 14, 2015 TEFLABS made ten sales of Fluo-8 in violation of the

court's permanent injunction.

   32. TEFLABS agreed to provide a certification of compliance with the permanent injunction

by May 13, 2015 but missed this deadline by one day.  On May 14, 2015, TEFLABS served a

certification by Dr. Minta which said, "This is to certify that TEFLABS has stopped selling Fluo-

2 MA AM.  We currently have 50 mg in stock and 500mg impure and all will be destroyed as

requested."  On May 19, 2015, Mr. Yeager represented to AAT's counsel that TEFLABS had

stopped selling Fluo-8.

**Appx17**

33. Notwithstanding Dr. Minta's certification and Mr. Yeager's representation to counsel, TEFLABS made two more sales of Fluo-8 after May 14, 2015.  According to TEFLABS, this occurred despite Dr. Minta's instructions because a new employee had begun working for TEFLABS, and Dr. Minta did not inform her that she should stop selling the infringing product.  Altogether, TEFLABS made twelve sales of Fluo-8 after the court entered the preliminary injunction, for total revenue of $2,015.

34. At trial, Dr. Minta testified that TEFLABS's Fluo-8 inventory had been destroyed.  Mr. Yeager could not confirm this, because he had not taken any steps to verify the fact of destruction.

### G.    TEFLABS's Conduct During Litigation

35. TEFLABS notes several undisputed facts that demonstrate its good faith conduct during litigation.  TEFLABS stipulated that if the '165 Patent was valid, then its Fluo-8 product infringed the patent, thereby obviating litigation of that fact.  TEFLABS also stipulated to numerous facts in the JSUF to facilitate a shorter trial on damages.

36. However, TEFLABS's overall litigation conduct was far from ideal.  For example, Mr. Yeager testified during his deposition that TEFLABS had put a litigation hold in place to prevent the destruction of documents relevant to the case.  But in fact, TEFLABS did not issue a litigation hold or inform its employees not to destroy materials that might be relevant to this case.  Dr. Minta testified that he never informed TEFLABS employees not to destroy potentially relevant documents because Mr. Yeager never instructed him to do so.  Mr. Yeager contradicted this, testifying that he did tell Dr. Minta to implement a litigation hold.  At any rate, there is no record evidence that documents were lost or destroyed as a result of TEFLABS's failure to implement a litigation hold.

37. TEFLABS's conduct in responding to written discovery, though dilatory, did not harm AAT.  TEFLABS served responses to Requests for Production on February 4, 2015, indicating that no documents existed for most of the document requests, but did so before it had searched any electronic email files.  TEFLABS produced fewer than 20 documents before the February 23, 2015 close of fact discovery.  These documents were the ones that Mr. Yeager could easily access by looking through the company's DropBox account.  TEFLABS unilaterally decided not

9

**Appx18**

1  to produce all of its documents in time to meet the February 23, 2015 fact discovery cutoff

2  because it wanted to save the expense of document production until after the summary judgment

3  hearing.  On February 26, 2015, the parties filed a joint stipulation in which AAT agreed to

4  extend the discovery deadline to March 11, 2015 for certain of TEFLABS's responses, including

5  its production of documents.  TEFLABS produced the remainder of its documents on March 11,

6  2015, after briefing on the cross-motions for summary judgment was complete.  There is no

7  evidence in the record that AAT was prejudiced by TEFLABS's discovery conduct.

8      38. TEFLABS also alleged an on-sale bar defense in its Answer, but made no investigation

9  into the facts of the defense before filing its answer.  TEFLABS abandoned this defense prior to

10  summary judgment.  There is no record evidence that the parties expended resources litigating

11  the on-sale bar defense prior to its abandonment.

12     39. TEFLABS took unrealistic and antagonistic settlement positions.  Early in the case, Mr.

13  Yeager offered a potential settlement in which AAT would buy TEFLABS, but the offer was not

14  well-received.  On December 14, 2014, TEFLABS made a settlement offer to AAT under which

15  AAT would pay TEFLABS a sum of money, and TEFLABS would receive a fully paid-up

16  license to the '165 patent and related patents, in exchange for TEFLABS not challenging AAT's

17  patents or expanding TEFLABS's infringement.  In the settlement offer, TEFLABS opined that

18  AAT could owe TEFLABS $500,000 if AAT lost, and the case was found to be exceptional,

19  based on TEFLABS's anticipated demand for attorneys' fees and relinquishment of AAT's

20  profits from the sale of Fluo-8 (although TEFLABS admitted it did not have a claim against

21  AAT that would have provided a basis for the latter).  TEFLABS never made a settlement offer

22  in which it proposed to pay AAT for its infringing sales of Fluo-8.

## II.     ISSUES AT TRIAL

The court held a bench trial on the following issues:

(1) Whether AAT is entitled to lost profits or reasonable royalties for TEFLABS's
infringement of the '165 Patent;

(2) Whether TEFLABS willfully infringed the '165 Patent, and if so, whether damages
should be enhanced; and

United States District Court
Northern District of California

10

**Appx19**

(3) Whether this is an exceptional case pursuant to 35 U.S.C. § 285, and if so, whether AAT is entitled to an award of attorneys' fees.

### III.    CONCLUSIONS OF LAW

**A.    Damages Under 35 U.S.C. § 284**

**1.    Legal Standards**

Upon a finding of infringement, the patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. "The burden of proving damages falls on the patentee." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). "There are two methods by which damages may be calculated under [35 U.S.C. § 284]. If the record permits the determination of actual damages, namely, the profits the patentee lost from the infringement, that determination accurately measures the patentee's loss. If actual damages cannot be ascertained, then a reasonable royalty must be determined." *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983). *See also Lucent*, 580 F.3d at 1324 ("Two alternative categories of infringement compensation are the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining."). "The correct measure of damages is a highly case specific and fact-specific analysis." *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1366 (Fed. Cir. 2008).

"Lost profits damages are appropriate whenever there is a reasonable probability that 'but for' the infringement, the patentee would have made the sales that were made by the infringer." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1263-64 (Fed. Cir. 2013) *cert. denied*, 134 S. Ct. 1013 (2014) (citation and formatting omitted). "The 'but for' inquiry therefore requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee" would have made. *Grain Processing Corp. v. Am. Maize–Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999). "To prevent the hypothetical from lapsing into pure speculation, [the] court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Federal Circuit has stated that a useful, but non-exclusive way for a patentee to prove

2    entitlement to lost profits is the *Panduit* four-factor test.  *See Rite-Hite Corp. v. Kelley Co.*, 56

3    F.3d 1538, 1545 (Fed. Cir. 1995) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575

4    F.2d 1152, 1156 (6th Cir. 1978)); *Versata*, 717 F.3d at 1264 ("A showing under the four-factor

5    *Panduit* test establishes the required causation.").  These factors are: "(1) demand for the patented

6    product, (2) absence of acceptable noninfringing alternatives, (3) manufacturing and marketing

7    capability to exploit the demand, and (4) the amount of profit [the patentee] would have made."

8    *Panduit*, 575 F.2d at 1156.  "A patentee need not negate every possibility that the purchaser might

9    not have purchased a product other than its own, absent the infringement."  *Rite-Hite*, 56 F.3d at

10    1545.  "The patentee need only show that there was a reasonable probability that the sales would

11    have been made 'but for' the infringement.  When the patentee establishes the reasonableness of

12    this inference, e.g., by satisfying the *Panduit* test, it has sustained the burden of proving

13    entitlement to lost profits due to the infringing sales."  *Id.*  "The burden then shifts to the infringer

14    to show that the inference is unreasonable for some or all of the lost sales."  *Id.*

15    An alternative to the *Panduit* test for determining entitlement to lost profits damages is the

16    two-supplier market test.  *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir.

17    2003).  The two-supplier market test requires the patentee to show: (1) the relevant market

18    contains only two suppliers; (2) the patentee has the marketing and manufacturing capacity to

19    make the sales that were lost to the infringer; and (3) the amount of profit that the patentee would

20    have made.  *Id.*  "In essence, the two-supplier market test collapses the first two *Panduit* factors

21    into one 'two suppliers in the relevant market' factor."  *Id.  See also GuideTech, Inc. v. Brilliant

22    Instruments, Inc.*, No. C 09-5517 CW, 2014 WL 4182340, at *5 (N.D. Cal. Aug. 22, 2014).  That

23    is, "[a]ccurately identifying a two-supplier market requires an analysis which excludes alternatives

24    to the patented product with disparately different prices or significantly different characteristics."

25    *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1288

26    (Fed. Cir. 2011) (citation and formatting omitted).[4]

27    _____

28    [4]  Since the two-supplier market test essentially collapses the first two *Panduit* factors, the court
declines to analyze the facts under both standards and opts for the *Panduit* test, with the

12

**Appx21**

1    If lost profits cannot be ascertained, then the patentholder is entitled to damages in the

2    form of a reasonable royalty on the infringer's sales.  *Hanson*, 718 F.2d at 1078.

3    **2.    Analysis**

4    AAT seeks lost profit damages for TEFLABS's sales of Fluo-8, starting from the date of

5    the issuance of the '165 Patent until TEFLABS's last infringing sale in May 2015.  In the

6    alternative, AAT seeks a reasonable royalty for those sales.

7    The court finds that AAT is entitled to damages beginning from July 15, 2014, the date the

8    '165 Patent issued, because it is undisputed that AAT publicly marked the materials for Fluo-8

9    with the patent number in compliance with the marking statute.  *Maxwell v. J. Baker, Inc.,* 86 F.3d

10   1098, 1111 (Fed Cir. 1996).

11    The court also finds that AAT is entitled to lost profit damages.  AAT meets much of its

12   burden of establishing the *Panduit* factors through undisputed facts to which the parties have

13   stipulated.

14   The first *Panduit* factor is the demand for the patented product.  TEFLABS concedes this

15   factor.  *See* Def.'s Proposed Findings of Fact and Conclusions of Law ["Def.'s PFFCL," Docket

16   No. 86] at 25 ("Plaintiff has demonstrated a demand for the patented product").  In any event,

17   ample evidence supports the existence of demand for Fluo-8.  It is undisputed that TEFLABS's

18   Fluo-8 product is the same compound as AAT's Fluo-8 product; thus, the demand for Fluo-8 is

19   illustrated by TEFLABS's undisputed Fluo-8 sales in 2014 and 2015.  *See BIC Leisure Products,*

20   *Inc. v. Windsurfing Int'l, Inc*., 1 F.3d 1214, 1218-19 (Fed. Cir. 1993) ("Evidence of [the

21   infringer's] sales of the infringing product may suffice to show *Panduit*'s first factor," as long as

22   "the patent owner and the infringer sell substantially the same product.").  Product demand is

23   further bolstered by the fact that Fluo-8 was TEFLABS's best-selling product during that time

24   period.

25   AAT has also met its burden of proof on the second *Panduit* factor, which is the absence of

26

27   understanding that the same facts would lead to the same conclusion under the two-supplier

28   market test.

**Appx22**

United States District Court
Northern District of California

1  acceptable noninfringing alternatives.  The parties have stipulated that the relevant market for

2  Fluo-8 is a two-supplier market consisting of AAT and TEFLABS.  Dr. Diwu testified that there

3  are no acceptable noninfringing alternatives to Fluo-8.  *Accord GuideTech*, 2014 WL 4182340 at

4  *5 (CEO testified that "in his years of experience in the field, he observed that were only two

5  competitors in the market of high-frequency time interval analyzers. . . .This is evidence that there

6  were no acceptable non-infringing substitutes and that the market consisted of only two

7  suppliers.").  Moreover, ample evidence, including TEFLABS's own marketing materials and

8  customer communications, demonstrates that Fluo-8 has unique and desirable qualities that

9  distinguish it from other fluo indicators.

10        TEFLABS's argument that noninfringing substitutes were available for Fluo-8 is

11  unpersuasive.  It rests on two premises: (1) that the small market share of Fluo-8 in the fluo

12  indicator market as compared with Fluo-3[5] and Fluo-4 establishes that those products are

13  acceptable noninfringing substitutes; and (2) the "fact that Dr. Tsien's affidavits[6] tout the

14  advantages of both 'Fluo-2' and 'Fluo-8' over Fluo-3 strongly suggests that Fluo-2 is a

15  noninfringing alternative to Fluo-8."  Def.'s PFFCL at 25.  Neither of these premises is true.

16        With respect to TEFLABS's first premise, the size of Fluo-8's share in the total market for

17  fluo indicators is not relevant, since there is no evidence that Fluo-3 and Fluo-4 have the same

18  desirable features as Fluo-8 such that they could be considered noninfringing alternatives.  *See*

19  *Apple Inc. v. Samsung Electronics Co.*, 786 F.3d 983, 1004 (Fed. Cir. 2015) ("The mere existence

20  of a competing [product] does not make that [product] an acceptable substitute.") (citation and

21  formatting omitted); *Standard Havens Products, Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373

22  (Fed. Cir. 1991) ("[I]f purchasers are motivated to purchase because of particular features

23  available only from the patented product, products without such features—even if otherwise

24

25  [5]  There is no evidence in the record about the market share of Fluo-3.  Moreover, Fluo-4 is a
26  patented product.

27  [6]  This portion of TEFLABS's argument apparently refers to Dr. Diwu's affidavits submitted to
28  the USPTO during prosecution of the '165 Patent.  *See* Exs. F7, F8.

**Appx23**

competing in the marketplace—would not be acceptable noninfringing substitutes."). Indeed, TEFLABS's own marketing materials clearly tout the superiority of Fluo-8 over Fluo-3 and Fluo-4 in a number of key aspects, such as loading, brightness, and cost effectiveness.

With respect to TEFLABS's second premise, TEFLABS relies exclusively on incomprehensible attorney argument rather than record evidence. TEFLABS claims that the affidavits show that "Dr. Diwu [told the USPTO that] both Fluo-8 AM and Fluo-2 AM (which TEFLABS alleged is sold by Plaintiff as Fluo-8H) had [the same] advantages. AAT Bioquest sells 4 versions of Fluo-8 with different affinities. There was no evidence that the Fluo-8 versions differ in any aspect other than affinity." Def.'s PFFCL ¶ 18 at 7. TEFLABS does not indicate where in Dr. Diwu's affidavits he makes this claim. The passage of Dr. Diwu's trial testimony that TEFLABS cites in support of its attorney argument actually shows that Fluo-8 and Fluo-8H are different products. TEFLABS failed to produce any competent evidence—during trial or at any prior point—of noninfringing substitutes.[7]

The parties have stipulated that AAT has satisfied the third *Panduit* factor. It is undisputed that AAT had the capability to produce, market and sell the Fluo-8 product sold by TEFFLABS between July 2014 and May 2015.

The fourth *Panduit* factor requires the patentee to demonstrate the amount of profit it would have made but for the infringing sales. The undisputed facts show that TEFLABS sold 1230.3 milligrams of Fluo-8 between July 2014 and May 2015, at a profit of $76,447.50. It is also undisputed that AAT's costs for manufacturing and selling Fluo-8 are $2.90 per milligram, AAT's market rate for Fluo-8 is $245 per milligram, and AAT offers distributors and potential strategic partners specific discounts. Based on these facts, AAT calculates its lost profits to be

---

[7]  As part of its pretrial submissions, TEFLABS attempted to introduce exhibits purporting to show noninfringing alternatives to Fluo-8. The court excluded these exhibits for numerous reasons: first, TEFLABS failed to disclose any noninfringing alternatives until its pretrial submissions, even though TEFLABS had been served with a contention interrogatory that directly requested this information; second, AAT moved in limine to exclude the exhibits and TEFLABS failed to timely oppose AAT's motion; and third, it was not apparent that the products on TEFLABS's list of noninfringing alternatives were even in the same class of products as Fluo-8. *See* Docket No. 78 at 3-5.

United States District Court
Northern District of California

1   $141,026.23.  This evidence meets AAT's requirement under the fourth *Panduit* factor to

2   demonstrate the amount of profit it would have made.

3        Once the patentee has "show[n] that there was a reasonable probability that the sales would

4   have been made 'but for' the infringement ... e.g., by satisfying the *Panduit* test, it has sustained

5   the burden of proving entitlement to lost profits due to the infringing sales."  *Rite-Hite*, 56 F.3d at

6   1545.  "The burden then shifts to the infringer to show that the inference is unreasonable for some

7   or all of the lost sales."  *Id.*

8        TEFLABS argues that it is unreasonable to believe that AAT could convert all of

9   TEFLABS's sales at almost twice TEFLABS's pricing.[8]  The only "evidence" cited in support of

10   TEFLABS's argument on this point are that (1) AAT did not retain an expert on damages; and (2)

11   TEFLABS's five major customers were distributors, and Dr. Diwu could not identify the desired

12   profit margins for distributors who purchase at a wholesale price.

13        Against TEFLABS's position are ample facts supporting the soundness of AAT's lost

14   profits analysis.  The market demand for Fluo-8 is undisputed.  If TEFLABS had not copied and

15   began selling Fluo-8, the Fluo-8 market would consist of one supplier, namely AAT, with AAT

16   setting the market prices. TEFLABS's sale of infringing product at reduced prices depressed the

17   market prices that AAT normally would have charged.

18        Using historical data for Fluo-8 sales from 2007 to 2014, AAT demonstrated that it had

19   standard rates for different types of customers, including distributors.  AAT established that it

20   would have applied those rates to TEFLABS's customers, had those customers been AAT's.

21        On balance, AAT's evidence is more robust and persuasive, and TEFLABS has failed to

22   meet its burden of showing that AAT's calculation of its lost sales is unreasonable.

23        For the foregoing reasons, the court finds that AAT has met its burden of establishing that

24   there was a reasonable probability that TEFLABS's sales of Fluo-8 would have been made by

25

26   _____

27   [8]  For the sake of the analysis, the court does some simple math based on the facts presented by the
     parties.  TEFLABS earned $76,447.50 in revenue from its sales of 1230.3 milligrams of Fluo-8,

28   for an average price of $62.13 per milligram.  AAT estimates its lost profits to be $141,026.23 for
     the sales of the same 1230.3 milligrams, for an average price of $114.62 per milligram.

**Appx25**

United States District Court
Northern District of California

1  AAT but for TEFLABS's infringement.  Accordingly, the court awards AAT damages for

2  TEFLABS's infringement of the '165 Patent in the form of lost profits, for a total amount of

3  **$141,026.23**.  Because it awards damages based on lost profits, the court does not reach the issue

4  of reasonable royalty damages.

5      **B.**    **Willfulness**

6      AAT argues that TEFLABS's infringement of the '165 Patent was willful and that AAT

7  should therefore be awarded enhanced damages.  The court first turns to the question of

8  willfulness, then enhanced damages.

9      **1.**    **Legal Standards**

10      "[T]he court may increase the damages [for infringement] up to three times the amount

11  found or assessed."  35 U.S.C. § 284.  "A trial court's discretion in awarding enhanced damages

12  has a long lineage in patent law."  *In re Seagate Technology, LLC*, 497 F.3d 1360, 1368 (Fed. Cir.

13  2007).  The Federal Circuit has held that "an award of enhanced damages requires a showing of

14  willful infringement."  *Id*.  However, "a finding of willfulness does not require an award of

15  enhanced damages; it merely permits it."  *Id.*

16      To establish the requisite recklessness for willful infringement, the *Seagate* court

17  established a "two-pronged analysis entailing separate objective and subjective inquiries."  *Powell*

18  *v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236 (Fed. Cir. 2011) (citing *Seagate*, 497 F.3d at

19  1371).  Under the first prong, "the patentee has the burden of showing 'by clear and convincing

20  evidence that the infringer acted despite an objectively high likelihood that its actions constituted

21  infringement of a valid patent.'"  *Stryker Corp. v. Zimmer, Inc.*, 782 F.3d 649, 660 (Fed. Cir.

22  2015) (citing *Seagate*, 497 F.3d at 1371)), *cert. granted*, 136 S. Ct. 356 (2015).  In other words,

23  "the 'objective' prong of *Seagate* tends not to be met where an accused infringer relies on a

24  reasonable defense to a charge of infringement."  *Spine Solutions, Inc. v. Medtronic Sofamor*

25  *Danek USA, Inc.*, 620 F.3d 1305, 1319 (Fed. Cir. 2010).  *See also Bard Peripheral Vascular, Inc.*

26  *v. W.L. Gore & Associates, Inc.*, 682 F.3d 1003, 1005 (Fed. Cir. 2012) (the willfulness inquiry

27  often turns on whether a defense or noninfringement theory was reasonable).  "The state of mind

28  of the accused infringer is not relevant to this objective inquiry."  *Seagate*, 497 F.3d at 1371.

1  Rather, "this objectively-defined risk …[is] determined by the record developed in the

2  infringement proceeding." *Id.  Accord Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No.

3  2014-1492, – F.3d –,  2015 WL 4639309, at \*15 (Fed. Cir. Aug. 4, 2015) (determination of

4  objective prong of *Seagate* may be made with reference to record developed during the

5  infringement proceeding, and was not limited to the trial record).Only if the patentee meets this

6  "threshold objective standard" does the inquiry then move on to the subjective second prong, i.e.,

7  whether "this objectively-defined risk (determined by the record developed in the infringement

8  proceeding) was either known or so obvious that it should have been known to the accused

9  infringer." *Id*. (citing *Seagate*, 497 F.3d at 1371).[9]

10      **2.      Analysis**

11          **a.    Objective Prong of *Seagate***

12      The court finds that AAT has demonstrated by clear and convincing evidence that

13  TEFLABS acted despite an objectively high likelihood that its actions infringed a valid patent.

14      To begin with, after the '165 Patent issued and AAT sent the cease and desist letter,

15

16  [9]   As discussed below, the Supreme Court's holding in *Octane Fitness, LLC v. ICON Health &*

17  *Fitness, Inc.*, – U.S. –, 134 S. Ct. 1749, 1756 (2014) overturned the Federal Circuit's previous

18  standard governing whether a case is "exceptional" under 35 U.S.C. § 285 such as to warrant
attorneys' fees.  On October 19, 2015, the Supreme Court granted certiorari for both *Halo
Electronics, Inc. v. Pulse Electronics, Inc.*, 780 F.3d 1357, 1361 (Fed. Cir. 2015), *cert. granted*,

19  136 S. Ct. 356 (2015), and *Stryker Corp. v. Zimmer, Inc.*, 782 F.3d 649, 660 (Fed. Cir. 2015), *cert.

20  granted*, 136 S. Ct. 356 (2015), consolidating the cases, to consider the question of whether the
Federal Circuit erred by applying the two-part test for enhancing patent infringement damages

21  under 35 U.S.C. § 284, in light of the Supreme Court's rejection of the same two-part test under
the similarly-worded 35 U.S.C. § 285 in *Octane Fitness*. 136 S. Ct. 356 (2015).  In her dissent in

22  *Halo*, Judge O'Malley noted that the Federal Circuit's test for exceptional cases under Section 285
is "analogous" to its test for enhanced damages under Section 284, and the jurisprudence on both

23  statutes has been "closely mirrored."  *Halo*, 780 F.3d at 1361 (O'Malley, J., dissenting).  Judge
O'Malley urged the Federal Circuit to abandon the *Seagate* enhanced damages analysis in favor of

24  a more flexible approach akin to the *Octane Fitness* analysis for exceptional cases, including by
abandoning the requirement that litigants establish their entitlement to enhanced damages by clear

25  and convincing evidence rather than the ordinary preponderance of the evidence standard.
However, as it stands today, the Federal Circuit has not abrogated its *Seagate* analysis for

26  enhanced damages.  *See Halo*, 780 F.3d at 1358 (denying petition for rehearing en banc); *Stryker*,

27  782 F.3d at 660-662 and n. 6 (applying *Seagate* analysis and noting that "[t]his court has not yet
addressed whether *Octane Fitness*… altered the standard of review under which this court

28  analyzes the objective prong of willfulness").

18

**Appx27**

1    TEFLABS knew that it was infringing the patent but nevertheless continued to sell its infringing

2    product.

3          An objective assessment of the case shows that TEFLABS did not present reasonable

4    defenses regarding invalidity or unenforceability of the patent.  As discussed above, on summary

5    judgment, TEFLABS repeatedly failed to present evidence related to the basic legal standards for

6    its defenses.  *See, e.g.,* MSJ Order at 8 ("TEFLABS failed to present any evidence relevant to th[e]

7    legal standard" on its written description defense, including by not addressing or providing

8    evidence regarding the most basic element of such defense, or "what a person of ordinary skill in

9    the art would have understood based on the disclosure within the four corners of the '165 Patent

10   specification or … based on what was well-known in the art"); 20 (TEFLABS's obviousness

11   argument "fail[ed] to cite to any evidence regarding what a person of ordinary skill in the art

12   would have understood at the time of patent filing.  This reason alone is sufficient to deny

13   TEFLABS's motion for summary judgment").

14         Instead, TEFLABS's summary judgment submissions relied heavily on attorney argument

15   rather than record evidence or case law.  As noted by this court, TEFLABS's briefs included

16   "virtually no citations to legal authority, and only minimal citations to undifferentiated masses of

17   [hundreds of pages] of [patent files]."  MSJ Order at 8.  *See also id.* at 21 ("TEFLABS simply

18   asserts that 'Fluo-2 is a lead compound … and is a logical starting point for investigating

19   competitive alternatives to Fluo-4.'  This is conclusory attorney argument with no evidence cited

20   to support it."); 26 ("TEFLABS makes conclusory, scattershot allegations of instances of

21   inequitable conduct supported by a handful of impenetrable evidentiary citations [i.e., mass

22   citations to approximately 1,000 pages of patent files].  These unsupported attorney arguments are

23   insufficient to meet TEFLABS's burden.  Notwithstanding this evidentiary failure, TEFLABS's

24   arguments are still insufficient to the extent they accuse 'AAT Bioquest' or 'Plaintiff' of engaging

25   in inequitable conduct, because they fail to demonstrate the specifics of the inequitable conduct.").

26         In its defense against a finding of willfulness, TEFLABS takes a second bite at the

27   proverbial apple by recapitulating the same attorney arguments about invalidity and

28   unenforceability that it raised during summary judgment.  This misses the point.  In determining

United States District Court
Northern District of California

19

**Appx28**

1    whether TEFLABS acted willfully, the court does not re-adjudicate the sufficiency of TEFLABS's

2    defenses but instead considers whether those defenses were objectively reasonable.  TEFLABS's

3    failure to offer evidence or persuasive case law in support of its defenses rendered them meritless

4    as presented.

5        The court finds that TEFLABS's reliance on its counsel's opinions was objectively

6    unreasonable because those opinions bore significant indicia of unreliability.  "[A] competent

7    opinion of counsel concluding … [that a patent is] invalid would provide a sufficient basis for [the

8    defendant] to proceed without engaging in objectively reckless behavior."  *Finisar Corp. v.

9    DirecTV Grp., Inc.*, 523 F.3d 1323, 1339 (Fed. Cir. 2008).  "Those cases where willful

10    infringement is found despite the presence of an opinion of counsel generally involve situations

11    where opinion of counsel was either ignored or found to be incompetent."  *Read Corp.*, 970 F.2d

12    at 828-29.[10]  This "does not mean a client must itself be able to evaluate the legal competence of

13    its attorney's advice to avoid a finding of willfulness.  The client would not need the attorney's

14    advice at all in that event."  *Read Corp.*, 970 F.2d at 829.  Instead, whether "an opinion is

15    'incompetent' must be shown by objective evidence.  For example, an attorney may not have

16    looked into the necessary facts, and, thus, there would be no foundation for his opinion.  A written

17    opinion may be incompetent on its face by reason of its containing merely conclusory statements

18    without discussion of facts or obviously presenting only a superficial or off-the-cuff analysis."  *Id.*

19        Mr. Yeager's March 3, 2011 response to AAT's notice letter relied entirely on the

20    argument that Fluo-8 was covered by the claims in the Tsien Patent, and that because the Tsien

21    Patent had expired, Fluo-8 was in the public domain.  Yet Mr. Yeager admitted that he did not cite

22

23    [10]  AAT contends that the fact that TEFLABS did not obtain the advice of *outside* counsel when

24    concluding that Fluo-8 was unpatentable and that the '165 Patent was invalid should weigh in
     favor of finding willfulness.  However, "there is no affirmative obligation to obtain opinion of

25    counsel."  *Seagate*, 497 F.3d at 1371.  This necessarily includes the corollary statement that there
     is no obligation to obtain opinion of outside counsel, especially where, as here, the TEFLABS

26    employee who reviewed the patent application and subsequent patent was a patent attorney who
     has been licensed to practice before the PTO for twenty years.  What is significant for the court's

27    analysis of willfulness is not that TEFLABS failed to seek the advice of *outside* counsel, but that it

28    failed to seek *competent* advice of counsel.

20

**Appx29**

1   any case law and did not examine whether Claim 1 of the '165 was patentable over the genus

2   claim in the Tsien Patent. After the '165 Patent issued, Mr. Yeager maintained the position that

3   the Tsien Patent anticipated or rendered obvious Claim 1 of the '165 Patent, even after the patent

4   examiner considered the same prior art and found Claim 1 patentable over it. This is significant

5   because, "[a] patent is presumed valid," 35 U.S.C. § 282; the party challenging validity must meet

6   the "high burden" of proving invalidity by "clear and convincing evidence," *Sciele Pharma Inc. v.*

7   *Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012); and the burden is especially high when the party

8   challenging validity relies on the same evidence that was before the patent examiner, *see Tokai*

9   *Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1367 (Fed. Cir. 2011).

10          Mr. Yeager was not alone in his dogged but objectively unsupported belief in the invalidity

11   of AAT's patent. At trial, Dr. Minta testified that nothing could have happened in the patent

12   prosecution that would have convinced TEFLABS that Claim 1 of the '165 Patent should have

13   issued.

14          Lastly, TEFLABS made numerous sales of the infringing product even after this court

15   granted summary judgment on the validity and enforceability of the '165 Patent and entered a

16   permanent injunction enjoining TEFLABS from selling Fluo-8. This alone constitutes clear and

17   convincing evidence that TEFLABS acted despite an objectively high likelihood that its actions

18   constituted infringement of a valid patent.

19                          **b.  Subjective Prong of *Seagate***

20          The court finds that AAT has easily met the second prong of the *Seagate* test. This

21   analysis asks whether the objectively-defined risk of infringement was either known or so obvious

22   that it should have been known to TEFLABS. With respect to TEFLABS's sales of Fluo-8 after

23   the issuance of the '165 Patent and prior to the permanent injunction, TEFLABS admits that it

24   knew these sales infringed the patent but continued selling Fluo-8 without attempting to design

25   around the patent. As to TEFLABS's sales of Fluo-8 after the permanent injunction, TEFLABS

26   should have attended to the obvious risk that TEFLABS employees would continue to sell Fluo-8

27   if they were not clearly informed of the injunction. Dr. Minta's  remorse about the post-injunction

28   sales is not sufficient to absolve TEFLABS of its responsibility to take reasonable measures to

United States District Court
Northern District of California

21

**Appx30**

1    implement a direct court order; its continued sales cannot be excused, even if they were the result

2    of reckless miscommunication rather than intentional malfeasance.

3        For the reasons stated above, the court finds that AAT has met its burden of showing by

4    clear and convincing evidence that TEFLABS acted despite an objectively high likelihood that its

5    actions constituted infringement of a valid patent, and that TEFLABS knew or should have known

6    about the risk of infringement, such that its infringement of the '165 Patent was willful.

### C.    Enhanced Damages

8        Having determined that TEFLABS's infringement was willful, the court now turns to the

9    separate question of whether damages should be enhanced.  *See i4i Ltd. P'ship v. Microsoft Corp.*,

10   598 F.3d 831, 859 (Fed. Cir. 2010), *aff'd*, 31 S. Ct. 2238 (2011) ("[T]he test for willfulness is

11   distinct and separate from the factors guiding a district court's discretion regarding enhanced

12   damages.").

### 1.    Legal Standards

14       As noted above, a finding of willful infringement is required for, but does not mandate

15   enhancement of damages.  *Seagate*, 497 F.3d at 1368.  *See also Robert Bosch, LLC v. Pylon Mfg.*

16   *Corp.*, 719 F.3d 1305, 1327 (Fed. Cir. 2013) (Reyna, J., concurring in part and dissenting in part)

17   ("*Seagate* was careful to distinguish between the determination that infringement was willful and

18   the decision of whether damages should be enhanced.").  In order to determine whether enhanced

19   damages are appropriate, a court must "evaluate willfulness and its duty of due care under the

20   totality of the circumstances."  *Seagate*, 497 F.3d at 1369.  *See also Read Corp. v. Portec, Inc.*,

21   970 F.2d 816, 826 (Fed. Cir. 1992) ("The paramount determination in deciding to grant

22   enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all

23   the facts and circumstances.").

24       The Federal Circuit has enumerated factors informing this inquiry ("the *Read* factors):

25   "(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the

26   infringer, when he knew of the other's patent, investigated the patent and formed a good faith

27   belief that it was invalid or that it was not infringed; (3) the infringer's behavior in the litigation;

28   (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the

United States District Court
Northern District of California

22

**Appx31**

1  misconduct; (7) the remedial action by the infringer; (8) the infringer's motivation for harm; and

2  (9) whether the infringer attempted to conceal its misconduct." *Robert Bosch*, 719 F.3d at 1327

3  (Reyna, J., concurring in part and dissenting in part) (citing *Read Corp.*, 970 F.2d at 826-27; *i4i*,

4  598 F.3d at 858-59). "The above factors taken together assist the trial court in evaluating the

5  degree of the infringer's culpability and in determining whether to exercise its discretion to award

6  enhanced damages and how much the damages should be increased." *Read Corp*, 970 F.2d at

7  828.

8            **2.    Analysis**

9       All but one of the *Read* factors weigh in favor of enhanced damages. For this reason, the

10  court finds that an award of enhanced damages is warranted.

11       As to the first factor, it is undisputed that TEFLABS deliberately copied Fluo-8, knowing

12  it was an AAT product.

13       The second factor also weighs in favor of enhanced damages. The court has already

14  discussed TEFLABS's doggedly blind confidence in its legal position. TEFLABS's misguided

15  belief that the '165 Patent was invalid (or that the patent would not issue) was based on a sparse

16  review by its owner/patent counsel that failed to examine whether Claim 1 would be patentable

17  over the genus claim of the Tsien Patent. Much of TEFLABS's invalidity argument rested on

18  the weak position that the Tsien Patent anticipated or rendered obvious Claim 1 of the '165

19  Patent, even though the patent examiner had considered the Tsien Patent and found Claim 1

20  patentable over it.

21       The third factor, TEFLABS's behavior in litigation, is a mixed bag that ultimately weighs

22  in favor of enhanced damages. TEFLABS's litigation behavior was problematic. It made

23  misrepresentations regarding its document preservation and document collection, and also

24  routinely missed deadlines. This is regrettable conduct and the court does not condone it, but the

25  court gives TEFLABS's counsel some leeway in acting as both attorney and client in a case for

26  which he was not compensated. Also mitigating against TEFLABS's poor behavior in litigation

27  is the fact that AAT has not identified how it was prejudiced by it. With respect to TEFLABS's

28  settlement positions, they were unrealistic but not outlandish, particularly when viewed in

United States District Court
Northern District of California

23

**Appx32**

1    comparison to the aggressive settlement positions often staked out in patent cases.  However,

2    TEFLABS's post-injunction behavior tilts this factor toward enhanced damages.  TEFLABS

3    continued to make infringing sales of Fluo-8 even after the court ordered a permanent injunction.

4    Although the total amount of post-injunction sales was modest, TEFLABS's flippant conduct

5    and lack of accountability exhibited disregard for the judicial process and for AAT's legally

6    established rights.

7        The fifth *Read* factor also supports an enhanced damage award.  The case was not close

8    on the merits.  This was due to TEFLABS' weak presentation of its defenses at summary

9    judgment, set forth above.

10       The sixth factor examines the duration of the misconduct.  Here, TEFLABS sold its

11   infringing product from before the issuance of the patent in July 2014 until May 27, 2015, which

12   was several weeks after entry of the permanent injunction.

13       Factors seven and eight also point toward an award of enhanced damages. TEFLABS did

14   not take remedial action to address the infringement.  For example, it did not attempt a design-

15   around once it learned of the issuance of the patent.  The evidence also supports a finding that

16   TEFLABS was motivated to harm AAT.  TEFLABS did not cease selling Fluo-8 in part because

17   it wanted the revenue.  It took deliberate steps to woo AAT customers by offering them a lower

18   price for its infringing product.  TEFLABS also was motivated to continue its infringing sales

19   because it wanted to make itself more attractive to one of AAT's customers, Molecular Devices,

20   as a potential acquisition.[11]

21       The ninth *Read* factor, which examines whether the infringer attempted to conceal its

22   misconduct, weighs moderately in favor of enhanced damages.  TEFLABS surreptitiously

23   acquired Fluo-8 from another source and analyzed it, because it knew that AAT would not sell to

24   TEFLABS.  However, these acts predated the issuance of the patent.  Once the patent was issued,

25

26

---

27   [11]  "Where … the infringer engages in infringing conduct to gain an edge over the patentee in a
28   competitive market, this factor favors an award of enhanced damages."  *Funai Elec. Co., Ltd. v.
     Daewoo Elec. Corp.*, 593 F.2d 1088, 1116-17 (N.D. Cal. 2009).

24

1    TEFLABS made no efforts to conceal that it was selling the same Fluo-8 product that AAT

2    offered.

3        The only *Read* factor that weighs against an enhanced damage award is the fourth one,

4    which examines the infringer's size and financial condition. TEFLABS is a small company

5    consisting of five employees, with revenue of $400,000 in 2014. The evidence establishes that

6    one of the reasons TEFLABS did not seek the advice of outside counsel is because it could not

7    afford to do so.

8        Considering all of the factors discussed above, the court finds that an award of enhanced

9    damages is warranted in this case. The court therefore **grants** AAT treble damages for

10   TEFLABS's infringement of the '165 Patent, or **$423,078.69**.

**D.    Exceptional Case**

12   AAT contends that this case is "exceptional," such that the court should award attorneys'

13   fees.

**1.    Legal Standards**

15   Under 35 U.S.C. § 285, a "court in exceptional cases may award reasonable attorney[s']

16   fees to the prevailing party." The Supreme Court recently held that "[a]n 'exceptional' case is

17   simply one that stands out from others with respect to the substantive strength of a party's

18   litigating position (considering both the governing law and the facts of the case) or the

19   unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health &*

20   *Fitness, Inc.*, – U.S. –, 134 S. Ct. 1749, 1756 (2014).

21   In reaching this holding, the Supreme Court abrogated the previous standard for

22   exceptional cases set forth in the Federal Circuit's decision in *Brooks Furniture Manufacturing,*

23   *Inc. v. Dutailier International, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005). Under the *Brooks Furniture*

24   standard, a case was "exceptional" only "if a district court either finds litigation-related

25   misconduct of an independently sanctionable magnitude or determines that the litigation was both

26   'brought in subjective bad faith' and 'objectively baseless.'" *Octane Fitness*, 134 S.Ct. at 1756

27   (citing *Brooks Furniture*, 393 F.3d at 1381). The Supreme Court rejected this formulation as

28   "overly rigid" because it "superimposes an inflexible framework onto statutory text that is

25

**Appx34**

1    inherently flexible," and also found it "so demanding that it would appear to render § 285 largely

2    superfluous." *Id.* at 1756, 1758.  The Supreme Court also rejected *Brooks Furniture*'s

3    requirement that patent litigants establish their entitlement to attorneys' fees by clear and

4    convincing evidence, and found instead that the preponderance of the evidence standard applied.

5    *Id.* at 1758.

6         Under the lower standard in *Octane Fitness*, "[d]istrict courts may determine whether a

7    case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the

8    circumstances." *Id.*  "[T]here is no precise rule or formula for making these determinations, but

9    instead equitable discretion should be exercised in light of the considerations we have identified."

10   *Id.* n.6 (identifying a "nonexclusive" list of considerations imported from copyright context,

11   including "frivolousness, motivation, objective unreasonableness (both in the factual and legal

12   components of the case) and the need in particular circumstances to advance considerations of

13   compensation and deterrence").

14        "While a finding of willful infringement does not require a finding that a case is

15   exceptional, … willfulness of the infringement by the accused infringer may be a sufficient basis

16   in a particular case for finding the case 'exceptional' for purposes of awarding attorney fees to the

17   prevailing patent owner." *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1340 (Fed. Cir.

18   2004) (citation and formatting omitted).  "Based on a finding of willful infringement, it is within

19   the district court's discretion whether to award attorney fees under § 285." *Id.*  However,

20   "[a]lthough an attorney fee award is not mandatory when willful infringement has been found,

21   precedent establishes that the court should explain its decision not to award attorney fees."

22   *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1349 (Fed. Cir. 2011) (citing *Transclean Corp.

23   v. Bridgewood Servs., Inc.,* 290 F.3d 1364, 1379 (Fed. Cir. 2002) ("[T]he general rule [is] that the

24   district court must normally explain why it decides that a case is not exceptional under 35 U.S.C. §

25   285 when a factual finding of willful infringement has been established and, if exceptional, why it

26   decides not to award attorney fees.").

27        An exceptional case is "rare."  *Octane Fitness*, 134 S.Ct. at 1756.  The sanctions imposed

28   under Section 285 "carry serious economic and reputational consequences for both litigants and

United States District Court
Northern District of California

26

**Appx35**

1    counsel." *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1376 (Fed. Cir. 2011).

2            **2.      Analysis**

3            AAT's argument for why this case is exceptional rests on the same facts as its arguments

4    on willfulness and enhanced damages, i.e., the weakness of TEFLABS's defenses, TEFLABS's

5    motivation behind copying AAT's product, and the unreasonable manner in which TEFLABS

6    litigated the case.  The court has discussed the evidence on each of these facts at length above, and

7    has granted AAT treble damages because of TEFLABS's conduct.  This body of evidence also

8    supports a finding that two aspects of this case are exceptional.  Specifically, it was objectively

9    unreasonable for TEFLABS to present its defenses in the manner that it did, i.e., by failing to cite

10   law in support of its arguments, and failing to raise evidence on the basic elements of its defenses.

11   This case also stands out from others because TEFLABS continued to sell a modest amount of its

12   infringing product (worth slightly over $2000) even after the court permanently enjoined it from

13   doing so.[12]

14           A determination that portions of this case are exceptional does not automatically mean that

15   AAT is entitled to attorneys' fees.  "[T]he decision whether or not to award fees is … committed

16   to the discretion of the trial judge, and even an exceptional case does not require in all

17   circumstances the award of attorney fees."  *Modine Mfg. Co. v. Allen Grp., Inc.*, 917 F.2d 538, 543

18   (Fed. Cir. 1990).  In determining whether to award attorneys' fees, the trial judge may consider

19   "any … factors that may contribute to a fair allocation of the burdens of litigation as between

20   winner and loser," *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir.

21   1986), including "the need in particular circumstances to advance considerations of compensation

22   and deterrence." *Octane Fitness*, 134 S.Ct. at 1758 n.6.

23           Here, TEFLABS's unsupported belief in the strength of its arguments was unreasonable in

24   light of its failure to present evidence supporting its positions, as well as its counsel's sparse

25   review of the matter.  TEFLABS's decision to rely on its owner/counsel to supply objective legal

26

27   _____
     [12]   Other conduct by TEFLABS does not warrant a finding of an exceptional case.  Namely, for
28   the reasons stated above, TEFLABS's conduct during litigation was inadvisable but not
     exceptional, as was TEFLABS's motivation to capture some of the market share of Fluo-8.

                                                    27

United States District Court
Northern District of California

**Appx36**

advice was foolhardy at best. But TEFLABS also presented evidence that it could not afford to hire counsel in addition to Mr. Yeager. TEFLABS is a small company and the scale of its infringement was likewise small: it sold 1230.3 milligrams of Fluo-8 over eleven months for which it made $76,447.50. AAT made hundreds of thousands of dollars in revenue from its sales of Fluo-8 in the same time period. This is not to trivialize the harm done to AAT by TEFLABS. Dr. Diwu testified convincingly about the stress and expense that he and his company faced as a result of TEFLABS's actions. However, the court's award of trebled lost profits damages to AAT means that TEFLABS will surrender to AAT an amount that is more than five times the actual revenue it made from its sales of Fluo-8, and roughly equivalent to AAT's 2014 total revenue. This is sufficient compensation, punishment, and deterrence. After considering the totality of the circumstances, the court will exercise its discretion and decline to award attorneys' fees under 35 U.S.C. § 285 for the two aspects of the case that it finds to be exceptional.

### IV.    CONCLUSION

The court awards AAT enhanced damages in the form of three times the amount of AAT's lost profits, for a total **$423,078.69**, plus interest and costs. The court finds that although some portions of this case are exceptional, attorneys' fees are not warranted for those portions. **By December 11, 2015,** the parties shall meet and confer and file a proposed briefing schedule on the sole remaining issues of interest and costs.

**IT IS SO ORDERED.**

Dated: November 30, 2015

_____

Donna M. Ryu
United States Magistrate Judge

United States District Court
Northern District of California

28

**Appx37**



US008779165B2

(12) **United States Patent**
Diwu et al.

(10) Patent No.: **US 8,779,165 B2**
(45) Date of Patent: **Jul. 15, 2014**

(54) **FLUORESCENT ION INDICATORS AND THEIR APPLICATIONS**

(75) Inventors: **Zhenjun Diwu**, Sunnyvale, CA (US); **Jianjun He**, Sunnyvale, CA (US); **Jinfang Liao**, Foster City, CA (US)

(73) Assignee: **AAT Bioquest, Inc.**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 311 days.

(21) Appl. No.: **12/932,683**

(22) Filed: **Mar. 2, 2011**

(65) **Prior Publication Data**

US 2011/0229924 A1     Sep. 22, 2011

**Related U.S. Application Data**

(62) Division of application No. 12/040,753, filed on Feb. 29, 2008, now abandoned.

(60) Provisional application No. 60/923,452, filed on Apr. 13, 2007.

(51) **Int. Cl.**
| | |
|---|---|
| *C07D 311/82* | (2006.01) |
| *C07D 219/06* | (2006.01) |
| *G01N 33/84* | (2006.01) |
| *C07D 311/90* | (2006.01) |
| *G01N 33/533* | (2006.01) |
| *C07D 493/10* | (2006.01) |
| *C07C 229/24* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *G01N 33/84* (2013.01); *C07D 219/06* (2013.01); *C07C 2103/24* (2013.01); *C07D 311/90* (2013.01); *G01N 33/533* (2013.01); *C07D 493/10* (2013.01); *C07C 229/24* (2013.01)
USPC .......................................................... **549/223**

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,603,209 | A | 7/1986 | Tsien et al. |
| 4,849,362 | A | 7/1989 | DeMarinis |
| 4,945,171 | A | 7/1990 | Haugland et al. |
| 5,049,673 | A | 9/1991 | Tsien et al. |
| 5,134,232 | A | 7/1992 | Tsien et al. |
| 5,227,487 | A | 7/1993 | Haugland et al. |
| 5,380,836 | A | 1/1995 | Rogart |
| 5,405,975 | A | 4/1995 | Kuhn et al. |
| 5,436,128 | A | 7/1995 | Harpold et al. |
| 5,439,828 | A | 8/1995 | Masilamani et al. |
| 5,453,517 | A | 9/1995 | Kuhn et al. |
| 5,459,276 | A | 10/1995 | Kuhn et al. |
| 5,501,980 | A | 3/1996 | Katerinopoulos et al. |
| 5,516,911 | A | 5/1996 | London et al. |
| 5,773,227 | A | 6/1998 | Kuhn et al. |
| 6,057,114 | A | 5/2000 | Akong et al. |
| 6,162,931 | A | 12/2000 | Gee et al. |
| 6,420,183 | B1 | 7/2002 | Krahn et al. |
| 2002/0164616 | A1 | 11/2002 | Martin et al. |

OTHER PUBLICATIONS

Online "http://www.interchim.fr/cat/CalciumAssays.pdf" Mar 31, 2004—Fluo-8 AM." "[PDF] Calcium Assays—Interchim" accessed Sep. 16, 2013.*
Online: http://www.teflabs.com/Portals/44052/docs/Fluo-2-MA-Info-Packet1.pdf" accessed Sep. 17, 2013.*
Adams, C.M.W., et al., "Permeability in Atherosclerosis," Atherosclerosis, 27, pp. 353-359 (1977).
Eidelman, O., and Cabantchik, Z. I., "Continuous Monitoring of Transport by Fluorescence on Cells and Vesicles," Biochim. Biophys. Acta, 988, pp. 319-334 (1989).
Molecular Probes Inc., Handbook of Fluorescent Probes and Research Chemicals, 7th edition, Chapter 1, Eugene, Oregon (1996-2007).
Davis, H.W., and Sauter, R.W., "Fluorescence of Trypan Blue in Frozen-Dried Embryos of the Rat," Histochemistry, 54, pp. 177-189 (1977).
Hathaway, W., et al., "The Acridine Orange Viability Test Applied to Bone Marrow Cells I. Correlation with Trypan Blue and Eosin Dye . . . ," Blook, 23, pp. 517-525 (2007).
Bacci, J., et al., "Efficient Two-Step Synthesis of 9-Aryl-6-hydroxy-3H-xanthen-3-one Fluorophores," Org. Chem., 70, pp. 9051-9053 (2005).
Lakowicz, J. R., "Topics in Fluorescence Spectroscopy," vol. 4: Probe Design and Chemical Sensing; Plenum Press, New York & London (1994).
Gee, K., et al., "Detection and Imaging of Zinc Secretion from Pancreatic B-Cells Using a New Fluorescent Zinc Indicator," J. Am. Chem. Soc., 124, pp. 776-778 (2002).
Martin, V., et al., "Fluorescent Sodium Ion Indicators Based on the 1,7-diaza-15-crown-5 system," Bioorg. Med. Chem. Lett., 14, pp. 5313-5316 (2004).
Parham, W. E., and Bradscher, C. K., "Aromatic Organolithium Reagents Bearing Electrophilic Groups. Preparation by Halogen . . . ," Acc. Chem. Res., 15, pp. 300-305 (1982).

* cited by examiner

*Primary Examiner* — David K O Dell

(57)     **ABSTRACT**

Fluorescent dyes useful for preparing fluorescent metal ion indicators, the fluorescent indicators themselves, and the use of the fluorescent indicators for the detection, discrimination and quantification of metal cations.

**1 Claim, 14 Drawing Sheets**

U.S. Patent

Jul. 15, 2014

Sheet 1 of 14

US 8,779,165 B2

Appx39



Fig. 1

## Fig. 2

Fig. 3

Fig. 4

Appx43



Fig. 5

Fig. 6

## Fig. 7

Fig. 8

Fig. 9

## Fig. 10

**Fig. 11**

## Fig. 12



Fig. 13

Fig. 14

Fig. 18

Fig. 15

Fig. 16

Fig. 17



US 8,779,165 B2

**1**

# FLUORESCENT ION INDICATORS AND THEIR APPLICATIONS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a divisional of U.S. patent application Ser. No. 12/040,753, filed Feb. 29, 2008, which claims priority under 35 U.S.C. §119(e) to U.S. provisional patent application Ser. No. 60/923,452, filed Apr. 13, 2007, both of which are hereby incorporated by reference.

## BACKGROUND

Metal ions play important roles in many biological systems. Cells utilize metal ions for a wide variety of functions, such as regulating enzyme activities, protein structures, cellular signaling, as catalysts, as templates for polymer formation and as regulatory elements for gene transcription. Metal ions can also have a deleterious effect when present in excess of bodily requirements or capacity to excrete. A large number of natural and synthetic materials are known to selectively or non-selectively bind or chelate metal ions. Ion chelators are commonly used in solution for in vivo control of ionic concentrations and detoxification of excess metals, and as in vitro buffers. Ion chelators can be used as optical indicators of ions when bound to a fluorophore, and may be useful in the analysis of cellular microenvironments or dynamic properties of proteins, membranes and nucleic acids. For example, $Ca^{2+}$ ions play an important role in many biological events, and so the determination of intracellular $Ca^{2+}$ is an important biological application.

Fluorescent indicators utilizing a polycarboxylate BAPTA chelator have been predominantly used for intracellular calcium detections (see for example U.S. Pat. No. 4,603,209; U.S. Pat. No. 5,049,673; U.S. Pat. No. 4,849,362; U.S. Pat. No. 5,453,517; U.S. Pat. No. 5,501,980; U.S. Pat. No. 5,459,276; U.S. Pat. No. 5,501,980; U.S. Pat. No. 5,459,276; and U.S. Pat. No. 5,516,911; each of which is hereby incorporated by reference). Xanthene-based fluorescent calcium indicators (such as Fluo-3, Fluo-4 and Rhod-2 as represented by formula 1) are the most common fluorescent indicators used in biological assays. However, these existing xanthene-based calcium indicators typically have low fluorescence quantum yields, resulting in low detection sensitivity). Furthermore their corresponding acetoxymethyl esters may not readily penetrate the membranes of live cells (thus requiring higher temperatures to achieve optimal dye loading, and once inside the cells, they exhibit a slow conversion to the corresponding BAPTA free acid.

**2**



Formula 1

| Indicator | X | Z | $R^2$ | $R^5$ |
|-----------|-----|-----|-----|-----|
| Fluo-3 | O | O | Cl | Cl |
| Fluo-4 | O | O | F | F |
| Rhod-2 | N(Me)$_2$ | N(Me)$_2$ | H | H |

In view of the existing drawbacks for currently used xanthene-based fluorescent calcium indicators, what is needed are improved compositions and methods that offer sensitive detection of small variations in calcium concentrations, with a rapid response and a strong fluorescence signal. Also needed are fluorescent indicators that can be readily loaded into live cells. In addition, compositions and methods that are less susceptible to the effects of external changes (such as temperature) are preferred for high throughput screening and high content analysis.

The present application is directed to a family of fluorescent dyes that are useful for preparing fluorescent metal ion indicators. The indicators include a fluorophore and a ionophore, and are useful for the detection, discrimination and quantification of metal cations.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1**. A synthetic scheme for the preparation of selected BAPTA aldehyde compounds, where. $R_x$ and $R_y$ represent one or more substituents of each ring.

FIG. **2**. A synthetic scheme for the preparation of BAPTA anhydride compounds and xanthene-substituted BAPTA compounds, where $R_x$, Ry and Rz represent one or more substituents of each ring.

FIG. **3**. A synthetic scheme for the preparation of selected BAPTA acid compounds and their derivatives, where $R_x$ and $R_y$ represent one or more substituents of each ring.

FIG. **4**. A synthetic scheme for the preparation of selected BAPTA bromide compounds (Method A), where $R_x$ and $R_y$ represent one or more substituents of each ring.

FIG. **5**. An alternative synthetic scheme for the preparation of BAPTA bromide compounds (Method B), where. $R_x$ and $R_y$ represent one or more substituents of each ring.

FIG. **6**. A synthetic scheme for the preparation of selected fluorescein-based ion indicators (Method A), where $R_x$, $R_y$ and $R_z$ represent one or more substituents of each ring.

FIG. **7**. An alternative synthetic scheme for the preparation of selected fluorescein-based ion indicators (Method B), where $R_x$, $R_y$, and $R_z$ represent one or more substituents of each ring.

FIG. **8**. A synthetic scheme for the preparation of selected rhodamine-based ion indicators (Method A), where $R_x$, $R_y$, and $R_z$ represent one or more substituents of each ring.

US 8,779,165 B2

**3**

FIG. **9**. An alternative synthetic scheme for the preparation of selected rhodamine-based ion indicators (Method B), where $R_x$, $R_y$, and $R_z$ represent one or more substituents of each ring.

FIG. **10**. A synthetic scheme for the preparation of selected rhodol-based ion indicators (Method A), where $R_x$, $R_y$, and $R_z$ represent one or more substituents of each ring.

FIG. **11**. An alternative synthetic scheme for the preparation of selected rhodol-based ion indicators (Method B), where $R_x$, $R_y$, and $R_z$ represent one or more substituents of each ring.

FIG. **12**. Another alternative synthetic scheme for the preparation of selected rhodol-based ion indicators (Method C), where $R_x$, $R_y$, and $R_z$ represent one or more substituents of each ring.

FIG. **13**. The absorption spectra of Compound 284 in the presence of 0.5 mM $Ca^{2+}$ and in the absence of $Ca^{2+}$ as described in Example 28).

FIG. **14**. The calcium-dependent fluorescence spectra of Compound 284 in the presence of 0.5 mM $Ca^{2+}$ and in the absence of $Ca^{2+}$ ion with fluorescence excitation at 460 nm, as described in Example 28.

FIG. **15**. Intracellular $Ca^{2+}$ response of the fluorescent indicator Fluo-3 AM when measured by a fluorescence microscope, as described in Example 29.

FIG. **16**. Intracellular $Ca^{2+}$ response of the fluorescent indicator Fluo-4 AM when measured by a fluorescence microscope, as described in Example 29.

FIG. **17**. Intracellular $Ca^{2+}$ response of the fluorescent indicator Compound 365 when measured by a fluorescence microscope, as described in Example 29.

FIG. **18**. The intracellular $Ca^{2+}$ response of selected fluorescent calcium indicators as measured by a fluorescence microplate reader that is equipped with an automated liquid handling system, as described in Example 30.

DEFINITIONS

The following definitions are set forth to illustrate and define the meaning and scope of the various terms used to describe the invention herein.

The term "organic substituent", as used herein, refers to a carbon-containing organic radical that incorporates straight, branched chain or cyclic radicals having up to 50 carbons, unless the chain length or ring size is limited thereto. The organic substituent may include one or more elements of unsaturation, such as carbon-carbon double or triple bonds. Organic substituents may include alkyl, alkylene, alkenyl, alkenylene and alkynyl moieties, among others.

The term "alkyl," as used herein, by itself or as part of another group, refers to straight, branched chain or cyclic radicals having up to 50 carbons, unless the chain length or ring size is limited thereto, such as methyl, ethyl, propyl, cyclopropanyl, isopropyl, butyl, t-butyl, isobutyl, pentyl, hexyl, cyclohexyl, isohexyl, heptyl, 4,4-dimethylpentyl, octyl, 2,2,4-trimethylpentyl, nonyl, and decyl, among others.

The term "alkylene," as employed herein, by itself or as part of another group, refers to straight, branched chain or cyclic divalent radicals having up to 50 carbons, unless the chain length or ring size is limited thereto. Typical examples include methylene (—CH$_2$—), ethylene (—CH$_2$CH$_2$—), hexylene, heptylene, octylene, nonylene, and decylene, among others.

The term "alkenyl," as used herein, by itself or as part of another group, means a straight, branched chain or cyclic radical having 2-50 carbon atoms and one or more carbon-carbon double bonds, unless the chain length or ring size is limited thereto, such as ethenyl, 1-propenyl, 2-propenyl,

**4**

2-methyl-1-propenyl, 1-butenyl, and 2-butenyl, among others. The alkenyl chain may be 2 to 10 carbon atoms in length. Alternatively, the alkenyl chain may be 2 to 4 carbon atoms in length.

The term "alkenylene," as used herein, by itself or as part of another group, means straight, branched chain or cyclic divalent radical having 2-50 carbon atoms, unless the chain length or ring size is limited thereto, said straight, branched chain or cyclic radical containing at least one carbon-carbon double bond. Typical examples include ethenylene (—CH═CH—), propenylene (—CH═CHCH$_2$— and —CH$_2$CH═CH—), n-butenylene, and 3-methyl-2-pentenylene, hexenylene, heptenylene, octenylene, nonenylene, and decenylene, among others.

The term "alkynyl," as used herein, by itself or as part of another group, means a straight, branched chain or cyclic radical of 2-50 carbon atoms, unless the chain length or ring size is limited thereto, having at least one carbon-carbon triple bond between two of the carbon atoms in the chain, such as acetylenyl, 1-propynyl, and 2-propynyl, among others. The alkynyl chain may be 2 to 10 carbon atoms in length. Alternatively, the alkynyl chain may be from 2 to 4 carbon atoms in length.

The term "alkynylene" as used herein, by itself or as part of another group, means a straight, branched chain or cyclic divalent radical having 2-50 carbon atoms, unless the chain length or ring size is limited thereto, that contains at least one carbon-carbon triple bond. Typical examples include ethynylene (—C≡C—), propynylene (—C≡CCH$_2$— and —CH$_2$C≡C—), n-butynylene, 4-methyl-2-pentynylene, 1-butynylene, 2-butynylene, 3-butynylene, 4-butynylene, pentynylene, hexynylene, heptynylene, octynylene, nonynylene, and decynylene, among others.

The term "alkoxy" as used herein, by itself or as part of another group, refers to any of the above radicals linked via an oxygen atom. Typical examples include methoxy, ethoxy, isopropyloxy, sec-butyloxy, n-butyloxy, t-butyloxy, n-pentyloxy, 2-methylbutyloxy, 3-methylbutyloxy, n-hexyloxy, and 2-ethylbutyloxy, among others. Alkoxy also may include PEG groups (—OCH$_2$CH$_2$O—) or alkyl moieties that contain more than one oxygen atom.

The term "aryl," as employed herein, by itself or as part of another group, refers to an aryl or aromatic ring system containing 1 to 4 unsaturated rings (each ring containing 6 conjugated carbon atoms and no heteroatoms) that are optionally fused to each other or bonded to each other by carbon-carbon single bonds, that is optionally further substituted as described below. Examples of aryl ring systems include, but are not limited to, substituted or unsubstituted derivatives of phenyl, biphenyl, o-, m-, or p-terphenyl, 1-naphthyl, 2-naphthyl, 1-, 2-, or 9-anthryl, 1-, 2-, 3-, 4-, or 9-phenanthrenyl and 1-, 2- or 4-pyrenyl. Aryl substituents may include phenyl, substituted phenyl, naphthyl or substituted naphthyl.

The term "heteroaryl," as employed herein, by itself or as part of another group, refers to groups having 5 to 14 ring atoms; 6, 10 or 14 π electrons shared in a cyclic array; and containing carbon atoms and 1, 2, 3, or 4 oxygen, nitrogen or sulfur heteroatoms (where examples of heteroaryl groups are: thienyl, benzo[b]thienyl, naphtho[2,3-b]thienyl, thianthrenyl, furyl, pyranyl, isobenzofuranyl, benzoxazolyl, chromenyl, xanthenyl, phenoxathiinyl, 2H-pyrrolyl, pyrrolyl, imidazolyl, pyrazolyl, pyridyl, pyrazinyl, pyrimidinyl, pyridazinyl, indolizinyl, isoindolyl, 3H-indolyl, indolyl, indazolyl, purinyl, 4H-quinolizinyl, isoquinolyl, quinolyl, phthalazinyl, naphthyridinyl, quinazolinyl, cinnolinyl, pteridinyl, carbazolyl, phenanthridinyl, acridinyl, perimidinyl, phenanthrolinyl, phenazinyl, isothiazolyl, phenothiazinyl, isoxazolyl, furazanyl, phenoxazinyl, and tetrazolyl groups).

Any aryl or heteroaryl ring system is unsubstituted or optionally and independently substituted by any synthetically

US 8,779,165 B2

**5**

accessible and chemically stable combination of substituents, such as H, halogen, cyano, sulfo, alkali or ammonium salt of sulfo, nitro, carboxy, alkyl, perfluoroalkyl, alkoxy, alkylthio, amino, monoalkylamino, dialkylamino or alkylamido, the alkyl portions of which having 18 or fewer carbons.

The terms "halogen" or "halo" as employed herein, by itself or as part of another group, refers to chlorine, bromine, fluorine or iodine.

The terms "AM ester" or "AM" as employed herein, by itself or as part of another group, refers to an acetoxymethyl ester of a carboxylic acid.

The terms "amino" or "amine" include NH₂, "monoalkylamine" or "monoalkylamino," and "dialkylamine" or "dialkylamino". The terms "monoalkylamine" and "monoalkylamino," "dialkylamine" and "dialkylamino as employed herein, by itself or as part of another group, refers to the group $NH_2$ where one hydrogen has been replaced by an alkyl group, as defined above.

The terms "dialkylamine" and "dialkylamino" as employed herein, by itself or as part of another group, refers to the group $NH_2$ where both hydrogens have been replaced by alkyl groups, as defined above.

The term "hydroxyalkyl," as employed herein, by itself or as part of another group, refers to an alkyl group where one or more hydrogens thereof are substituted by one or more hydroxyl moieties.

The term "haloalkyl," as employed herein, by itself or as part of another group, refers to an alkyl group where one or more hydrogens thereof are substituted by one or more halo moieties. Typical examples include chloromethyl, fluoromethyl, difluoromethyl, trifluoromethyl, trichloroethyl, trifluoroethyl, fluoropropyl, and bromobutyl, among others.

The term "haloalkenyl," as employed herein, by itself or as part of another group, refers to an alkenyl group where one or more hydrogens thereof are substituted by one or more halo moieties.

The term "haloalkynyl," as employed herein, by itself or as part of another group, refers to an alkynyl group where one or more hydrogens thereof are substituted by one or more halo moieties.

The term "carboxyalkyl," as employed herein, by itself or as part of another group, refers to an alkyl group where one or more hydrogens thereof are substituted by one or more carboxylic acid moieties.

The term "heteroatom" as used herein, by itself or as part of another group, means an oxygen atom ("O"), a sulfur atom ("S") or a nitrogen atom ("N"). It will be recognized that when the heteroatom is nitrogen, it may form an $NR_1R_2$ moiety, where $R_1$ and $R_2$ are, independently from one another, hydrogen or alkyl, or together with the nitrogen to which they are bound, form a saturated or unsaturated 5-, 6-, or 7-membered ring.

The terms "chelator", "chelate", "chelating group", "ionophore", or "ionophoric moiety" as used herein, by itself or as part of another group, refers to a chemical moiety that binds to, or complexes with, one or more metal ions, such as lithium, calcium, sodium, magnesium, potassium, and/or other biologically important metal ions. The binding affinity of a chelator for a particular metal ion can be determined by measuring the dissociation constant between that chelator and that ion. Chelators may include one or more chemical moieties that bind to, or complex with, a cation or anion. Examples of suitable chelators include 1,2-Bis(2-aminophenoxy)ethane-N,N,N′-tetraacetic acid (BAPTA), bipyridyl (bipy); terpyridyl (terpy); ethylenediaminetetraacetic acid (EDTA); crown ethers; aza-crown ethers; succinic acid; citric acid; salicylic acids; histidines; imidazoles; ethyleneglycol-bis-(beta-aminoethyl ether) N,N′-tetraacetic acid (EGTA); nitroloacetic acid; acetylacetonate (acac); sulfate; dithiocarbamates; carboxylates; alkyldiamines; ethylenediamine (en);

**6**

diethylenetriamine (dien); nitrate; nitro; nitroso; glyme; diglyme; bis(acetylacetonate)ethylenediamine (acaen); 1,4,7,10-tetraazacyclododecanetetraacetic acid (DOTA), 1,4,7,10-tetraazacyclododecane-1,4,7-triacetic acid (DO3A), 1-oxa-4,7,10-triazacyclododecane-triacetic acid (OTTA), 1,4,7-triazacyclononanetriacetic acid (NOTA), 1,4,8,11-tetraazacyclotetra-decanetetraacetic acid (TETA), DOTA-N-(2-aminoethyl) amide; DOTA-N-(2-aminophenethyl) amide; and 1,4,8,11-tetraazacyclotetradecane, among others.

The term "BAPTA" or "1,2-Bis(2-aminophenoxy)ethane-N,N,N′,N′-tetraacetic acid" as used herein, by itself or as part of another group, refers to the following ring structure or its derivatives, such as esters, amides, carbamates and so on:



BAPTA

The term "fluorophore or fluorophore moiety" as used herein, by itself or as part of another group, means a molecule or a portion of a molecule which exhibits fluorescence. By fluorescence is meant that the molecule or portion of a molecule can absorb excitation energy having a given wavelength and emit energy at a different wavelength. The intensity and wavelength of the emitted energy depend on the fluorophore, the chemical environment of the fluorophore, and the specific excitation energy used. Exemplary fluorophores include, but are not limited to, fluoresceins, rhodamines, coumarins, oxazines, cyanines, pyrenes, and other polycyclic aromatic molecules.

The term "xanthene", or "xanthene derivative", as used herein, by itself or as part of another group, means any compounds or substituents that contain one or more of the following fused ring structures or its derivatives:



Xanthene

(X, Z = O, S or Se or N; Y = O, S, Se, N or C)

The term "fluorescein" as used herein, by itself or as part of another group, means any compounds or substituents that contain one or more of the following fused ring structures or its derivatives:



Fluorescein

(Y = O, S, Se, N or C)

The term "rhodamine" as used herein, by itself or as part of another group, means any compounds or substituents that contain one or more of the following fused ring structures or its derivatives:

US 8,779,165 B2

**7**



Rhodamine

(Y = O, S, Se, N or C)

The term "rhodol" as used herein, by itself or as part of another group, means any compounds or substituents that contain one or more of the following fused ring structures or its derivatives:



Rhodol

(Y = O, S, Se, N or C)

The term "substituted," as used herein, refers to the formal replacement of a hydrogen on a chemical moiety or functional group with an alternative radical. Where a compound, chemical moiety or functional group is described as substituted, the alternative radical substituent moiety is generally selected from the group consisting of hydroxy, oxo, nitro, trifluoromethyl, halogen, alkoxy, alkylenedioxy, aminoalkyl, aminoalkoxy, amino, monoalkylamino, dialkylamino, alkylcarbonylamino, alkoxycarbonylamino, alkoxycarbonyl, carboxy, hydroxyalkoxy, alkoxyalkoxy, monoalkylaminoalkoxy, dialkylaminoalkoxymono(carboxyalkyl)amino, bis(carboxyalkyl)amino, alkoxycarbonyl, alkynylcarbonyl, alkylsulfonyl, alkenylsulfonyl, alkynylsulfonyl, arylsulfonyl, alkylsulfonyl, alkylsulfinyl, alkylsulfonamido, arylsulfonamido, alkylsulfonamido, carboxyalkoxy, carboxyalkyl, carboxyalkylamino, cyano, trifluoromethoxy, perfluoroethoxy, guanidine, amidino, oxyguanidino, alkylimino, formylimino, acyl nitrile, acyl azide, acetyl azide, dichlorotriazene, isothiocyante, sulfonyl halide, sulfosuccinimidyl ester, isocyante, acyl halide, aldehyde, haloacetamide, maleimido, aziridinyl, alkylthio (disulfide), acrylo, haloalkylcarbonyl, boronate, hydrazide, semicarbazide, carbohydrazide, arylalkyl, heteroarylalkyl, cycloalkylalkyl, cycloalkenylalkyl, cycloheteroalkylalkyl, and cycloheteroalkenylalkyl.

The term "indicator compound" refers to the compounds of the invention, specifically to those compounds having utility as fluorescent metal ion indicators, as well as their acylated or otherwise protected precursor compounds, such as the acetoxymethyl ester derivatives suitable for adding to samples containing biological cells.

The term "screening" refers to the testing and/or evaluation of a multiplicity of molecules or compounds for a selected property or therapeutic utility. Screening is typically a repetitive, or iterative, process. A multiplicity of candidate molecules may be screened for their ability to bind to a target molecule which is capable of denaturing and/or unfolding. For example, a multiplicity of candidate molecules may be evaluated for their ability to bind to a target molecule (e.g., a protein receptor) in a thermal shift assay. If none of a selected

**8**

subset of molecules from the multiplicity of candidate molecules (for example, a combinatorial library) binds to the target molecule, then a different subset may be tested for binding in the thermal shift assay.

The term "high-throughput", as used herein, encompasses screening activity in which human intervention is minimized, and automation is maximized. For example, high-throughput screening may include any of a variety of automated processes, including for example the automation of pipetting, mixing, and/or heating, the software-controlled generation of thermal unfolding information, and the software-controlled comparisons of thermal unfolding information. Alternatively, a high-throughput method is one in which hundreds of compounds can be screened per 24 hour period by a single individual operating a single suitable apparatus.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present application is directed to Fluorescent dyes useful for preparing fluorescent metal ion indicators, the fluorescent indicators themselves, and the use of the fluorescent indicators for the detection, discrimination and quantification of metal cations.

In one aspect of the invention, the compounds of the invention may be described by Formula 2, below:

Formula 2



Substituents $R^1$-$R^6$ are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl, or heteroaryl; or alkyl, or alkoxy that

US 8,779,165 B2

**9**                                                                                   **10**

is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

The heteroatom Y is independently selected from O, S, Se, $NR^9$ and $CR^{10}R^{11}$. The X and Z substituents are independently selected from O and $NR^{12}R^{13}$, where each $R^9$, $R^{10}$, $R^{11}$, $R^{12}$ and $R^{13}$ is independently H, an alkyl having 1-12 carbons, or carboxyalkyl.

The T and U substituents are independently selected from alkyl having 1-12 carbons, alkoxy having 1-12 carbons, aryloxy, amino, halogen, cyano, carboxy, carboxyalkyl, carbonyl, sulfonyl, phosphonyl, boronic acid, aryl, and heteroaryl.

The V and W are independently selected from $OR^{14}$, $SR^{15}$ or $NR^7R^{13}$, such that at least one of V or W, in combination with $NR^7R^8$, forms a metal chelator, where each $R^7$, $R^8$, and $R^{12}$-$R^{15}$ are independently H, an alkyl having 1-12 carbons, carboxyalkyl, alkoxy or aryloxy.

In one aspect of the invention X and Z are both O. In another aspect of the invention X and Y are O, and Z is $NR^{12}R^{13}$. In yet another aspect of the invention, X, Y and Z are each O. Careful selection of the nature of the X, Y, and Z heteroatoms allows the spectral properties of the indicators to be tuned through the selection of the appropriate xanthene dye

The compound of the invention may include exactly two fluorophores, which may be the same or different, and which may each be independently bound to the chelator by a covalent linkage L, or may be fused to the chelator moiety. Where the compound of the invention includes two fluorophores, the two fluorophores may result in an indicator compound that exhibits ratiometric spectral properties (such as Indo-1 or Fura-2).

The compounds of the present invention are xanthene-based metal ion indicators. The existing xanthene-based BAPTA calcium indicators are either fluorescein- (where X, Y and Z are O) or rhodamine- (where X and Z are N while Y is O) based structures such as Fluo-3, Fluo-4 and Rhod-2. The spectral properties of the existing xanthene-based ion indicators may be modulated by selecting substituents $R^1$-$R^6$, while the chelating properties of the indicator may be adjusted by selecting and/or modifying substituents j, k, m and n on the phenyl ring that is not conjugated to the xanthene ring.

The substituents T and U can play unexpectedly important roles in determining both the spectral properties and the chelating properties of the indicator compounds. Another unexpected discovery is that substituents $R^1$, $R^2$, $R^5$ and $R^6$ play important roles in controlling the cell loading and intracellular esterase-induced hydrolysis rate of acetoxymethyl (AM) esters of xanthene-based fluorescent BAPTA indicators. For example, the acetoxymethyl (AM) esters of xanthene-based BAPTA indicators are much more readily loaded into live cells when $R^1$, $R^2$, $R^5$ and $R^6$ are all hydrogen. The compounds of the present invention provide sensitive and selective xanthene-based fluorescent indicators for optical measurement of ion concentrations in cells. Furthermore, substituents T and U can be selected to provide the optimized spectral responses of xanthene-based fluorescent ion indicators for selective measurement of ions in cells. Careful selection of the $R^1$, $R^2$, $R^5$ and $R^6$ groups of acetoxymethyl (AM) esters of xanthene-based BAPTA indicators may result in optimal cell-loading properties.

In one aspect of the invention, the compounds of the invention can be described by Formula 3, below.



Formula 3

In the embodiment of formula 3, heteroatom Y is independently selected from O, S, Se, $NR^9$ and $CR^{10}R^{11}$. Substituents X and Z are independently selected from O and $NR^{12}R^{13}$ where each $R^9$, $R^{10}$, $R^{11}$, $R^{12}$ and $R^{13}$ are independently H or an alkyl having 1-12 carbons or carboxyalkyl. Substituents T and U are independently selected from an alkyl having 1-12 carbons, alkoxy having 1-12 carbons, aryloxy, amino, halogen, cyano, carboxy, carboxyalkyl, carbonyl, sulfonyl, phosphonyl, boronic acid, aryl and heteroaryl. $R^3$, $R^4$, j, k, m, n and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In another aspect of the invention, the compounds of the invention can be described by Formula 4, below.



Formula 4

In this embodiment of the invention, the heteroatom Y is independently selected from O, S, Se, $NR^9$ and $CR^{10}R^{11}$. Z is acyl having less than 10 carbon atom or —$CH_2OAc$. $R^9$, $R^{10}$, $R^{11}$, $R^{12}$ and $R^{13}$ are independently H or alkyl having 1-12 carbons, or carboxyalkyl. T and U are independently selected from hydrogen, alkyl having 1-12 carbons, alkoxy having 1-12 carbons, aryloxy, amino, halogen, cyano, carboxy, carboxyalkyl, carbonyl, sulfonyl, phosphonyl, boronic acid, aryl, and heteroaryl. $R^3$, $R^4$, j, k, m, n and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or

US 8,779,165 B2

**11**

alkyl or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention can be described by Formula 5, below.

Formula 5



In this embodiment, the heteroatom Y is independently selected from O, S, Se, $NR^9$ and $CR^{10}R^{11}$. X and Z are independently selected from O or $NR^{12}R^{13}$, where each $R^9$, $R^{10}$, $R^{11}$, $R^{12}$ and $R^{13}$ is independently H or an alkyl having 1-12 carbons or carboxyalkyl. T and U are independently selected from an alkyl having 1-12 carbons, alkoxy having 1-12 carbons, aryloxy, amino, halogen, cyano, carboxy, carboxyalkyl, carbonyl, sulfonyl, phosphonyl, boronic acid, aryl and heteroaryl. $R^1$-$R^6$, j, k, m, n and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl. In this embodiment, the fluorophore moiety is typically a xanthene.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 6, below.

Formula 6



**12**

In this embodiment, the substituents T and U are independently selected from alkyl having 1-12 carbons, alkoxy having 1-12 carbons, aryloxy, amino, halogen, cyano, carboxy, carboxyalkyl, carbonyl, sulfonyl, phosphonyl, boronic acid, aryl or heteroaryl. $R^1$-$R^6$, j, k, m, n and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

The disclosed indicator compounds typically exhibit low fluorescence quantum efficiency in the absence of metal ions. However, in the presence of increasing metal ion concentration the fluorescence quantum efficiency rises dramatically. For example, selected indicators of this family exhibit a fluorescence signal increase of over 100-times between zero and a saturating calcium concentration.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 7, below.

Formula 7



In this embodiment, substituents T and U are independently selected from alkyl having 1-12 carbons, alkoxy having 1-12 carbons, aryloxy, amino, halogen, cyano, carboxy, carboxyalkyl, carbonyl, sulfonyl, phosphonyl, boronic acid, aryl and heteroaryl. $R^1$-$R^6$, j, k, m, n and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl. $R^{12}$ and $R^{13}$ are independently H or alkyl having 1-12 carbons or carboxyalkyl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 8, below.

US 8,779,165 B2

13                                                              14
                                                          -continued

Formula 8



In this embodiment, substituents T and U are independently selected from alkyl having 1-12 carbons, alkoxy having 1-12 carbons, aryloxy, amino, halogen, cyano, carboxy, carboxyalkyl, carbonyl, sulfonyl, phosphonyl, boronic acid, aryl and heteroaryl. $R^1$-$R^6$, j, k, m, n and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl. X and Z, which may be same or different, are independently selected from $NR^{12}R^{13}$, where $R^{12}$ and $R^{13}$ are independently H or alkyl having 1-12 carbons or carboxyalkyl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 9, below.

In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 10, below.

Formula 9



OR

Formula 10



OR

US 8,779,165 B2

**15**
-continued



In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In another aspect of the invention, the compounds of the invention are fluorescent indicators having Formula 11.

Formula 11



OR

**16**
-continued



In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 12, below.

Formula 12



OR

US 8,779,165 B2

**17**

-continued

**18**

-continued



In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 13, below.

In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 14, below.

Formula 13



Formula 14



OR

OR

US 8,779,165 B2

**19**
-continued



**20**
-continued



In this embodiment, $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 15.

In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 16, below.

Formula 15



OR

Formula 16



OR

US 8,779,165 B2

**21**
-continued

**22**
-continued

le;2qIn this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 17, below.

In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which may be described by Formula 18.

Formula 17

Formula 18

OR

OR

US 8,779,165 B2

23

-continued



24

-continued



In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 19, below.

In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 20, below.

Formula 19



OR

Formula 20



OR

US 8,779,165 B2

**25**
-continued

**26**
-continued



In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 21, below.

In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 22, below.

Formula 21



OR

Formula 22



OR

US 8,779,165 B2

**27**

-continued



In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 23, below.

Formula 23



**28**

-continued



In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, aryl or heteroaryl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 24, below.

Formula 24



In this embodiment, heteroatom Y is $NR^9$ or $CR^{11}R^{12}$, where $R^9$, $R^{11}$ and $R^{12}$ are independently alkyl having 1-12 carbons, carboxyalkyl having 1-12 carbons, alkoxy having 1-12 carbons, a polyethylene glycol (PEG) moiety, aryloxy; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl. Substituents T and U are independently selected from H, alkyl having 1-12 carbons, alkoxy having 1-12 carbons, aryloxy, amino, halogen, cyano, carboxy, carboxyalkyl, carbonyl, sulfonyl, phos-

US 8,779,165 B2

**29**

phonyl, boronic acid, aryl and heteroaryl. $R^1$-$R^6$, j, k, m, n and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl. X and Z, which may be the same or different, are independently selected from O or $NR^{12}R^{13}$, where $R^{12}$ and $R^{13}$ are independently H or an alkyl having 1-12 carbons or carboxyalkyl having 2-12 carbons. In this embodiment, Y is typically N-alkyl where the alkyl group has 1-12 carbon atoms or $=C(alkyl)_2$, where each alkyl independently has 1-6 carbons. More, Preferably Y is NMe or $C(Me)_2$.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 25, below.

**30**

phonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl. $R^{11}$ and $R^{12}$ are independently an alkyl having 1-12 carbons or carboxyalkyl, alkoxy having 1-12 carbons, PEG chain, aryloxy; or alkyl, alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl. X and Z, which may be the same or different, are independently selected from O and $NR^{13}R^{14}$, where $R^{13}$ and $R^{14}$ are independently H or alkyl having 1-12 carbons, or carboxyalkyl having 2-12 carbons. In this embodiment, $R^{13}$ and $R^{14}$ are typically lower alkyl or lower alkoxy having 1-12 carbon atoms. Preferably, $R^{13}$ and $R^{14}$ are methyl or ethyl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 26, below.

Formula 25

Formula 26



In this embodiment, substituents T and U are independently selected from H, alkyl having 1-12 carbons, alkoxy having 1-12 carbons, aryloxy, amino, halogen, cyano, carboxy, carboxyalkyl, carbonyl, sulfonyl, phosphonyl, boronic acid, aryl and heteroaryl. $R^1$-$R^6$, j, k, m, n and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phos-

In this embodiment, substituents T and U are independently selected from H, alkyl having 1-12 carbons, alkoxy having 1-12 carbons, aryloxy, amino, halogen, cyano, carboxy, carboxyalkyl, carbonyl, sulfonyl, phosphonyl, boronic

US 8,779,165 B2

31

acid, aryl and heteroaryl. $R^1$-$R^6$, j, k, m, n and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, carbonyl, boronic acid, aryl or heteroaryl. $R^{23}$ is H or an alkyl having 1-12 carbons or carboxyalkyl, alkoxy, aryloxy, amino, alkylamino or arylamino. In this embodiment, $R^{23}$ is typically lower alkyl or lower alkoxy having 1-12 carbon atoms. Preferably $R^{23}$ is methyl or methoxy. More preferably $R^{23}$ is methyl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 27, below.

Formula 27

Formula 28

32

substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl. $R^{23}$ is independently H or an alkyl having 1-12 carbons or carboxyalkyl, alkoxy, aryloxy, amino, alkylamino or arylamino. In this embodiment, $R^{23}$ is typically lower alkyl or lower alkoxy having 1-12 carbon atoms. Preferably $R^{23}$ is methyl or methoxy. More preferably $R^{23}$ is methyl.

In yet another aspect of the invention, the compounds of the invention are fluorescent indicators which can be described by Formula 28, below.

In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl. $R^{23}$ is independently H or alkyl having 1-12 carbons or carboxyalkyl, alkoxy, aryloxy, amino, alkylamino or arylamino. In this embodiment, $R^{23}$ is typically lower alkyl or lower alkoxy of 1-12 carbon atoms. Preferably $R^{23}$ is methyl or methoxy. More preferably $R^{23}$ is methyl.

In yet another aspect of the invention, the compound of the invention can be described by Formula 29, below.

In this embodiment, substituents $R^1$-$R^6$, j, k, m, n, T, U and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally

US 8,779,165 B2

33



Formula 29

34

from O and $NR^{12}R^{13}$, where each $R^9$, $R^{10}$, $R^{11}$, $R^{12}$ and $R^{13}$ is independently H or alkyl having 1-12 carbons or carboxyalkyl. T and U are independently selected from an alkyl having 1-12 carbons, alkoxy having 1-12 carbons, aryloxy, amino, halogen, cyano, carboxy, carboxyalkyl, carbonyl, sulfonyl, phosphonyl, boronic acid, aryl and heteroaryl. $R^1$-$R^6$ and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl. In this embodiment, preferably the fluorophore moiety is a xanthene. $R^{20}$ is typically alky or aryl.

In yet another aspect of the invention, the compound of the invention can be described by Formula 31, below.



Formula 31

In this embodiment, Y is independently selected from O, S, Se, $NR^9$ and $CR^{10}R^{11}$; X and Z are independently selected from O and $NR^{12}R^{13}$, where each $R^9$, $R^{10}$, $R^{11}$, $R^{12}$ and $R^{13}$ is independently H or alkyl having 1-12 carbons or carboxyalkyl. T and U are independently selected from alkyl having 1-12 carbons, alkoxy having 1-12 carbons, aryloxy, amino, halogen, cyano, carboxy, carboxyalkyl, carbonyl, sulfonyl, phosphonyl, boronic acid, aryl and heteroaryl. $R^1$-$R^6$ and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl. In this embodiment, the fluorophore moiety is typically a xanthene.

In yet another aspect of the invention, the compound of the invention can be described by Formula 30, below.



Formula 30

In this embodiment, Y is independently selected from O, S, Se, $NR^9$ and $CR^{10}R^{11}$. X and Z are independently selected

In this embodiment, Y is independently selected from O, S, Se, $NR^9$ and $CR^{10}R^{11}$, where each $R^9$, $R^{10}$, $R^{11}$, $R^{12}$ and $R^{13}$ are independently H or an alkyl having 1-12 carbons or carboxyalkyl. T and U are independently selected from an alkyl having 1-12 carbons, alkoxy having 1-12 carbons, aryloxy, amino, halogen, cyano, carboxy, carboxyalkyl, carbonyl, sulfonyl, phosphonyl, boronic acid, aryl or heteroaryl. $R^1$-$R^6$ and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl. In this embodiment, preferably the fluorophore moiety is a xanthene.

In yet another aspect of the invention, the compound of the invention can be described by Formula 32, below.

US 8,779,165 B2

35 36



Formula 32

In this embodiment, Y is independently selected from O, S, Se, $NR^9$ and $CR^{10}R^{11}$. X and Z are independently selected from O and $NR^{12}R^{13}$, where each $R^9$, $R^{10}$, $R^{11}$, $R^{12}$ and $R^{13}$ are independently H, alkyl having 1-12 carbons, or carboxyalkyl. T and U are independently selected from an alkyl having 1-12 carbons, alkoxy having 1-12 carbons, aryloxy, amino, halogen, cyano, carboxy, carboxyalkyl, carbonyl, sulfonyl, phosphonyl, boronic acid, aryl, and heteroaryl. $R^1$-$R^6$ and V are independently H, halogen, carboxy, alkoxy, aryloxy, thiol, alkylthiol, arylthiol, azido, nitro, nitroso, cyano, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl or heteroaryl; or alkyl, or alkoxy that is itself optionally substituted one or more times by halogen, amino, hydroxy, phosphonyl, sulfonyl, carbonyl, boronic acid, aryl, or heteroaryl. $R^{20}$ and $R^{21}$ are independently H or alkyl having 1-12 carbons, or carboxyalkyl. Typically the fluorophore moiety is a xanthene.

In yet another aspect of the invention, the compounds of the invention further include the alkyl ester derivatives of any of the compounds described by Formulas 2 to 32, in order to facilitate the delivery of fluorescent metal ion indicators into live cells. The acetoxymethyl (AM) esters of the disclosed fluorescent indicators are preferably used for applications that include the detection of ions in live cells.

The AM esters of the invention can be described by Formula 33, below.



Formula 33

In the above formula, the "Fluorescent Ion Indicator" moiety corresponds to a compound of Formula 2 to 32, n is an integer from 1 to 10, and $R^{23}$ is H or an alkyl having 1-12 carbons or carboxyalkyl, alkoxy, aryloxy, amino, alkylamino or arylamino. In this embodiment, $R^{23}$ is typically lower alkyl or lower alkoxy having 1-12 carbon atoms. Preferably $R^{23}$ is methyl or methoxy. More preferably $R^{23}$ is methyl.

The fluorophore moiety can be any compound described by any of Formulas 2-32 that exhibits an absorption maxi-

mum beyond 450 nm, that is bound to a chelator by a covalent linkage L, or that is fused to a chelator. The covalent linkage L may be a single covalent bond, or a suitable combination of stable chemical bonds, as described in greater detail below. The covalent linkage binding the fluorophore moiety to the chelator is typically a single bond, but optionally incorporates 1-20 nonhydrogen atoms selected from the group consisting of C, N, O, P, and S.

As described above, where the fluorophore moiety is a xanthene, the resulting compound may be a fluorescein, a rhodol (U.S. Pat. No. 5,227,487, hereby incorporated by reference), or a rhodamine. As used herein, fluorescein includes benzo- or dibenzofluoresceins, seminaphthofluoresceins, or naphthofluoresceins. Similarly, as used herein rhodol includes seminaphthorhodafluors (U.S. Pat. No. 4,945,171, hereby incorporated by reference). Fluorinated xanthene dyes have been described previously as possessing particularly useful fluorescence properties (U.S. Pat. No. 6,162,931, hereby incorporated by reference).

Alternatively, the fluorophore moiety is a xanthene that is bound via a covalent linkage L that is a single covalent bond at the 9-position of the xanthene. Preferred xanthenes include derivatives of 3H-xanthen-6-ol-3-one bound at the 9-position, derivatives of 6-amino-3H-xanthen-3-one bound at the 9-position, or derivatives of 6-amino-3H-xanthen-3-imine bound at the 9-position.

In one aspect of the invention, the fluorophore moiety has an absorption maximum beyond 480 nm. In a particularly useful embodiment, the fluorophore moiety absorbs at or near 488 nm to 514 nm, and so is particularly suitable for excitation by the output of an argon-ion laser excitation source, or near 546 nm, and so is particularly suitable for excitation by a mercury arc lamp.

The fluorophore moiety is typically selected to confer its fluorescence properties on the indicator compound it is incorporated into. That is, the resulting indicator compound exhibits a detectable optical response when excited by energy having a wavelength at which that fluorophore absorbs As used herein, a detectable optical response means a change in, or occurrence of, an optical property that is detectable either by observation or instrumentally, such a change in absorption (excitation) wavelength, fluorescence emission wavelength, fluorescence emission intensity, fluorescence polarization, or fluorescence lifetime, among others.

In addition, the compounds of the invention preferably exhibit a detectable change in the optical response upon binding a target metal ion. Where the detectable response is a fluorescence response, the detectable change is typically a change in fluorescence, such as a change in the intensity, excitation or emission wavelength distribution of fluorescence, fluorescence lifetime, fluorescence polarization, or a combination thereof. Preferably, the change in optical response upon binding the target metal ion is a change in fluorescence intensity that is greater than approximately 50-fold, more preferably greater than 100-fold. In another aspect, the change in optical response upon binding the target metal ion is a shift in the wavelength of maximal excitation or emission. Typically the shift in wavelength is greater than about 20 nm, preferably greater than about 30 nm.

Selected specific compounds of the invention are provided in Table 2.

US 8,779,165 B2

37                                                                              38

TABLE 2

Selected embodiment of the compounds of the invention:

| Cpd. no. | Structure | Method of synthesis |
|---|---|---|
| 256 |  | Example 7 |
| 258 |  | Example 8 |
| 275 |  | Example 11 |

US 8,779,165 B2

39                                                                                          40

TABLE 2-continued

| Selected embodiment of the compounds of the invention: | | |
|---|---|---|
| Cpd. no. | Structure | Method of synthesis |
| 280 |  | Example 12 |
| 282 |  | Example 13 |
| 284 |  | Example 14 |
| 286 |  | Example 15 |

US 8,779,165 B2

**41**                                           **42**

TABLE 2-continued

| | Selected embodiment of the compounds of the invention: | |
|---|---|---|
| Cpd. no. | Structure | Method of synthesis |
| 288 |  | Example 16 |
| 290 |  | Example 17 |
| 292 |  | Example 18 |

**43**                                                                    **44**

TABLE 2-continued

Selected embodiment of the compounds of the invention:

| Cpd. no. | Structure | Method of synthesis |
|---|---|---|
| 294 |  | Example 19 |
| 296 |  | Example 20 |
| 298 |  | Example 21 |

US 8,779,165 B2

45                                                                                 46

TABLE 2-continued

Selected embodiment of the compounds of the invention:

| Cpd. no. | Structure | Method of synthesis |
|---|---|---|
| 300 | | Example 22 |
| 302 | | Example 23 |
| 304 | | Example 24 |

US 8,779,165 B2

47                                                                                     48

TABLE 2-continued

Selected embodiment of the compounds of the invention:

| Cpd. no. | Structure | Method of synthesis |
|---|---|---|
| 306 |  | Example 25 |
| 308 |  | Example 26 |
| 310 |  | Example 27 |

US 8,779,165 B2

**49**                     **50**

TABLE 2-continued

| | Selected embodiment of the compounds of the invention: | |
|---|---|---|
| Cpd. no. | Structure | Method of synthesis |
| 350 |  | FIG. 8 |
| 351 |  | FIG. 8 or FIG. 9 |
| 352 |  | FIG. 10 or FIG. 11 or FIG. 12 |

US 8,779,165 B2

51    52

TABLE 2-continued

| | Selected embodiment of the compounds of the invention: | |
|---|---|---|
| Cpd. no. | Structure | Method of synthesis |
| 353 |  | FIG. 6 |
| 352 |  | FIG. 7 |
| 353 |  | FIG. 6 |

US 8,779,165 B2

53    54

TABLE 2-continued

Selected embodiment of the compounds of the invention:

| Cpd. no. | Structure | Method of synthesis |
|----------|-----------|---------------------|
| 354 |  | FIG. 7 |
| 355 |  | FIG. 7 |
| 356 |  | FIG. 6 |

US 8,779,165 B2

**55**                                    **56**

TABLE 2-continued

| | Selected embodiment of the compounds of the invention: | |
|---|---|---|
| Cpd. no. | Structure | Method of synthesis |
| 357 | | FIG. 9 |
| 358 | | FIG. 7 |
| 359 | | FIG. 7 |
| 360 | | FIG. 6 or FIG. 7 |

US 8,779,165 B2

TABLE 2-continued

Selected embodiment of the compounds of the invention:

| Cpd. no. | Structure | Method of synthesis |
|---|---|---|
| 365 | | FIG. 6 or FIG. 7 |
| 366 | | FIG. 2 |

Synthesis

The compounds of the invention may be prepared using any suitable synthetic scheme. The methodology used to prepare the compounds of the invention may involve two components. The first component may involve the formation of the chelator, while the second may involve the modification of the chelator by forming a reactive functional group, covalently attaching a conjugate, or covalently attaching a fluorophore moiety to form the desired indicator compound. Although these synthetic components are typically performed in the order given, they may be carried out in any other suitable sequence. For example, a portion of the chelator may be derivatized with a fluorescent dye prior to formation of the complete chelator ring. The representative synthetic methods are summarized in FIGS. 1-12. The appropriate methods may be used to synthesize the desired compounds of the invention.

As the metal binding ability of the resulting chelators may be significantly influenced by the nature of the amine substituents, careful selection of the alkylating agent may be necessary to prepare a reporter for a particular target ion. BAPTA chelators are typically selective for calcium ion. Where the chelator nitrogens are alkylated by methyl bromoacetate, the resulting bis-aza-crown ether is typically selective for sodium ions. If the alkylating agent is 2-picolyl chloride, the resulting crown ether is typically selective for zinc ions. Selection of an alkylating agent that incorporates a

precursor to a reactive functional group is useful for producing chemically reactive compounds of the invention, as well as acting as a useful intermediate for preparing conjugates, as described above.

The syntheses of chelating groups selective for different metal ions has been well described in the literature (U.S. Pat. No. 4,603,209; U.S. Pat. No. 5,049,673; U.S. Pat. No. 4,849,362; U.S. Pat. No. 5,453,517; U.S. Pat. No. 5,501,980; U.S. Pat. No. 5,459,276; U.S. Pat. No. 5,501,980; U.S. Pat. No. 5,459,276; U.S. Pat. No. 5,516,911; U.S. Application No. 2002/0164616; each of which is incorporated by reference). These methods can be readily adapted to prepare chelator intermediates useful for the synthesis of the compounds of the invention.

Synthesis of conventional xanthene dyes such as fluoresceins, rhodamines and rhodols typically involves the condensation of two equivalents of resorcinol (for fluoresceins), aminophenol (for rhodamines) or a mixture of a resorcinol and an aminophenol (for rhodols) with a carbonyl-containing moiety such as a phthalic acid derivative or benzaldehyde. However, in the synthesis of the xanthene indicators of the invention, the desired resorcinol or aminophenol is condensed with a chelator intermediate that contains a carbonyl group, yielding either the reduced xanthene (where the chelator contains an aldehyde) or the oxidized xanthene (where the chelator intermediate ether contains a carboxylic acid, anhy-

59

dride or acyl halide) bound directly to the chelating moiety. This synthetic method is illustrated in FIGS. **7**, **9** and **11**.

An oxidation step is typically required after condensation of a formyl-substituted chelator with the fluorophore precursors. Optionally, the dihydro condensation product may be isolated and subsequently oxidized with air or by standard chemical oxidants, such as DDQ or chloranil. For some fluorophores, the oxidation reaction is enhanced by acidic reaction conditions. These mild oxidation reaction conditions tolerate a wide variety of substituents on the fluorophore and/or crown ether of the resulting indicators. The carbonyl-derived methods are well described in the literature (K. R. Gee, Z. Zhou, W. Qian and R. Kennedy, J. Am. Chem. Soc. 2002, 124, 776; J. P. Bacci, A. M. Keramey and D. L. Van Vranken, J. Org. Chem. 2005, 70, 9051; U.S. Application No. 2002/0164616; each of which is incorporated by reference).

Unsymmetrical xanthene dyes are typically constructed using statistical methods, using a 1:1 mixture of the desired resorcinols or aminophenols in the condensation reaction, and purifying the desired product from the resulting statistical mixture of products using methods known in the art. This synthetic method is represented by FIG. **11**. In addition, unsymmetrical xanthene dyes can be prepared from benzophenone intermediate as shown in FIG. **12**.

Alternatively the fluorescent indicators of the invention can be prepared via the condensation of properly protected xanthones with a chelator anion, typically prepared from the corresponding chelator bromide or iodide. This organometallic chemistry is also well described in the literature (C. Chen, R. Yeh and D. S. Lawrence, J. Am. Chem. Soc. 2002, 124, 3840; U.S. Pat. No. 5,049,673); Y. Urano, M. Kamiya, K. Kanda, T. Ueno, K. Hirose and T. Nagano, J. Am. Chem. Soc. 2005, 127, 4888; each of which is incorporated by reference) and can be readily adapted to synthesize the compounds of the invention (see FIGS. **6**, **8** and **10**).

Post-condensation modifications of both the chelator and the fluorophore moiety are typically analogous to known methods of indicator modification. For example, the reduction of nitro substituents to amino groups, the conversion of carboxy substituents to cyano groups, and the preparation of esters of carboxylic acids, including acetoxymethyl esters (see FIGS. **6**-**11**). Additionally, a given salt or counterion of the indicators of the invention may be readily converted to other salts by treatment with ion-exchange resins, selective precipitation, and basification, as is well-known in the art.

Post-condensation modifications of xanthylium dyes are well known. For instance, the xanthenone portion of the dye can be halogenated by treatment with an appropriate halogenating agent, such as liquid bromine. Xanthenes containing unsaturated fused rings can be hydrogenated to the desired derivatives.

The reduced and oxidized versions of the xanthene indicators are freely interconvertible by well-known oxidation or reduction reagents, including borohydrides, aluminum hydrides, hydrogen/catalyst, and dithionites. Care must be exercised to select an oxidation or reducing agent that is compatible with the chelator used. A variety of oxidizing agents mediate the oxidation of dihydroxanthenes, including molecular oxygen in the presence or absence of a catalyst, nitric oxide, peroxynitrite, dichromate, triphenylcarbenium and chloranil. The dihydroxanthenes may also be oxidized electrochemically, or by enzyme action, including the use of horseradish peroxidase in combination with peroxides or by nitric oxide.

Rather than condensing the fluorophore moiety precursors directly with substituted chelators, the preformed fluorophore moiety may be covalently bound to the chelator via a conven-

60

tional cross-linking reaction. A wide variety of chemically reactive or potentially chemically reactive and fluorescent fluorescein, rhodamine, rhodol, benzoxanthenes, dibenzoxanthene and other xanthene oxygen heterocycles that absorb maximally beyond about 490 nm are commercially available as described by Haugland, HANDBOOK OF FLUORESCENT PROBES AND RESEARCH CHEMICALS (7th ed., 1999), as described above, or in other literature references. The nature of the bond that links fluorophore moiety to the chelator appears to have an effect on the optical response of the fluorophore moiety to ion binding, sometimes a significant effect. Acceptability of the linking chemistry can be determined by titration of the resultant indicator with the ion of interest over the target range of response.

Applications of the Fluorescent Indicators of the Invention

The indicators disclosed herein possess particular utility for the detection and/or quantification of metal ions in a sample of interest. Such indicators may be useful for measuring ions in extracellular spaces; in vesicles; in vascular tissue of plants and animals; biological fluids such as blood and urine; in fermentation media; in environmental samples such as water, soil, waste water and seawater; and in chemical reactors. Optical indicators for ions are important for qualitative and quantitative determination of ions, particularly in living cells. Fluorescent indicators for metal cations also permit the continuous or intermittent optical determination of these ions in living cells, and in solutions containing the ions.

In effecting such determination, the substance to be determined, or analyte, which contains the ion of interest is contacted with a fluorescent indicator as disclosed above. Complexation of the metal ion in the chelator of the indicator results in a detectable change in the fluorescence properties of the indicator. Detection and optionally quantification of the detectable change permits the ion of interest to be detected and optionally quantified.

Upon binding the target ion in the chelating moiety of the indicator, the optical properties of the attached fluorophore are generally affected in a detectable way, and this change may be correlated with the presence of the ion according to a defined standard. Compounds having relatively long wavelength excitation and emission bands can be used with a variety of optical devices and require no specialized (quartz) optics, such as are required by indicators that are excited or that emit at shorter wavelengths. These indicators are suitable for use in fluorescence microscopy, flow cytometry, fluorescence microplate readers, or any other application that currently utilize fluorescent metal ion indicators.

This determination method may be based on the so-called "PET effect", or the transfer, induced by photons, of electrons (photoinduced electron transfer=PET) from the ionophoric moiety or ionophore, respectively, to the fluorophore moiety or fluorophore, respectively, which leads to a decrease in the (relative) fluorescence intensity and the fluorescence decay time of the fluorophore. Absorption and emission wavelengths, however, are not significantly affected in the process (J. R. Lakowicz in "Topics in Fluorescence Spectroscopy", Volume 4: Probe Design and Chemical Sensing; Plenum Press, New York & London (1994)).

By the binding of ions to the ionophore, the PET effect may be partly or completely inhibited, so that there is an increase in the fluorescence of the fluorophore moiety. Hence, the concentration or the activity of the ion to be determined can be deduced by measuring the change in fluorescence properties, i.e. fluorescence intensity and/or fluorescence decay time.

A variety of fluorescent indicators that are useful for the detection of biologically relevant soluble free metal ions

US 8,779,165 B2

61       62

(such as $Ca^{2+}$, $Mg^{2+}$ and $Zn^{2+}$) have been described that utilize oxygen-containing anionic or polyanionic chelators to bind to metal ions. In general, a useful property for metal ion indicators is selectivity, or the ability to detect and/or quantify a selected metal ion in the presence of other metal ions. Discrimination of $Ca^{2+}$, $Na^+$ and $K^+$ ions in the presence of other metal ions is particularly advantageous in certain biological or environmental samples. For most biological applications, it is useful that the indicators be effective in aqueous solutions. It is also beneficial if the indicator absorbs and emits light in the visible spectrum where biological materials typically have low intrinsic absorbance or fluorescence.

Optical methods using fluorescence detection of metal ions permit measurement of the entire course of ion flux in a single cell as well as in groups of cells. The advantages of monitoring transport by fluorescence techniques include the high level of sensitivity of these methods, temporal resolution, modest demand for biological material, lack of radioactivity, and the ability to continuously monitor ion transport to obtain kinetic information (Eidelman, O. Cabantchik, Z. I. Biochim. Biophys. Acta, 1989, 988, 319-334). The general principle of monitoring transport by fluorescence is based on having compartment-dependent variations in fluorescence properties associated with translocation of compounds.

Optical methods were developed initially for measuring $Ca^{2+}$ ion flux (U.S. Pat. No. 5,049,673, hereby incorporated by reference; Scarpa, A. Methods of Enzymology, 1979, 56, 301 Academic Press, Orlando, Fla.; Tsien, R. Y. Biochemistry, 1980, 19, 2396; Grynkiewicz, G., Poenic, M., Tsien, R. Y. J. Biol Chem., 260, 3440) and have been modified for high-throughput assays (U.S. Pat. No. 6,057,114, hereby incorporated by reference). The flux of $Ca^{2+}$ ion is typically performed using calcium-sensitive fluorescent dyes such as Fluo-3, Fluo-4, Calcium Green, and others. (Molecular Probes Inc., Handbook of Fluorescent probes and research chemicals, 7th edition, chapter 1, Eugene, Oreg.).

In particular, fluorescent indicators utilizing a polycarboxylate BAPTA chelator have been previously described. A determination method utilizing aza-cryptands as the chelator moiety and using xanthenes and coumarins as fluorophores has also been described (U.S. Pat. No. 5,439,828 and US Patent Application 20020164616; each hereby incorporated by reference). These aza-cryptand may, depending on their structure, exhibit selectivity for lithium, sodium or potassium ions. Some fluorescent indicators selective for $Li^+$, $Na^+$ and $K^+$ in aqueous or organic solution have also been described, based on the chemical modification of crown ethers (U.S. Pat. No. 5,134,232; U.S. Pat. No. 5,405,975, each hereby incorporated by reference).

The desired indicator compound is generally prepared for use as a detection reagent by dissolving the indicator in solution at a concentration that is optimal for detection of the indicator at the expected concentration of the target ion. Modifications that are designed to enhance permeability of the indicator through the membranes of live cells, such as functionalization of carboxylic acid moieties using acetoxymethyl esters and acetates, may require the indicator to be predissolved in an organic solvent such as dimethylsulfoxide (DMSO) before addition to a cell suspension, where the indicators may then readily enter the cells. Intracellular enzymes then cleave the esters, generating more polar acids and phenols which are then well-retained inside the cells. For applications where permeability of cell-membranes is required, the indicators of the invention are typically substituted by only one fluorophore.

The specific indicator used in a particular assay or experiment may be selected based on the desired affinity for the target ion as determined by the expected concentration range in the sample, the desired spectral properties, and the desired selectivity. Initially, the suitability of a material as an indicator of ion concentration is commonly tested by mixing a constant amount of the indicating reagent with a measured amount of the target ion under the expected experimental conditions.

Where the binding of an ion in the metal ion-binding moiety of the indicator results in a detectable change in spectral properties of the indicator compound, that indicator may be used for the detection and/or quantification of that ion (the target ion). Although the change in spectral properties may include for example a change in absorption intensity or wavelength, preferably the change in spectral properties is a detectable fluorescence response. Preferred indicators display a high selectivity, that is, they show a sufficient rejection of non-target ions. The interference of a non-target ion is tested by a comparable titration of the indicator with that ion. In one aspect of the invention, the target ions for the indicators of the present invention are selected from $Ca^{2+}$, $Na^+$ and $K^+$.

A detectable fluorescence response, as used herein, is a change in a fluorescence property of the indicator that is capable of being perceived, either by direct visual observation or instrumentally, the presence or magnitude of which is a function of the presence and/or concentration of a target metal ion in the test sample. This change in a fluorescence property is typically a change in fluorescence quantum yield, fluorescence polarization, fluorescence lifetime, a shift in excitation or emission wavelength, among others, or a combination of one or more of such changes in fluorescence properties. The detectable change in a given spectral property is generally an increase or a decrease. However, spectral changes that result in an enhancement of fluorescence intensity and/or a shift in the wavelength of fluorescence emission or excitation may also be useful. The change in fluorescence on ion binding may be due to conformational or electronic changes in the indicator that may occur in either the excited or ground state of the fluorophore, due to changes in electron density at the ion binding site, due to quenching of fluorescence by the bound target metal ion, or due to any combination of these or other effects.

A typical indicator for a specific target ion is an indicator that exhibits at least a 50-fold change in net fluorescence emission intensity (either an increase or decrease), or at least a 1 nanosecond difference in fluorescence lifetime (either shorter or longer). In one aspect of the invention, the indicator exhibits a 50-fold or greater change in net fluorescence emission intensity, and/or a 100% change in fluorescence lifetime in the presence of the target ion. In an alternative aspect of the invention, the indicator exhibits a shift in excitation or emission wavelength of at least 10 nm (either to shorter or longer wavelength), more preferably exhibiting a wavelength shift of 25 nm or greater.

The spectral response of a selected indicator to a specific metal ion is a function of the characteristics of the indicator in the presence and absence of the target ion. For example, binding to a metal ion may alter the relative electron densities of the fluorophore and the metal binding site. Additionally, or in the alternative, some metal ions may quench fluorescence emission when in close proximity to a fluorophore (heavy atom quenching). In one embodiment of the invention, the indicator is essentially nonfluorescent or exhibits low fluorescence in target ion-free solution and exhibits an increase in fluorescence intensity or fluorescence lifetime (or both) upon target metal ion binding. In yet another embodiment of the

US 8,779,165 B2

63

64

invention, the fluorescence intensity remains approximately the same but there is a shift in the excitation or emission spectrum, or both, upon metal ion binding.

As the optical response of the indicating reagent is typically determined by changes in fluorescence, the threshold of detection of the target ion will be dependent upon the sensitivity of the equipment used for its detection.

If the optical response of the indicator will be determined using fluorescence measurements, the sample of interest is typically stained with indicator concentrations of $10^{-9}$ M to $10^{-3}$ M. The most useful range of analyte concentration includes about one log unit above and below the dissociation constant of the ion-indicator complex. This dissociation constant may be determined by titration of the indicator with known concentrations of the target ion, usually over the range of virtually zero concentration to approximately 100 mM of the target ion, depending on which ion is to be measured and which indicator is being used. The dissociation constant may be affected by the presence of other ions, particularly ions that have similar ionic radii and charge. It may also be affected by other conditions such as ionic strength, pH, temperature, viscosity, presence of organic solvents and incorporation of the sensor in a membrane or polymeric matrix, or conjugation or binding of the sensor to a protein or other biological molecule. Any or all of these effects are readily determined, and can be taken into account when calibrating a selected indicator.

The indicator is typically combined with a sample in a way that will facilitate detection of the target ion concentration in the sample. The sample is generally a fluid or liquid suspension that is known or suspected to contain the target ion. Representative samples include intracellular fluids from cells such as in blood cells, cultured cells, muscle tissue, neurons and the like; extracellular fluids in areas immediately outside of cells; fluids in vesicles; fluids in vascular tissue of plants and animals; biological fluids such as blood, saliva, and urine; biological fermentation media; environmental samples such as water, soil, waste water and sea water; industrial samples such as pharmaceuticals, foodstuffs and beverages; and samples from chemical reactors. Detection and quantitation of the target ion in a sample can help characterize the identity of an unknown sample, or facilitate quality control of a sample of known origin.

In one embodiment of the invention, the sample includes cells, and the indicator is combined with the sample in such a way that the indicator is added within the sample cells. By selection of the appropriate chelating moiety, fluorophore, and the substituents thereon, indicators may be prepared that will selectively localize in a desired organelle, and provide measurements of the target ion in those organelles. Conjugates of the indicators of the invention with organelle-targeting peptides may be used to localize the indicator to the selected organelle, facilitating measurement of target ion presence or concentration within the organelle (as described in U.S. Pat. No. 5,773,227, hereby incorporated by reference). Alternatively, selection of a lipophilic fluorophore, or a fluorophore having predominantly lipophilic substituents may result in localization of the indicator in lipophilic environments in the cell, such as cell membranes. Selection of cationic indicators will typically result in localization of the indicator in mitochondria.

In one embodiment of the invention, the indicator compound of the invention optionally further includes a metal ion. In another embodiment, the compounds of the invention, in any of the embodiments described above, are associated, either covalently or noncovalently, with a surface such as a microfluidic chip, a silicon chip, a microscope slide, a micro-plate well, or another solid or semisolid matrix, and is combined with the sample of interest as it flows over the surface. In this embodiment, the detectable optical response may therefore be detected on the matrix surface itself, typically by use of instrumental detection. This embodiment of the invention may be particularly suited to high-throughput screening using automated methods.

The fluorescence response of the indicator to the target ion may be detected by various means that include without limitation measuring fluorescence changes with fluorometers, fluorescence microscopes, laser scanners, flow cytometers, and microfluidic devices, as well as by cameras and other imaging equipment. These measurements can be made remotely by incorporation of the fluorescent ion sensor as part of a fiber optic probe. The indicator may be covalently attached to the fiber optic probe material, typically glass or functionalized glass (e.g., aminopropyl glass) or the indicator may be attached to the fiber optic probe via an intermediate polymer, such as polyacrylamide. The indicator solution is alternatively incorporated non-covalently within a fiber optic probe, as long as there is a means whereby the target ion may come into contact with the indicator solution. More preferably, the BAPTA indicators of the invention are used with a fluorescence microplate reader that is equipped with an automated liquid handling system such as FLIPR, FLEXSTATION and FDSS.

In another aspect of the invention, the fluorescent ion indicators of the invention may be used in combination with one or more non-fluorescent dyes that are not substantially cell-permeable in order to reduce the background fluorescence analogous to the methods described in U.S. Pat. No. 6,420, 183, hereby incorporated by reference. Non-fluorescent dyes and dye mixtures that have large water solubilities and minimal effects on the physiology of the cells are preferred for this application. More preferably are water-soluble azo dyes (such as trypan blue), which have been used in cell-based assays for many years (H. W. Davis, R. W. Sauter. Histochemistry, 1977, 54, 177; W. E. Hathaway, L. A. Newby, J. H. Githens, Blood, 1964, 23, 517; C. W. Adams, O. B. Bayliss, R. S. Morgan, Atherosclerosis, 1977, 27, 353).

The screening methods described herein can be performed with cells growing in or deposited on solid surfaces. A common technique is to use a microwell plate where the fluorescence measurements are performing using a commercially available fluorescent plate reader. These methods lend themselves to use in high throughput screening using both automated and semi-automated systems.

Using the indicators of the present invention, the measurement of fluorescence intensity can provide a sensitive method for monitoring changes in intracellular ion concentrations. Thus, fluorescence measurements at appropriate excitation and emission wavelengths provide a fluorescence readout which is sensitive to the changes in the ion concentrations.

In one embodiment, the invention includes a) adding a compound as described above to a sample containing a cell; b) incubating the sample for a time sufficient for the compound to be loaded into the cell and an indicator compound to be generated intracellularly; c) illuminating the sample at a wavelength that generates a fluorescence response from the indicator compound; d) detecting a fluorescence response from the indicator compound; and e) correlating the fluorescence response with the presence of intracellular calcium.

In one aspect of the invention, the disclosed method is useful for screening potential therapeutic drugs, for example drugs which may affect ion concentrations in biological cells. These methods may include measuring ion concentrations as described above in the presence and absence (as a control

US 8,779,165 B2

**65**

measurement) of the test sample. Control measurements are usually performed with a sample containing all components of the test sample except for the putative drug being screened. Detection of a change in ion concentration in the presence of the test agent relative to the control indicates that the test agent is active. Ion concentrations can also be determined in the presence or absence of a pharmacologic agent of known activity (i.e., a standard agent) or putative activity (i.e., a test agent). A difference in ion concentration as detected by the methods disclosed herein allows one to compare the activity of the test agent to that of a standard agent of known activity. It will be recognized that many combinations and permutations of drug screening protocols are known to one of skill in the art and they may be readily adapted to use with the method of ion concentration measurement disclosed herein to identify compounds which affect ion concentrations.

In yet another aspect of the invention, the disclosed method may facilitate the screening of test samples in order to identify one or more compounds that are capable of modulating the activity of an ion channel, pump or exchanger in a membrane, and the method further includes stimulating the cell, monitoring changes in the intensity of the fluorescence response from the indicator compound, and correlating the changes in fluorescence intensity with changes in intracellular calcium levels.

An additional method may be used to evaluate the efficacy of a stimulus that generates a target ion response, including (a) loading a first set and a second set of cells with the ion indicators of the invention which monitor ion concentrations; (b) optionally, exposing both the first and second set of cells to a stimulus which modulates the ion channel, pump or exchanger; (c) exposing the first set of cells to the test sample; (d) measuring the ion concentrations in the first and second sets of cells; and (e) relating the difference in ion concentrations between the first and second sets of cells to the ability of a compound in the test sample to modulate the activity of an ion channel, pump or exchanger in cells. In one aspect of the recited method, the method may include the addition of probenecid or a probenecid derivative to the sample.

One or more of the methods disclosed herein may be enhanced by the addition of a cell-impermeant and non-fluorescent dye to the sample, such that the dye remains in the extracellular solution, and acts as an acceptor dye for energy transfer from the indicator compound, thereby decreasing background signal from the sample solution. In one aspect of the method, the cell-impermeant and non-fluorescent dye is a water-soluble azo dye.

Ion channels of particular interest may include, but are not limited to, sodium, calcium, potassium, nonspecific cation, and chloride ion channels, each of which may be constitutively open, voltage-gated, ligand-gated, or controlled by intracellular signaling pathways.

Biological cells of potential interest for screening application may include, but are not limited to, primary cultures of mammalian cells, cells dissociated from mammalian tissue, either immediately or after primary culture. Cell types may include, but are not limited to white blood cells (e.g. leukocytes), hepatocytes, pancreatic beta-cells, neurons, smooth muscle cells, intestinal epithelial cells, cardiac myocytes, glial cells, and the like.

The disclosed method may also include the use of recombinant cells into which ion transporters, ion channels, pumps and exchangers have been inserted and expressed by genetic engineering. Many cDNA sequences for such transporters have been cloned (see U.S. Pat. No. 5,380,836 for a cloned sodium channel, hereby incorporated by reference) and methods for their expression in cell lines of interest are within the

**66**

knowledge of one of skill in the art (see, U.S. Pat. No. 5,436, 128, hereby incorporated by reference). Representative cultured cell lines derived from humans and other mammals include LM cells, HEK-293 (human embryonic kidney cells), 3T3 fibroblasts, COS cells, CHO cells, RAT1 and HepG2 cells, Hela cells, $U_2OS$ cells and Jurkat cells etc.

Assay Kits

Due to the advantageous properties and the simplicity of use of the disclosed ion indicator compounds, they possess particular utility in the formulation of a kit for the complexation, detection, or quantification of selected target ions. An exemplary kit may include one or more compounds or compositions of the invention in any of the embodiments described above, either present as a pure compound, in a suitable carrier composition, or dissolved in an appropriate stock solution. The kit may further include instructions for the use of the indicator compound to complex or detect a desired target ion. The kit may further include one or more additional components, such as an additional detection reagent.

The indicator of the invention may be present in the kit associated with a surface, such as a chip, microplate well, or other solid or semi-solid matrix.

The additional kit components may be selected from, without limitation, calibration standards of a target ion, ionophores, fluorescence standards, aqueous buffers, surfactants and organic solvents. The additional kit components may be present as pure compositions, or as aqueous solutions that incorporate one or more additional kit components. Any or all of the kit components optionally further comprise buffers.

In one aspect of the disclosed kit, the kit includes at least one indicator compound as described above, and a non-fluorescent and cell-impermeant quencher dye. The non-fluorescent and cell-impermeant quencher dye is optionally present with the indicator compound in a combined composition, such as a mixed powder or a solution. Alternatively, or in addition, the cell-impermeant quencher dye is present in a container distinct from the indicator compound.

The examples provided below illustrate selected aspects of the invention. They are not intended to limit or define the entire scope of the invention.

EXAMPLES

Example 1

Preparation of Compound 205



Compound 205 is analogously prepared according to the procedure of U.S. Application No. 2002/0164616, hereby

US 8,779,165 B2

**67**

incorporated by reference. A mixture of Compound 200 (15 g) and 1-bromo-2-chloroethane (50 g) is dissolved in DMF at room temperature. To the reaction mixture K$_2$CO$_3$ is added with stirring. The reaction mixture is stirred at room temperature for 4-6 days. The reaction mixture is poured into water, and the resulted solid is collected. The dried solid is purified on a silica gel column using a gradient of hexanes/ethyl acetate to give a light yellow solid.

Example 2

Preparation of Compound 215



205



215

Compound 215 is prepared analogously to the procedure of U.S. Pat. No. 5,049,673 and U.S. Application No. 2002/0164616 (hereby incorporated by reference). The mixture of Compound 205 (20 g) and 5-methyl-2-nitrophenol (20 g) is dissolved in DMF at room temperature. To the reaction mixture K$_2$CO$_3$ is added, and the reaction mixture is stirred at 140-160° C. for 12-24 h. The reaction mixture is cooled, and poured into water, and resulted solid is collected. The dried solid is purified on a silica gel column using a gradient of hexanes/ethyl acetate to give a very light yellow solid.

Example 3

Preparation of Compound 225



215

**68**

-continued



225

Compound 225 is prepared analogously to the procedure of U.S. Pat. No. 5,049,673 and U.S. Application No. 2002/0164616, each hereby incorporated by reference. Compound 215 is dissolved in DMF at room temperature. To the solution 10% palladium on carbon is added. The reaction mixture is hydrogenated at 40-45 psi for 3-4 h. The reaction mixture is filtered through diatomaceous earth to remove the catalyst that is washed with DMF. The combined DMF solution is poured into water. The formed solid is collected by filtration, and washed with water. The dried solid is purified on a silica gel column using a gradient of chloroform/ethyl acetate to give an off-white solid.

Example 4

Preparation of Compound 235



225



235

Compound 235 is prepared analogously to the procedure of U.S. Pat. No. 5,049,673. Compound 225 (25 g) is dissolved in DMF at room temperature. To the reaction mixture (iPr)$_2$NEt (100 mL) is added with stirring, and then methyl bromoac-

US 8,779,165 B2

69

70

etate (50 mL) is added with stirring. The reaction mixture is heated at 70-90° C. for 24-36 h. The concentrated DMF solution is poured into water. The formed solid is collected by filtration, and washed with water. The dried solid is purified on a silica gel column using a gradient of chloroform/ethyl acetate to give an off-white solid.

Example 5

Preparation of Compound 245



235

-continued



245

Compound 245 is prepared analogously to the procedure of U.S. Application No. 2002/0164616. DMF (50 mL) is cooled ice in water bath. To the DMF is added POCl₃ dropwise. The resulted solution is stirred at room temperature for 1-2 h, and cooled to 5-10° C. To the POCl₃/DMF mixture is dropwise added a solution of compound 235 (10 g) in DMF (100 mL) over 40-45 min. The reaction mixture is heated at 40-45° C. for 12-24 h. The resulted mixture is cooled to room temperature, and concentrated in vacuo, and poured into ice/water. The suspension is filtered to collect the solid that is washed with water. The dried solid is purified on a silica gel column to give of off-white solid using a gradient of chloroform/ethyl acetate.

Example 6

Preparation of Compound 252



245



252

US 8,779,165 B2

**71**

Compound 252 is prepared analogously to the procedures of U.S. Application No. 2002/0164616; K. R. Gee, Z. L. Zhou, W. J. Qian, R. Kennedy, J. Am. Chem. Soc. 2002, 124, 776; V. V. Martin, A. Rothe, Z. Diwu and K. Gee, Bioorg. Med. Chem. Lett. 2004, 14, 5313; and J. P. Bacci, A. M. Kearney and D. L. Van Vranken, J. Org. Chem. 2005, 70, 9051). The mixture of aldehyde 245 (2 g) and 4-chlororesorcinol (1.5 g) in $MeSO_3H$ (30 mL) is stirred overnight, and then poured into NaOAc solution. The precipitated solid is filtered, washed with water and dried to give the dihydro form of Compound 252 that is directly used in the next step without additional purification. The mixture of the crude dihydro form of Compound 252 and chloranil in MeOH is heated at reflux for 12 to 24 h, then cooled to room temperature, filtered (to remove excess oxidizer), and evaporated. The residue is concentrated and purified on a silica gel column using a gradient of chloroform/methanol.

Example 7

Preparation of Compound 256



252

LiOH / MeOH



256

**72**

Compound 252 (100 mg) is suspended in 1:1 methanol/water (10 mL). To the suspension LiOH (150 mg) is added slowly while cooled in ice/water bath, and stirred at room temperature for 12-24 h. The reaction mixture is diluted with water (200 mL), and neutralized with concentrated HCl (2-3 mL). The mixture is filtered to collect the precipitate. The solid is redissolved in methanol, and further purified by HPLC to give Compound 256.

Example 8

Preparation of Compound 258



BrCH2OAc / iPr2NEt

256



258

Compound 256 (50 mg) is dissolved in anhydrous DMF (3 mL) at room temperature. To the solution $BrCH_2OAc$ (70 µL) in anhydrous DMF (2 mL) is slowly added while stirring in a water bath. To the resulted mixture $iPr_2Net$ (130 µL) is added slowly. The resulted mixture is stirred for 24-36 h. The reaction mixture is poured into ice/water. The suspension is filtered to collect the solid that is washed with water. The dried solid is purified on a silica gel column to give an off-white solid using a gradient of chloroform/ethyl acetate.

US 8,779,165 B2

**73**

Example 9

Preparation of Compound 265

**74**

Example 10

Preparation of Compound 268



260

265

265

268

Compound 265 is prepared analogously to the procedure of U.S. Pat. No. 5,049,673. Compound 260 (10 g, prepared analogous to the procedure of Compound 235), 1,8-bis(dimethylamino)naphthalene (30 g), anhydrous sodium iodide (2 g), tert-butyl bromoacetate (50 g) and DMF (100 mL) is stirred with heating at 70-90° C. for 18 hours. The concentrated DMF solution is poured into water. The formed solid is collected by filtration, and washed with water. The dried solid is purified on a silica gel column to give an off-white solid.

Compound 268 is prepared analogously to the procedure of U.S. Pat. No. 5,049,673. Compound 265 (10 g) is dissolved in dichloromethane (100 mL) and cooled to −78° C. Pyridine (0.2 mL) is added and the mixture is stirred while bromine (3 g) in dichloromethane (20 mL) is added. The mixture is allowed to warm up to room temperature and then evaporated in vacuo. The residue is purified on a silica gel column using a gradient of chloroform/ethyl acetate to give an off-white solid.

Example 11

Preparation of Compound 275



268

268

271

US 8,779,165 B2

75                                                              76

-continued



272



275

Compound 275 is prepared analogously to the procedure of U.S. Pat. No. 5,049,673. Compound 268 (150 mg) is dissolved in 2-methyl-tetrahydrofuran (5 mL) and stirred at −150° C. in a liquid nitrogen-isopentane bath. Tertiary butyl-lithium (6 equivalents) in hexane is added and the metallation monitored by thin layer chromatography of small samples quenched into water. Compound 271 (100 mg, see Parham, W. E., and Bradscher, C. K., Acc. Chem. Res., 1982, 15, 300; U.S. Pat. No. 5,049,673), dissolved in tetrahydrofuran, is added dropwise to the reaction mixture. Stirring is continued for another 30 minutes. The reaction mixture is quenched with water in tetrahydrofuran and then allowed to warm up to room temperature, and extracted twice with ethyl acetate. The combined organic extracts are washed with brine and evaporated to dryness. The residue is then stirred with acetic acid to convert all the leuco-base into the desired dye. Evaporation of the acetic acid in vacuo leaves a gummy residue which is purified by column chromatography on silica gel using a gradient of chloroform/ethyl acetate/methanol to give pure Compound 272.

Compound 272 (10 mg) is dissolved in acetic acid (1 mL) and BF₃ etherate (0.1 mL) is added. The resulting solution is stirred at room temperature overnight. The solution is then evaporated in vacuo. The crude product is further purified by HPLC.

Example 12

Preparation of Compound 280

Compound 280 is prepared analogously to the procedure of Compound 256.



280

Example 13

Preparation of Compound 282

Compound 282 is prepared analogously to the procedure of Compound 256.



282

US 8,779,165 B2

**77**                                                      **78**

Example 14

Preparation of Compound 284

US 8,779,165 B2

79                                                                                    80

-continued



284G

Compound 284A (20 g, Shaanxi Zhendi Chemical Biology, Ltd.) is converted to Compound 284C (22 g) analogously to the protocol of Compound 215.

Compound 284C (12 g) is dissolved in ethanol. To the ethanol solution is added 23 g stannous chloride hydrate. The reaction mixture is heated at reflux until Compound 284C is completely consumed, cooled to room temperature, and poured into ice water. The reaction mixture is neutralized with sodium carbonate to have pH=6-7, and filtered to collect the solid that is further purified on a silica gel column eluted with a gradient of chloroform/methanol to give pure Compound 284D.

Compound 284D (10 g) is converted to Compound 284E analogously according to the protocol of Compound 235.

Compound 284E is dissolved in DMF at room temperature. To the solution palladium on carbon is added. The reaction mixture is hydrogenated until Compound 284E is completely consumed. The reaction mixture is filtered through diatomaceous earth to remove the catalyst which is washed with DMF. The combined DMF solution is poured into water. The formed solid is collected by filtration, and washed with water. The dried solid is purified on a silica gel column using a gradient of chloroform/ethyl acetate to give Compound 284F as an off-white solid.

Phthalic acid 284F (6 g) is added to the solution of resorcinol (3 g) in methanesulfonic acid (10 mL). The resulting mixture is heated under dry nitrogen at 70-80° C. until Compound 284F is completely consumed. The cooled mixture is poured into ice water followed by filtration. The filtrate containing Compound 284 and its isomer 284G is dried, and purified on a silica gel column eluted with a gradient of water/acetonitrile to give the mixture of Compound 284 and its isomer 284G. The mixture of Compounds 284 and 284G is further purified by HPLC using C18 column and a gradient of 1% TFA acetonitrile-1% TFA buffer to give the pure Compound 284.

Example 15

Preparation of Compound 286

Compound 286 is prepared analogously to the procedure of Compound 284 or FIG. 2.

286



Example 16

Preparation of Compound 288

Compound 288 is prepared analogously to the procedure of Compound 256.

288

US 8,779,165 B2

**81**                                     **82**

### Example 17

Preparation of Compound 290

Compound 290 is prepared analogously to the procedure of Compound 256.



290

294

### Example 18

Preparation of Compound 292

Compound 292 is prepared analogously to the procedure of Compound 256 or 275.

### Example 20

Preparation of Compound 296

Compound 296 is prepared analogously to the procedure of Compound 258.



292

296

### Example 19

Preparation of Compound 294

Compound 294 is prepared analogously to the procedure of Compound 258.

### Example 21

Preparation of Compound 298

Compound 298 is prepared analogously to the procedure of Compound 258.

US 8,779,165 B2

**83**                                                    **84**

298



302

Example 22

Preparation of Compound 300

Compound 300 is prepared from the reaction of Compound 286 with acetic anhydride analogously to the procedure of U.S. Pat. No. 6,162,931.

Example 24

Preparation of Compound 304

Compound 304 is prepared analogously to the procedure of Compound 258 by using a large excess of bromomethylacetate and base.

300

Example 23

Preparation of Compound 302

Compound 302 is prepared analogously to the procedure of Compound 258.

304

US 8,779,165 B2

**85**

Example 25

Preparation of Compound 306



284



$\xrightarrow{\text{BrCH}_2\text{OAc}}{(\text{iPr})_2\text{NEt/DMF}}$

306B



306

Compound 284 (350 mg) is heated at 80° C. with Ac$_2$O (5 mL) and pyridine (0.1 mL) until Compound 284 is completely consumed (10 to 30 min). The solution is cooled to room temperature. The reaction mixture is poured into ice water, and carefully adjusted to pH=4-5. The aqueous mixture is titrated with dioxane to give a precipitate that is collected by filtration. The resulting mixture is first air-dried, and further vacuum-dried in a desiccator with P$_2$O$_5$ for 12 h to yield crude Compound 306 B that is directly used for next step reaction.

The crude Compound 306B is converted into Compound 306 analogously to the procedure of Compound 258.

**86**

Example 26

Preparation of Compound 308

Compound 308 is prepared analogous to the procedure of Compound 275.

308



Example 27

Preparation of Compound 310

Compound 310 is prepared analogous to the procedure of Compound 275.

310



Example 28

Spectral Properties of the Fluorescent Indicators

The absorbance and fluorescence properties of a representative indicator in the presence and absence of Ca$^{2+}$ are shown in FIGS. **13** and **14**, using Compound 284. The calcium binding has little effect on the absorption spectra, as shown in FIG. **13**. However, the indicator compounds of the present invention demonstrate fluorescence that is strongly enhanced by Ca$^{2+}$ binding, as shown in FIG. **14**. Additionally, Ca$^{2+}$ binding has little effect on the wavelengths of peak excitation or emission. Specifically, 200 μL of 5 μM of compound 284 in 100 mM KCl with 30 mM Tris buffer in the presence and

**87**

absence of 0.5 mM calcium is measured for absorption spectra using Spectra Max while the fluorescence spectra (excitation at 460 nm) is measured with Gemini fluorescence microplate reader. The indicators of the invention demonstrate substantially similar spectral responses to calcium binding.

### Example 29

#### Calcium Responses of the Fluorescent Indicators Measured Using a Fluorescence Microscope

Cells expressing a GPCR of interest that signals through calcium are pre-loaded with a selected indicator that has been functionalized with acetoxy methyl ester groups (or AM esters), such as for example Compounds 258, 294, 296, 298, 302, 304 and 306. Specifically, HEK-293 cells are plated at 50,000 cells per 100 μL per well in DMEM with 5% FBS and 1% L-glutamine in a 96-well black wall/clear bottom Costar plate, incubated in 5% CO$_2$, 37° C. incubator overnight. The Growth medium is removed, and 100 μL/well of 1-8 μM Fluo-3, AM, Fluo-4 AM, Compounds 258, 294, 296, 298, 302, 304, 306 or 365 in Hanks and HEPES buffer (HHBS) is added into the cells, incubated in 5% CO$_2$, 37° C. incubator for 1 hr. The cells are washed with 200 μL HHBS buffer twice, and then replaced with 100 μL HHBS. Images are taken using fluorescence microscope (Olympus, IX 71) with FITC filter at 20 ms exposure time. The indicators of the invention remain substantially photostable and permit fluorescence imaging of the cells.

Representative fluorescence images for the indicators Fluo-3 AM (where R$^2$ and R$^5$ are chloro) and Fluo-4 AM (where R$^2$ and R$^5$ are fluoro) are provided in FIGS. **15** and **16**, respectively. The fluorescence image for cells loaded with Compound 365 is provided in FIG. **17**. Compound 365 is loaded into cells much faster than either Fluo-3 AM or Fluo-4 AM. In addition, Compound 365 is brighter than both Fluo-4 AM and Fluo-3 AM.

### Example 30

#### Calcium Responses of the Fluorescent Indicators Measured Using a Microplate Reader Equipped with an Automated Liquid Handling System

Calcium flux assays are preferred methods in drug discovery for screening G protein coupled receptors (GPCR). The fluorescent indicators of the invention provide a homogeneous fluorescence-based assay for detecting the intracellular calcium mobilization. Cells expressing a GPCR of interest that signals through calcium are pre-loaded with the indicator AM esters (such as Fluo-3 AM, Fluo-4 AM, Compounds 258, 294, 296, 298, 302, 304, 306 and 365) which can cross cell membrane. Once inside the cell, the lipophilic blocking groups are cleaved by non-specific cell esterase, resulting in a negatively charged fluorescein dye that is well-retained in cells, and its fluorescence is greatly enhanced upon binding to calcium. When the sample cells are stimulated with screening

**88**

compounds, the receptor triggers a release of intracellular calcium, which then greatly increases the fluorescence of the intracellular indicators. The combination of long wavelength fluorescence properties, high sensitivity, and often a >100 times increase in fluorescence upon binding with calcium make the disclosed indicators well-suited for measurement of cellular calcium.

Specifically, CHO cells stably transfected with muscarinic receptor 1 are plated at 60,000 cells per 100 μl per well in F12 with 5% FBS and 1% L-glutamine in a 96-well black wall/clear bottom Costar plate, incubated in 5% CO$_2$, 37° C. incubator overnight. The growth medium is removed and the cells are incubated with 100 μL/well of 1-8 μM Fluo-3 AM, Fluo-4 AM, and one of Compounds 258, 294, 296, 298, 302, 304, 306 or 365 in Hanks and HEPES buffer with 2.5 mM probenecid for 1 hour at room temperature. Carbachol (50 μl/well) is added by NOVOstar (BMG LabTech) or FLIPR (Molecular Devices) to achieve the final desired concentration. A representative comparison is shown in FIG. **18**.

Compound 365 (in which substituents R$^1$, R$^2$, R$^5$ and R$^6$ are all hydrogen) is loaded into cells much faster than Fluo-3, AM (in which R$^2$ and R$^5$ are chloro) and Fluo-4 AM (in which R$^2$ and R$^5$ are fluoro). In addition, Compound 365 (Curve A) demonstrates 2 times the fluorescence intensity of Fluo-4 AM (Curve B) and 4 times the fluorescence intensity of Fluo-3 AM (Curve C).

Although the present invention has been shown and described with reference to the foregoing operational principles and preferred embodiments, it will be apparent to those skilled in the art that various changes in form and detail may be made without departing from the spirit and scope of the invention. The present invention is intended to embrace all such alternatives, modifications and variances that fall within the scope of the appended claims.

What is claimed is:

**1**. A compound having the formula:



*    *    *    *    *